**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NEW YORK**

---

THOMAS W. MCNAMARA, as the Court-
Appointed Receiver for StratFS, LLC (f/k/a
Strategic Financial Solutions, LLC), et al.,

               Plaintiff,

vs.

ICE LEGAL, P.A., a Florida Profit Corporation,
THOMAS ICE, an individual, and ARIANE ICE,
an individual,

               Defendants.

Case No.
1:25-CV-00275

---

**MEMORANDUM IN SUPPORT OF JOINED RULE 12 MOTIONS:**
**MOTION FOR MORE DEFINITE STATEMENT; MOTIONS TO DISMISS FOR LACK**
**OF PERSONAL JURISDICTION AND INSUFFICIENT PROCESS, ON THE GROUNDS**
**THAT CLAIMS MUST BE ARBITRATED, AND FAILURE TO STATE A CLAIM; AND**
**MOTION TO STRIKE;**

**AND IN THE ALTERNATIVE, MOTION TO STAY THE PROCEEDINGS**

**Lundergan Legal, LLC**
Amanda L. Lundergan, Esq.
Post Office Box 211474
Royal Palm Beach, FL 33421
Direct: (561) 779-4126
Assistant: (561) 629-2643
Email:  amanda@lunderganlegal.com

*Attorney for Defendants,*
*Ice Legal, P.A., Thomas Ice and*
*Ariane Ice*

## TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS.................................................................................................ii

TABLE OF AUTHORITIES ........................................................................................ vi

ABBREVIATIONS ...................................................................................................... xiv

DEFINED TERMS ....................................................................................................... 14

INTRODUCTION ........................................................................................................... 2

I.    The Parties ......................................................................................................... 2

II.   The Receiver's claims........................................................................................ 2

III.  Background ........................................................................................................ 3

      A.   Prior to the engagement at issue, Ice Legal had represented consumer
           clients against a few of the Receiver's Claimants. ................................. 3

      B.   After the settlement, a group of entities involved in the same debt
           settlement business negotiated a retainer agreement with the Ice Firm................. 5

      C.   The Engagement Clients made little use of Ice Legal's availability, but did
           ask Ice Legal to produce a written outline which correctly identified
           regulatory issues................................................................................... 6

MOTION FOR MORE DEFINITE STATEMENT UNDER RULE 12(e)
FED. R. CIV. P. ............................................................................................................... 7

I.    Summary of the Argument.............................................................................. 7

II.   The Receiver's identification of the claimants and payors is so inconsistent
      and unintelligible, Ice Legal cannot reasonably prepare an answer. ........................... 8

      A.   At times, the Receiver claims that 58 different entities paid the Ice Firm's
           retainer or were otherwise harmed by the Ice Firm's engagement (while
           also saying only 17 were Ice Legal clients). ........................................... 8

      B.   At other times, the Receiver alleges that only three (or four) entities paid
           the Ice Firm's retainer or were otherwise harmed by Ice Legal—even
           though most are not Receivership Defendants.................................... 10

      C.   The Receiver's allegations also suggest that only three entities entered into
           the Ice Firm retainer agreement. ......................................................... 11

D.   Potential defenses cannot be pled without knowing what entities are making claims. ................................................................................... 13

III.   The Receiver does not identify the "corporate entities" or "corporate clients" of Ice Legal allegedly harmed by the unnamed "officers and employees" of the Strategic Parties.................................................................................. 15

IV.   Legal Standard: a motion for more definite statement should be granted when a complaint fails to specifically identify the parties to the activities alleged. ........... 17

V.   Conclusion ...................................................................................... 18

MOTION TO DISMISS THE COMPLAINT FOR LACK OF PERSONAL JURISDICTION AND INSUFFICIENT PROCESS UNDER RULES 12(b)(2) AND 12(b)(4) FED. R. CIV. P. .................................................................................... 19

I.   The Court lacks jurisdiction over the Individual Defendants because the Receiver failed to file the notice required by 28 U.S.C. § 754. ................................. 19

II.   The Court lacks jurisdiction over Ice Legal, P.A. because, to the extent its principal place of business is relevant to 28 U.S.C. § 754, that place is also New Hampshire where the Receiver did not file a § 754 notice. .............................. 21

III.   The Court lacks jurisdiction over Ice Legal, P.A. because the Receiver failed to file a new §754 notice after expiration of the Temporary Restraining Order........ 22

IV.   Process cannot issue without compliance with 28 U.S.C. § 754. .............................. 22

V.   Conclusion ...................................................................................... 22

MOTION TO STRIKE UNDER RULE 12(f) FED. R. CIV. P. .................................................... 23

I.   The paragraphs related to the terms of the settlements of the consumer cases should be stricken as immaterial or redacted from the public version of the Complaint.......................................................................................... 23

II.   The paragraphs related to the negotiations of the settlements of the consumer cases and purported "reduced settlements" should be stricken as immaterial and scandalous. ...................................................................................... 23

III.   The allegations made by Ice Legal's consumer clients against the Consumer Case Defendants should be stricken as immaterial and barred by absolute litigation privilege. ...................................................................................... 24

A.   Allegations from complaints filed in actions that were never adjudicated are immaterial under Rule 12(f) Fed. R. Civ. P. ..................................................... 25

      B.   Statements made by attorneys during the course of litigation are absolutely privileged. ................................................................................ 26

IV.   Conclusion .......................................................................................... 26

MOTION TO DISMISS UNDER RULES 12(b)(1), 12(b)(3), 12(b)(6) AND THE FEDERAL ARBITRATION ACT  ON THE GROUNDS THAT THE RECEIVER'S CLAIMS MUST BE ARBITRATED. .......................................................................... 27

I.   The retainer agreement at the center of the Claimants' allegations contains an agreement to arbitrate and an explicit delegation of all issues of arbitrability to the arbitrator. ......................................................................................... 27

II.   The liberal federal policy favoring arbitration ........................................... 28

III.   The case must be dismissed (rather than stayed) because the Receiver is not authorized to bring an arbitration case. ....................................................... 28

IV.   Conclusion .......................................................................................... 30

MOTION TO DISMISS COMPLAINT UNDER RULE 12(b)(6) FED. R. CIV. P. ................... 31

I.   Summary of Argument ........................................................................... 31

II.   Legal standard applicable to all counts: allegations cannot be conclusory or implausible. ......................................................................................... 32

III.   Reasons for dismissal applicable to multiple counts. .................................. 32

      A.   No Unconscionability or "Per Se" Invalidity ....................................... 33

      B.   The professional negligence and malpractice-related counts are duplicative, time-barred, and fail to allege actual, ascertainable damages. .......... 40

IV.   Additional reasons for dismissal applicable to the individual counts. ...................... 52

      A.   Motion to Dismiss Count 3: Rescission of Per Se Invalid Nonrefundable Retainer ............................................................................... 52

      B.   Motion to Dismiss Count 4: Voidable Transfer ..................................... 54

      C.   Motion to Dismiss Count 6: Unjust Enrichment .................................... 59

V.   Conclusion as to all counts ..................................................................... 62

MOTION TO STAY (IN THE ALTERNATIVE) ..................................................... 62

      A.   The appellants' probability of success is enhanced by the *Loper Bright* decision. ............................................................................... 63

B.   Ice Legal will be irreparably harmed without the stay. ........................... 64

C.   The stay will not substantially injure other parties. ............................... 64

D.   Where the public interest lies................................................................... 65

E.   The purpose of a stay is the same as the purpose of the Preliminary
     Injunction and the mandate of the Receiver—to preserve the status quo............. 65

F.   Conclusion ................................................................................................ 66

# TABLE OF AUTHORITIES

## Cases

*Access Point Med., LLC v. Mandell*,
106 A.D.3d 40, 963 N.Y.S.2d 44 (2013) ................................................................. 47

*Agusta & Ross v. Trancamp Contracting Corp.*,
193 Misc. 2d 781, 751 N.Y.S.2d 155 (N.Y. Civ. Ct. 2002) ........................... 4, 7, 38

*All. Bernstein Inv. Research & Mgmt., Inc. v. Schaffran*,
445 F.3d 121 (2d Cir. 2006) ................................................................................ 27

*AmBase Corp. v. Davis Polk & Wardwell*,
8 N.Y.3d 428, 834 N.Y.S.2d 705 (2007) .............................................................. 50

*Arnold v. Devane*,
123 A.D.3d 1202, 998 N.Y.S.2d 509 (N.Y. App. Div. 3d Dept. 2014) ............. 48, 50

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ......................................................................................... 32, 33

*AT&T Mobility LLC v. Concepcion*,
563 U.S. 3339 (2011) ........................................................................................... 28

*Atkins & O'Brien LLP. v. ISS Int'l Serv. Sys., Inc.*,
252 A.D.2d 446, 678 N.Y.S.2d 596 (1998) .......................................................... 34

*Barrett v. Goldstein*,
161 A.D.3d 472, 76 N.Y.S.3d 148 (N.Y. App. Div. 1st Dept. 2018) ................ 40, 42

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ..................................................................................... passim

*Boone v. Bender*,
904 N.Y.S.2d 467 (N.Y. App. Div. 2d Dept. 2010) .............................................. 48

*Borey v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pennsylvania*,
934 F.2d 30 (2d Cir. 1991) .................................................................................. 64

*Capstone Enterprises of Port Chester, Inc. v. Cnty. of Westchester*,
62 A.D.2d 343, 691 N.Y.S.2d 574 (N.Y. App. Div. 2d Dept. 1999) ...................... 47

*Clark-Fitzpatrick, Inc. v. Long Island R. Co.*,
70 N.Y.2d 382, 516 N.E.2d 190 (N.Y. 1987) ....................................................... 61

*Clayton v. City of Middletown*,
237 F.R.D. 538 (D. Conn. 2006) .......................................................................... 18

*Cobalt Multifamily Invs. I, LLC v. Arden*,
    46 F. Supp. 3d 357 (S.D.N.Y. 2014) ........................................................ 55

*Contec Corp. v. Remote Sol., Co., Ltd.*,
    398 F.3d 205 (2d Cir. 2005) .................................................................... 27

*Corcoran v. Yorty*,
    347 F.2d 222 (9th Cir. 1965) ................................................................... 18

*Corsello v. Verizon New York, Inc.*,
    18 N.Y.3d 777, 967 N.E.2d 1177 (N.Y. 2012) .......................................... 41, 45, 61

*Daniel v. Safir*,
    135 F.Supp.2d 367 (E.D.N.Y. 2001) ........................................................ 37

*Daniels v. Lebit*,
    299 A.D.2d 310, 749 N.Y.S.2d 149 (N.Y. App. Div. 2d Dept. 2002) .................... 42

*Danielson v. Local 275, Laborers Intern. Union of N.A.*,
    479 F.2d 1033 (2d Cir. 1973) .................................................................. 66

*Denisco v. Uysal*,
    195 A.D.3d 989, 146 N.Y.S.3d 813 (N.Y. App. Div. 2d Dept. 2021) .................... 50

*E. T. C. Corp. v. Title Guarantee & Tr. Co.*,
    2 N.E.2d 284 (N.Y. 1936) ........................................................................ 52

*Eberhard v. Marcu*,
    530 F.3d 122 (2d Cir. 2008) .................................................................... 55

*Ellsworth v. Foley*,
    24 A.D. 3d 1239, 805 N.Y.S. 2d 899 (N.Y. App. Div 4th Dept. 2005) .................. 48

*Empire Outlet Builders LLC v. Constr. Resources Corp. of New York*,
    97 N.Y.S.3d 68 (N.Y. App. Div. 1st Dept. 2019) ........................................ 53

*Ferguson v. Lion Holding, Inc.*,
    312 F.Supp.2d 484 (S.D.N.Y. 2004) ........................................................ 36

*Ferrari v. Cnty. of Suffolk*,
    790 F. Supp. 2d 34 (E.D.N.Y. 2011) ........................................................ 14

*Footbridge Ltd.* v. *Countrywide Home Loans, Inc.*,
    No. 09 Civ. 4050, 2010 WL 3790810 (S.D.N.Y. Sept. 28, 2010) .................... 25

*Gendot Associates, Inc. v. Kaufold*,
    866 N.Y.S.2d 361 (N.Y. App. Div. 2d Dept. 2008) ...................................... 36

*Glamm v. Allen*,
   57 N.Y.2d 87, 439 N.E.2d 390 (N.Y. 1982) ........................................................ 46

*Greene v. Clean Rite Centers, LLC*,
   714 F. Supp. 3d 134 (E.D.N.Y. 2024) .............................................................. 61

*Gurvey v. Cowan, Liebowitz & Latman, P.C.*,
   No. 06 CIV. 1202 (LGS), 2017 WL 2880554 (S.D.N.Y. July 6, 2017),
   aff'd, 757 F. App'x 62 (2d Cir. 2018) ............................................................. 45

*Haile v. Henderson Nat'l Bank*,
   657 F.2d 816 (6th Cir. 1981) ......................................................................... 19

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
   586 U.S. 638 (2019) ...................................................................................... 27

*Hertz Corp. v. Friend*,
   559 U.S. 77 (2010) ........................................................................................ 21

*In re Lawrence*,
   24 N.Y.3d 320, 23 N.E.3d 965 (N.Y. 2014) .......................................... 33, 34, 46

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*,
   218 F.R.D. 76 (S.D.N.Y. 2003) ...................................................................... 25

*In re World Trade Ctr. Disaster Site Litig.*,
   503 F.3d 167 (2d Cir. 2007) .......................................................................... 62

*Ingrami v. Rovner*,
   847 N.Y.S.2d 132 (N.Y. App. Div. 2d Dept. 2007) ........................................ 47

*Jones v. De Ronde*,
   255 N.Y.S. 505 (N.Y. Sup. Ct. 1932) ............................................................. 36

*Jones v. J.C. Penney's Dep't Stores, Inc.*,
   No. 03-CV-0920A(F), 2005 WL 1313442 (W.D.N.Y. May 31, 2005),
   *report and recommendation adopted sub nom. Jones v. J.C. Penney Corp.*,
   No. 03-CV-920, 2006 WL 8455728 (W.D.N.Y. Mar. 31, 2006) ....................... 37

*Jud. Watch, Inc. v. U.S. Dep't of Com.*,
   224 F.R.D. 261 (D.D.C. 2004) ....................................................................... 24

*Kantor v. Bernstein*,
   225 A.D.2d 500, 640 N.Y.S.2d 40 (1996) ....................................................... 37

*Kelly v. MD Buyline, Inc.*,
   2 F. Supp. 2d 420 (S.D.N.Y. 1998) .......................................................... 38, 39

*Kent v. Quicksilver Mining Co.*,
  78 N.Y. 159 (1879) ............................................................................ 36

*Kidder, Peabody & Co. v. Maxus Energy Corp.*,
  925 F.2d 556 (2d Cir. 1991) ............................................................... 65

*Kindred Nursing Centers Ltd. P'Ship v. Clark*,
  581 U.S. 246 (2017) ........................................................................... 28

*King v. Fox*,
  7 N.Y.3d 181, 851 N.E.2d 1184 (N.Y. 2006) ............................... 33, 36

*Kliger-Weiss Infosystems, Inc. v. Ruskin Moscou Faltischek, P.C.*,
  159 A.D.3d 683, 73 N.Y.S.3d 205 (N.Y. App. Div. 2d Dept. 2018) ..... 40

*Landis v. N. Am. Co.*,
  299 U.S. 248 (1936) ........................................................................... 62

*Lank v. New York Stock Exch.*,
  548 F.2d 61 (2d Cir.1977) ................................................................. 55

*Lia v. Saporito*,
  541 Fed. Appx. 71 (2d Cir. 2013) ...................................................... 47

*Lipsky* v. *Commonwealth United Corp.*,
  551 F.2d 887 (2d Cir. 1976) .............................................................. 25

*Loper Bright Enterprises v. Raimondo*,
  603 U.S. 369 (2024) ...................................................................... 63, 64

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ........................................................................... 30

*Marcum LLP v. L'Abbate, Balkan, Colavita & Contini, L.L.P.*,
  222 A.D.3d 486, 202 N.Y.S.3d 73 (N.Y. App. Div. 1st Dept. 2023) ..... 42

*McCoy v. Feinman*,
  99 N.Y.2d 295, 785 N.E.2d 714 (N.Y. 2002) ................................... 46

*McNamara v. Voltage Pay Inc.*,
  No. 2:15-cv-02177-JAD-GWF, 2017 WL 3709057 (D. Nev. Aug. 28, 2017) ......... 8

*Mecca v. Shang*,
  258 A.D.2d 569, 685 N.Y.S.2d 458 (N.Y. App. Div. 2d Dept. 1999) ..... 42

*Meineke Discount Muffler Shops, Inc. v. Noto*,
  603 F. Supp. 443 (E.D.N.Y. 1985) .................................................... 66

ix

*Miszko v. Leeds & Morelli*,
    769 N.Y.S.2d 923 (N.Y. App. Div. 3d Dept. 2004) .............................................. 44

*Mohammed v. Reno*,
    309 F.3d 95 (2d Cir. 2002) ................................................................................. 63

*Nespresso USA, Inc. v. Ethical Coffee Co. SA*,
    263 F. Supp. 3d 498 (D. Del. 2017).................................................................... 21

*Nevijel v. North Coast Life Ins. Co.*,
    651 F.2d 671 (9th Cir. 1981) .............................................................................. 18

*New York Tel. Co. v. Jamestown Tel. Corp.*,
    26 N.E.2d 295 (N.Y. 1940)................................................................................. 47

*Nken v. Holder*,
    556 U.S. 418 (2009)............................................................................................ 63

*Noskov v. Roth*,
    No. 19-CV-7431 (RA), 2020 WL 4041125 (S.D.N.Y. July 17, 2020)................... 47

*Ocean Ships. Inc. v. Stiles*,
    315 F.3d 111 (2d Cir. 2002) ............................................................................... 48

*Offshore Express, Inc. v. Milbank, Tweed, Hadley & McCloy, LLP*,
    291 F. App'x 358 (2d Cir. 2008) ......................................................................... 46

*Perks v. Lauto & Garabedian*,
    306 A.D.2d 261, 760 N.Y.S.2d 231 (N.Y. App. Div. 2d Dept. 2003)................... 51

*Perry v. Thomas*,
    482 U.S. 483 (1987)............................................................................................ 28

*Pigford v. Veneman*,
    215 F.R.D. 2 (D.D.C. 2003)................................................................................ 24

*Rodriguez v. Chex Sys., Inc.*,
    730 F. Supp. 3d 36 (W.D.N.Y. 2024)............................................................... 8, 18

*RSM Prod. Corp. v. Fridman*,
    643 F. Supp. 2d 382 (S.D.N.Y. 2009) ................................................................ 25

*Rudman v. Cowles Commun., Inc.*,
    280 N.E.2d 867 (N.Y. 1972)........................................................................... 52, 53

*S.E.C. v. Bilzerian*,
    378 F.3d 1100 (D.C. Cir. 2004) .......................................................................... 19

*S.E.C. v. Vision Communications, Inc.*,
74 F.3d 287 (D.C. Cir. 1996) ................................................................... 20

*Safeco Ins. Co. of Am. v. M.E.S., Inc.*,
No. 09-CV-3312 (ARR) (ALC), 2010 WL 5437208 (E.D.N.Y. Dec. 17, 2010) ................... 65

*Schildiner v. Toscano*,
No. A-2507-16T1, 2018 WL 4904726 (N.J. Super. App. Div. Oct. 10, 2018) ...................... 34

*Scholes v. Lehmann*,
56 F.3d 750 (7th Cir. 1995) ...................................................................... 55

*Sierra Club v. U.S. Army Corps of Engineers*,
732 F.2d 253 (2d Cir. 1984) ...................................................................... 66

*Simms v. Seaman*,
308 Conn. 523, 69 A.3d 880 (2013) ........................................................... 26

*Smith v. Spizzirri*,
601 U.S. 472 (2024) ............................................................................. 30

*Sutherland v. Ernst & Young LLP*,
856 F. Supp. 2d 638 (S.D.N.Y. 2012) ........................................................ 65

*T.D.S. Inc. v. Shelby Mut. Ins. Co.*,
760 F.2d 1520 (11th Cir. 1985) ........................................................... 17, 18

*Ulico Cas. Co. v. Wilson, Elser, Moskowitz, Edelman & Dicker*,
56 A.D.3d 1, 865 N.Y.S.2d 14 (N.Y. App. Div. 1st Dept. 2008 ............................. 48

*United States v. Am. Express Co.*,
No. 10CV4496NGGRER, 2015 WL 13735045 (E.D.N.Y. May 19, 2015) ..................... 65

*United States v. Guerreiro*,
675 F.Supp. 1430 (S.D.N.Y.1987) ........................................................... 37

*Van Dyke Ford, Inc. v. Ford Motor Co.*,
399 F. Supp. 277 (E.D. Wis. 1975) ........................................................... 17

*Vibe Micro, Inc. v. Shabanets*,
878 F.3d 1291 (11th Cir. 2018) ............................................................... 17

*Weil, Gotshal & Manges, LLP v. Fashion Boutique of Short Hills. Inc.*,
10 A.D. 3d 267, 780 N.Y.S. 2d 593 (N.Y. App. Div. 1st Dept. 2004) .................... 48

*Weiland v. Palm Beach Cnty. Sheriff's Off.*,
792 F.3d 1313 (11th Cir. 2015) ........................................................... 17, 18

*Weintraub v. Phillips, Nizer, Benjamin, Krim, & Ballon*,
   172 A.D.2d 254, 568 N.Y.S.2d 84 (1991) ............................................................ 37

*Wiand v. ATC Brokers Ltd.*,
   96 F.4th 1303 (11th Cir. 2024) ........................................................................ 55

*Wiener v. Weintraub*,
   22 N.Y.2d 330, 239 N.E.2d 540 (1968) .............................................................. 26

*Williamson ex rel. Lipper Convertibles, L.P. v. PricewaterhouseCoopers LLP*,
   9 N.Y.3d 1, 872 N.E.2d 842 (2007) .................................................................. 45

## Statutes and Regulations

15 U.S.C. § 6101 *et seq.* (Telemarketing and Consumer Fraud and
   Abuse Prevention Act) ...................................................................................... 63

16 C.F.R. § 310 ........................................................................................... xiv, 6

16 C.F.R. § 310.6(b)(3) .......................................................................................... 6

28 U.S.C. § 1367(a) .............................................................................................. 2

28 U.S.C. § 1367(c)(2) ........................................................................................... 2

28 U.S.C. § 1692 ............................................................................. 19, 20, 21, 22

28 U.S.C. § 754 ................................................................................ 19, 20, 21, 22

9 U.S.C. § 2 ....................................................................................................... 28

9 U.S.C. §1-16 .......................................................................................... 28, 30

N.Y. C.P.L.R. § 214(6) ...................................................................................... 45

N.Y. Debt. & Cred. Law § 273(a)(2)(i) .............................................................. 57

N.Y. Debt. & Cred. Law § 273(a)(2)(ii) ............................................................. 57

N.Y. Debt. & Cred. Law § 278(b) ...................................................................... 58

N.Y. Debt. & Cred. Law § 279 .......................................................................... 15

N.Y. Debt. & Cred. Law §§ 270, *et seq.* (Uniform Voidable Transactions Act) ...... xiv, 54, 55, 56

## Rules

Rule 1.16(e) of the New York Code of Professional Conduct ................................... 38

Rule 1.2(b) (2013) ABA Model Rules of Professional Conduct ............................... 26

Rule 1.5 of the New York Code of Professional Conduct ................................................ 37

Rule 12 Fed. R. Civ. P. ................................................................................................ 62

Rule 12(b)(1) Fed. R. Civ. P. ................................................................................... 27, 30

Rule 12(b)(2) Fed. R. Civ. P. ................................................................................... 19, 22

Rule 12(b)(3) Fed. R. Civ. P. ................................................................................... 27, 30

Rule 12(b)(4) Fed. R. Civ. P. ................................................................................... 19, 22

Rule 12(b)(6) Fed. R. Civ. P. .................................................................................. passim

Rule 12(e) Fed. R. Civ. P. ............................................................................................. 7, 8

Rule 12(f) Fed. R. Civ. P. ........................................................................................ passim

Rule 7.1(a)(1) Fed. R. Civ. P. ....................................................................................... 10

Rule 8 Fed. R. Civ. P. ................................................................................................... 18

Rule 8(a)(2) Fed. R. Civ. P. ..................................................................................... 17, 18

**Treatises**

Restatement (Third) of the Law Governing Lawyers (2000) § 34 cmt. c ...................... 34

Restatement (Third) of the Law Governing Lawyers (2000), § 34 cmt. e ............... 34, 35

**Other Authorities**

Canon 3C(1)(c) of the Code of Conduct for United States Judges ............................... 10

Elizabeth Wolford, *Legal Malpractice Plaintiffs Face Tough Road*,
    THE DAILY RECORD, TRIALS & TRIBULATIONS, October 1, 2009 ...................... 43, 48

New Hampshire Rules of Professional Conduct, Ethics Committee
    Comment to Rule 1.15 ........................................................................................... 37

Preamble & Scope of the Model Rules of Professional Conduct [20] ......................... 38

Rule 7.1 Fed. R. Civ. P. Committee Notes on Rules—2002 ....................................... 10

The Preamble (Scope) of the New York Code of Professional Conduct [12] ............. 37

**ABBREVIATIONS**

| | |
|---|---|
| ¶___ | Paragraph of the Complaint |
| CFPB | Consumer Financial Protection Bureau |
| NY-UVTA | New York Uniform Voidable Transfer Act (N.Y. Debt. & Cred. Law §§ 270, *et seq.*) |
| TSR | Telemarketing Sales Rule (16 C.F.R. § 310) |

**DEFINED TERMS**

| | |
|---|---|
| Individual Defendants | Thomas Ice and Ariane Ice |
| Ice Legal | Ice Legal, P.A. and the Individual Defendants |
| Consumer Case Defendants | Defendants in the cases brought by Ice Legal on behalf of consumers |
| CFPB case | *Consumer Financial Protection Bureau, et al. v. StratFS, LLC (f/k/a Strategic Financial Solutions, LLC), et al.*, 1:24-cv-00040-EAW-MJR (W.D.N.Y.) |
| CFPB Defendants | Defendants in the CFPB case |
| Receivership Defendants | As defined by the Preliminary Injunction in the CFPB case |
| Claimants or Receiver's Claimants | The entities in the receivership estate of the CFPB case who are bringing claims in this case |

# INTRODUCTION

## I.    The Parties

This case arises from an attorney retainer agreement between Ice Legal, P.A. (the "Ice Firm"). and over one hundred clients ("Engagement Clients"), most of whom were other law firms and attorneys (*see*, the contract attached as Exhibit A to the Complaint, the "Engagement Agreement").

The Plaintiff is Thomas McNamara appointed as the Receiver in a civil action brought by the CFPB and certain state Attorneys General[1] against a group of about 58 entities (the "CFPB Defendants"), less than a third of whom were also Ice Legal's clients under the retainer agreement.  In this case, the Receiver—on behalf of an unspecified number of defendants in the CFPB case ("Receiver's Claimants" or "Claimants")—brings six state law claims[2] against Ice Legal and its two attorneys, Thomas Ice and Ariane Ice (the "Individual Defendants," or together with Ice Legal, P.A., "Ice Legal").

## II.    The Receiver's claims

The principal thrust of the Complaint is a legal malpractice action which the Receiver has pled under various, but duplicative, legal theories.  This case is unusual in that the Receiver is not claiming that Ice Legal participated in any wrongdoing of the CFPB Defendants.  Nor does

---

[1] *Consumer Financial Protection Bureau, et al. v. StratFS, LLC (f/k/a Strategic Financial Solutions, LLC), et al.*, 1:24-cv-00040-EAW-MJR (W.D.N.Y.) (the "CFPB case").

[2] These six claims are not "so related to claims in the [CFPB] action…that they form part of the same case or controversy…" in order to vest this Court with supplemental jurisdiction under 28 U.S.C. § 1367(a).  Moreover, the state law claims substantially predominate over the claims made in the CFPB action, such that the Court may decline to exercise supplemental jurisdiction under 28 U.S.C. § 1367(c)(2). This question of subject matter jurisdiction will be the subject of a separate motion.

he claim that Ice Legal's advice was wrong or caused the Receiver's Claimants to violate state and federal laws. <u>Instead, the Receiver is claiming that Ice Legal's advice was absolutely correct yet somehow not "sufficient" to make their clients stop violating some unspecified state and federal laws and regulations</u> (*see e.g.*, ¶168).

The case is also unusual in that a receiver is suing on a contract where the companies in the receivership estate are a minority subset of the parties to the contract. It is far more unusual that a receiver would allow that fact to be obscured by his pleadings (*see*, ¶19 [stating that Ice Legal's "arrangement" was with seventeen Receivership Defendants], ¶¶43-52 [stating that the negotiations and the ultimate agreement were between Ice Legal and the three "Strategic Parties"— a group which he incorrectly alleges is entirely composed of Receivership Defendants]). This pattern of inaccuracies obfuscates the fact that the Receiver seeks as damages <u>all</u> the money paid to the Ice Firm regardless of whether all or part of that money was provided by, or on behalf of, entities outside the receivership estate.

## III.    Background

### A. Prior to the engagement at issue, Ice Legal had represented consumer clients against a few of the Receiver's Claimants.

The Receiver opens his Complaint with a three-page story about Ice Legal's previous representation of consumer clients in a series of lawsuits and class actions against a group of companies and individuals in a joint business endeavor to provide debt settlement services to consumers ("Consumer Case Defendants") (¶¶20-23 and subparagraphs). This is the same debt settlement business that is the subject of the CFPB case, but only a few of the Consumer Case

Defendants are also defendants in that case.  After extensive litigation, the Ice Legal clients and the Consumer Case Defendants reached confidential[3] settlements.

This continuous stream of cases brought by Ice Legal on behalf of consumers against assorted entities in the debt settlement enterprise gave the Receiver's Claimants a powerful incentive to—as the Receiver put it—"buy off Ice Legal so it would stop bringing lawsuits" (¶¶42).  In fact, the Receiver alleges that his Claimants "primarily intended to use this arrangement [i.e. the retainer agreement at issue]" for that purpose (¶58).[4]  (Not that it matters in this case, but this was not Ice Legal's primary reason for agreeing to the retention.  Ice Legal thought, perhaps naively, they would be actively involved in improving their new clients' interactions with consumers).

---

[3] Each of the settlements contained a confidentiality clause of which the following is an example:

> 19.    Confidentiality.  The Parties agree to keep this Agreement confidential and not disclose the contents hereof, particularly the settlement amount and terms, except to the extent required by law (including, but not limited to tax reporting) or court order or to enforce this Agreement or defend any claim made on account of this Agreement.

By revealing the settlement amounts (¶31, see also, ¶¶25 and 37), the Receiver has exposed the receivership estate to liability for breaching contracts with Ice Legal's former consumer clients and for interfering with the contractual rights of all of the Consumer Case Defendants who are not part of the receivership estate.  This settlement and others are available to be filed under seal if the Receiver denies the confidentiality term.  Moreover, Defendants directed the Receiver's attention to this confidentiality breach in a March 28, 2025 letter (available on request), but the Receiver has declined to redact the amounts or otherwise remedy the problem.

[4] There is nothing improper about this motive. See Agusta & Ross v. Trancamp Contracting Corp., 193 Misc. 2d 781, 785, 751 N.Y.S.2d 155 (N.Y. Civ. Ct. 2002) ("[C]lients often pay [a "general" or "engagement"] retainer as a means of preventing a … sought-after attorney from being retained by the opposing party.").

**B.  After the settlement, a group of entities involved in the same debt
settlement business negotiated a retainer agreement with the Ice Firm.**

After the cases were settled, attorneys representing a group of businesses, law firms, and

attorneys involved in the same debt settlement business invited Ice Legal to a meeting where

they proposed an agreement where their clients

would retain the Ice Firm as consulting counsel

(*see*, ¶38).  Over the course of nearly fourteen

weeks, Ice Legal and the in-house and outside

attorneys for the parties who would become the

Engagement Clients  negotiated the agreement

(¶52).  The Engagement Agreement was then

drafted by counsel for the Engagement Clients. (¶51).



The agreement provided that the Ice Firm would be available for four years to provide

advice—upon request—concerning compliance with consumer protection and debt reduction

laws as well as bar ethics rules and rules of professional conduct, including advice about

regulatory investigations (Engagement Agreement, Attachment B of Exhibit A to the

Complaint).  Given that Ice Legal would be conflicted out of further lawsuits against this debt

settlement group, the agreement provided for a retainer fee of $3,250,000 paid periodically

(roughly quarterly) over the four years (*Id*.).  Most importantly, it expressly provided that the fee

was being paid for Ice Legal's availability and, even if the Engagement Clients requested no

consultations, the Ice Firm would still be entitled to the fee:

> The Fees described herein are a "true" or "classic" retainer that secures the Firm's
> availability for each year during the Term for the maximum number of hours
> described below and are earned upon receipt. There is no requirement that the
> Firm spend the number of hours below during any year or in total…

(Engagement Agreement, p. 10).

**C. The Engagement Clients made little use of Ice Legal's availability, but did ask Ice Legal to produce a written outline which correctly identified regulatory issues.**

As is well-documented in the Complaint, the Engagement Clients made little use of Ice Legal's availability[5] but continued to pay the Ice Firm as agreed.[6]  The Engagement Clients did ask the Ice Firm to prepare what the Receiver calls a "meager April 21, 2021 bullet-point outline." (¶154).  It is perhaps not by accident that the Receiver did not attach that fifteen-page document to the Complaint—despite referencing it fifteen times[7]—because it correctly identified the issues that lay at the heart of the complaint in the CFPB case. (*see*, Memorandum, dated April 19, 2021 ["Ice Legal Memo" or "Memo"] Exhibit 1).  For example, on the issue of compliance with the face-to-face presentation exception to the Telemarketing Sales Rule (16 C.F.R. § 310; "TSR"; face-to-face presentation exception at § 310.6(b)(3)), the outline cautions that, among other things:

> Holding out third-party notaries as attorneys or staff or even "representatives" of the firm may not comply with TSR or bar rules regarding misleading potential clients. (*see* compliance with bar rules).

Ice Legal Memo, p. 7.

Throughout its Memo, the Ice Firm was highly critical of the Claimants' business model (with the proviso that the Clients had not shared any information with Ice Legal about their <u>current</u> business practices, Ice Legal Memo, p. 1).  In any event, in the crowd of consulting attorneys and compliance experts advising the Claimants, the Ice Firm was apparently (and ironically) the lone voice that warned of potential problems.

---

[5] ¶¶4, 6, 19, 89, 92, 93, 170, 183.

[6] ¶¶86, 91, 96, 101, 104, 108, 113, 118, 121, 125, 130.  When Mr. McNamara was appointed as the Receiver in the CFPB case, these retainer payments abruptly stopped although he never sought to terminate the contract according to its terms.

[7] ¶¶78, 81, 82, 83, 87 (2x), 152, 154, 161, 162, 169 (2x), 170, 171, 192.

In the end, the Receiver seeks to reverse his Claimants' well-considered business decision that foresaw—and already reaped—a financial benefit from paying to conflict Ice Legal out of any further representation of litigants adverse to them.  Reversing that decision would be a windfall for the Receiver and a taking from Ice Legal who gave value for the exchange.  As summarized by the court in *Agusta & Ross v. Trancamp Contracting Corp.*, 193 Misc. 2d 781, 785–86, 751 N.Y.S.2d 155 (N.Y. Civ. Ct. 2002):

> The fee paid for availability is "earned when paid" [citations omitted]. The general retainer is not some windfall for the attorney. In signing a general retainer, the lawyer makes two important sacrifices. First, he agrees implicitly to turn down other work opportunities that might  interfere with his ability to perform the retainer-client's legal needs. Second, he gives up the right to be retained by a host of clients whose interests might conflict with those of the retainer-client.

(emphasis added).

Thus, the Receiver's repeated assertion that Ice Legal "did not provide… any value in exchange for millions of dollars" (*e.g.*, ¶76) flatly contradicts his admission that his Claimants' primary purpose for agreeing to the payments was to compensate Ice Legal for giving up the right to be retained by consumers who wanted to sue the Claimants (¶58).

## MOTION FOR MORE DEFINITE STATEMENT UNDER RULE 12(e) FED. R. CIV. P.

### I.    Summary of the Argument

The Receiver's Complaint is self-contradictory on the most rudimentary aspect of any complaint: identification of the parties.  In this instance, the Receiver is staggeringly inconsistent when identifying the companies on whose behalf he is bringing claims.  It is also inconsistent and vague as to which parties he claims actually paid the Ice Firm's retainer—a basic element of all the Receiver's Counts.  And finally, it is contradictory as to what entities were allegedly

harmed by Ice Legal.[8]  These inconsistencies make the Complaint an unintelligible "shotgun"

pleading for which the Receiver should be required to amend to provide a more definite

statement under Rule 12(e) Fed. R. Civ. P. *See*, *Rodriguez v. Chex Sys., Inc.*, 730 F. Supp. 3d 36,

39 (W.D.N.Y. 2024) (this Court granted a motion for more definite statement where pleading did

not comply with Rule 8).

Such fatally vague allegations about the suing parties is not a first for Mr. McNamara.  In

*McNamara v. Voltage Pay Inc.*, No. 2:15-cv-02177-JAD-GWF, 2017 WL 3709057 (D. Nev.

Aug. 28, 2017), the court granted defendant's motion for judgment on the pleadings for, among

other things, McNamara's failure to allege which of the receiver entities paid the defendant's

fees and when the fees were paid. (Order Granting Defendants' Motion on the Pleadings, pp. 5,

6; Exhibit 2).

## II.     The Receiver's identification of the claimants and payors is so inconsistent and unintelligible, Ice Legal cannot reasonably prepare an answer.

### A.  At times, the Receiver claims that 58 different entities paid the Ice Firm's retainer or were otherwise harmed by the Ice Firm's engagement (while also saying only 17 were Ice Legal clients).

The Receiver's 45-page Complaint never explicitly alleges on whose behalf he is

bringing the claims.  Under the section of the Complaint entitled "Parties," the Receiver lists 58

entities he claims are identified as "Receivership Entities" included in the "Receivership

Estate"—terms he alleges are defined in the Preliminary Injunction of March 4, 2024 (¶11).  The

Preliminary Injunction, however, does not define these phrases (even though it uses them).

Instead, it defines the term "Receivership Defendants" (emphasis added).  That term means

---

[8] Even the Defendant, Ice Legal, P.A., is misidentified in the Prayer for Relief as "Ice Legal, LLC."

"Corporate Defendants" and certain "Relief Defendants"—which together total only 37 entities.[9] If the Receiver meant to reference the Preliminary Injunction's "Receivership Defendants" then there are 22 entities on whose behalf the Receiver is apparently asserting claims even though he has not alleged what orders, if any, grant him that authority.

Notably, the Receiver also listed all 58 entities in the caption.  But in the caption of *McNamara v. Monevo Inc*, Case 1:24-cv-00977, WDNY (2024) (oddly alleged to be related to this case), the Receiver listed only a small subset of the Receivership Defendants.  This further suggests that, here, the Receiver means to bring claims on behalf of all 58 entities listed in the "Parties" section of the Complaint.



Additionally, in the Civil Cover Sheet (Dkt. 1-4) where the Receiver identifies the Plaintiffs, he directs the Court to Attachment 1 for a complete listing.  That attachment is merely a copy of the caption of the Complaint showing all 58 entities.

Despite this, Paragraph 18 of the Complaint lists less than a third of these 58—a total of seventeen—as having been clients of the Ice Firm.  While it would seem that these seventeen would constitute the universe of entities through which the Receiver could complain about Ice Legal services or retainer, the Receiver repeatedly alleges that it is the "Receivership Entities" (i.e. all 58) that paid the retainer and were harmed. (*e.g.*: Defendants charged "Receivership

---

[9] Preliminary Injunction, dated March 4, 2024, p 7. *See,* Comparison Table, attached as (Exhibit 3).

Entities $1.625 million in fees" (¶159); Defendants did no legal work for the "Receivership

Entities" (*Id.*); Defendants breached their fiduciary obligations to the "Receivership Entities"

(¶161); Defendants did not sufficiently advise "Receivership Entities" (*Id.*); "Receivership

Entities" made payments to the Defendants (¶202)).[10]

> **B.  At other times, the Receiver alleges that only three (or four) entities paid the Ice Firm's retainer or were otherwise harmed by Ice Legal—even though most are not Receivership Defendants.**

Muddying the waters still further, the Receiver most often uses the term "Strategic

Parties" which the Complaint defines as just three entities: Strategic Financial Solutions, LLC

("Strategic"), Hedgewick Consulting, LLC ("Hedgewick"), and a stranger to the CFPB case,[11]

Lit Def Solutions, LLC ("Lit Def") (¶¶2-3).[12]  At first, the Receiver carves out Hedgewick when

claiming that the "Strategic Parties" are "Receivership Entities" (¶3)—and rightly so, since the

court has never appointed Mr. McNamara as a receiver for that entity.  Yet later, in the Prayer for

Relief, the Receiver alleges that he is the "Court-appointed Receiver for the Strategic Parties,"

which can only be interpreted as the Receiver claiming that Hedgewick and Lit Def. are, in fact,

"Receivership Entities."  Adding to the Receiver's self-contradictions, when he attempts to

---

[10] The Plaintiff's Corporate Disclosure Statement (Dkt. 14) is equally unhelpful for identifying which entities' claims the Receiver is bringing the Complaint.  While it is true that Mr. McNamara is not himself a "corporate party" subject to the disclosure requirement of Rule 7.1(a)(1) Fed. R. Civ. P., the purpose of the Rule is to help the Court make "properly informed disqualification decisions in situations that call for automatic disqualification under Canon 3C(1)(c) [of the Code of Conduct for United States Judges]." Rule 7.1 Fed. R. Civ. P. Committee Notes on Rules—2002.  Failing to disclose the particular entities (and their affiliates, subsidiaries and parent corporations) in whose shoes the Receiver purports to stand in this case does not meet the spirit of the Rule.

[11] *Consumer Financial Protection Bureau, et al. v. StratFS, LLC (f/k/a Strategic Financial Solutions, LLC), et al.*, 1:24-cv-00040-EAW-MJR (W.D.N.Y.) (the "CFPB case").

[12] The Receiver may have intended to name Lit Def <u>Strategies</u>, LLC.

identify certain Ice Legal clients, he twice alleges that an entity named "Hedgewick, LLC" (rather than Hedgewick Consulting, LLC) is, in fact, one of the Receivership Entities (¶¶18-19).

Even though the Receiver initially concedes that at least one of the three "Strategic Parties" is not a "Receivership Entity," in each and every one of the Counts, the Receiver says that these three entities were the payors who were harmed—except of course when he is alleging that all 58 "Receivership Entities" were harmed.  More than a few times, the Receiver expressly alleges that MEC Distribution LLC ("MEC") was also harmed.[13]  But MEC is not a "Receivership Entity" and unlike Hedgewick, is not falsely alleged to be.  This means that, in these paragraphs, three of the four parties alleged to have been harmed by Ice Legal are not even parties for which the Receiver can speak or bring claims.

Worse, most of the paragraphs in the Prayer for Relief specifically ask for damages or equitable remedies on behalf of the "Strategic Parties"—which, again, would include the non-entity Lit Def and the non-Receivership Entity, Hedgewick.[14]

### C.  The Receiver's allegations also suggest that only three entities entered into the Ice Firm retainer agreement.

The Complaint also uses the term "Strategic Parties" to describe the organizations who requested, negotiated for, and contracted for the engagement of the Ice Firm for consultation availability.[15]  The implication that the Ice Firm's retainer agreement was with only three companies contradicts the Receiver's allegation that seventeen "Receivership Entities" were Ice

---

[13] ¶¶83, 84, 162, 168, 169, 171.

[14] Ice Legal pointed out many of the errors discussed in this memorandum to the Receiver in a letter dated March 28, 2025 (available on request), but so far, the Receiver has chosen to stand by his Complaint as drafted.

[15] ¶¶38-53.

Legal clients (¶18).  But it also conflicts with the Engagement Agreement itself (attached as Exhibit A to the Complaint) which identifies "[a]ll law firms, and their current and future members, managers, partners, employees and attorneys…" as Ice Legal clients.  Presumably, the Receiver who, after having been on the job for over fifteen months and charged the estate tens of thousands of dollars to investigate the debt settlement model in the CFPB case is well aware of these law firms—and well aware that their numbers dwarf the seventeen clients he listed in the Complaint.  Indeed, many of those law firms have intervened in the CFPB case.

Nor did the Receiver attach the list of such law firms that is specifically referenced in the Engagement Agreement that he attached as Exhibit A to the Complaint.  That list (Exhibit 4) shows that forty law firms and an even greater number of their attorney owners were Ice Legal clients.[16]



Diagram Comparing Organizations that were Ice Legal Clients to "Receivership Entities"
(see full size version, Exhibit 5; see also Exhibit 9)

---

[16] This omission appears to be intentionally designed to lend credence to the Receiver's choice-of-law argument that New York law should apply because "the services described in the Engagement Agreement were principally for the benefit of Strategic Family, Inc. and its various subsidiaries listed in the Agreement, all of which are domiciled, headquartered, and maintain their business operations in New York." (¶¶55-56) (cleaned up and emphasis added).  Notably, the Receiver did not even list Strategic Family, Inc. as a Receivership Entity that was also an Ice Firm client (¶18).

### D. Potential defenses cannot be pled without knowing what entities are making claims.

It is essential for Ice Legal to know who, amongst the bewildering array of parties possibly making claims—either 58 entities, 17 entities, or just three or four entities—is actually doing so. The most fundamental problem is that this inconsistency helps obscure the fact that the Receiver is attempting to bring claims on behalf of entities for which he has never been appointed as a receiver (or which were never clients of Ice Legal), and in so doing, interferes with Ice Legal's right to have those claims dismissed.

Another fundamental issue caused by the inconsistent identification of claimants is determining which, if any, of the potential claimants meets the constitutional requirements of Article III standing. To proceed in federal court, claimants must show that they have (1) suffered an actual or imminent injury in fact that (2) is fairly traceable to the conduct of the defendant and that (3) would be redressed by a favorable decision of the court. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Here, under the Complaint's use of the term "Receivership Entities," the Receiver presents claims of companies who were not Ice Legal clients and therefore would have difficulty alleging they suffered an injury traceable to Ice Legal. Moreover, under the Complaint's definition of "Strategic Parties," the Receiver presents claims of companies that he himself has no standing to bring.

Another insurmountable problem that these conflicting claimant definitions create for the preparation of a defense is that Ice Legal cannot decipher as to which and how many entities the Receiver is alleging paid the Ice Firm's retainer, and which of those, if any, are entities whose claims the Receiver is authorized to bring. For example, the Receiver repeatedly states that

"[t]he Strategic Parties paid Ice Legal"[17] even though at least one of those entities is outside the

scope of the Receiver's appointment.  At other times, the Receiver uses passive voice seemingly

to avoid identifying a payor or payors.[18]

Tellingly, the Receiver repeatedly claims that the "Strategic Parties promptly paid" the

Ice Firm, but he never mentions a date for any of the payments—which of course, is necessary to

a determination as to whether his claims are timely.  Nor does he attach a single check, wire

transfer, or even a bookkeeping entry to substantiate these vague allegations which seem to

suggest that, despite being separate entities, all three or four (or 58) of his Claimants somehow

made each payment in one-lump sum.  The Receiver did not allege how much each of his

Claimants contributed to each payment—or for that matter, how much was contributed by the

other Engagement Clients, which is crucial given that the Engagement Clients number more than

one hundred and the majority are neither Receivership Defendants nor part of this lawsuit.  (In

light of the fact that the Receiver is billing the receivership estate for his on-staff forensic

accountant to investigate the source of these payments to the Ice Firm,[19] it is puzzling, if not

troubling, as to why he would keep the results of that investigation secret from Ice Legal and the

Court.)

---

[17] ¶¶91, 96, 101 104, 108, 113, 118, 121, 125, 130, 183 (*but see*, ¶86 where the Receiver pleads
that a payment was made to all Defendants).

[18] ¶¶4, 19, 66, 69, 77, 79, 152, 164, 179.

[19] If the Receiver denies this, Ice Legal would ask the Court to take judicial notice of the invoices
submitted with the Third Motion for Attorney Fees and Expenses of the Receiver and
Professionals, filed April 23, 2025 in the CFPB case (Dkt. 669), particularly the entries for Lisa
M. Jones on 8/14/24, 8/15/24, 8/20/24, 8/29/24, 10/1/24, and 10/2/24.

Since the Receiver claims this case is "related" to the CFPB case, the Court may consider that
case to be "prior litigation," such that the filings therein may be judicially noticed. *See Ferrari v.
Cnty. of Suffolk*, 790 F. Supp. 2d 34, 38 (E.D.N.Y. 2011) ("In the Rule 12(b)(6) context, a court
may take judicial notice of prior pleadings, orders, judgments, and other related documents that
appear in the court records of prior litigation and that relate to the case *sub judice*.").

Additionally, the conflicting definitions of the claimants (and the inclusion of non-Receivership Entities) prevent an intelligible analysis of which state's law should apply. (*see*, fn. 16)  For example, if the "Strategic Parties" are the sole claimants, then two (incidentally, those for which the Receiver is not authorized to bring claims) are more likely domiciled in Illinois than New York.

This choice-of-law problem is especially problematic for the Receiver's voidable transfer claim.  Under the model Uniform Voidable Transactions Act, Section 10, as well as the New York version cited by the Receiver, the governing law is the jurisdiction in which the "debtor" (presumably one of the Receiver's Claimants) is located when the transfer occurred (N.Y. Debt. & Cred. Law § 279).  The Receiver does not plead where the three "Strategic Parties" are located, much less where all 58 "Receivership Defendants" are located.  Without alleging what specific entities made the transfers and where they are located, neither Ice Legal nor this Court can begin to analyze whether the New York voidable transfer statute is the one that governs the issue.

**III.    The Receiver does not identify the "corporate entities" or "corporate clients" of Ice Legal allegedly harmed by the unnamed "officers and employees" of the Strategic Parties.**

The Receiver claims that Ice Legal knew that "certain Strategic Parties' officers and employees" were acting against the interests of some unnamed "corporate entities" when they allegedly failed to take steps to follow Ice Legal's advice—and that, as a result, Ice Legal was

obligated to "follow[] up" with "management" or "higher authorities" (¶83).[20]  The Receiver

does not identify the supposedly rogue officers and employees or, more importantly, the

corporate entities supposedly harmed.[21]  Sometimes the Complaint refers to these corporate

entities as Ice Legal's "corporate clients,"[22] the majority of which are not "Receivership

Entities."  Often, the Receiver claims the Strategic Parties' officers and employees acted against

the interests of MEC (and sometimes even MEC's "affiliates" (¶83)) which, again, is not a

defendant in the CFPB case, much less one included in the Receiver's appointment.[23]  A

particularly egregious example of the Receiver's baffling allegations is the paragraph where he

variously describes the harmed clients as "the Strategic Parties and MEC" or as "all of [Ice

Legal's] clients, including Strategic Parties and MEC" (¶83).

---

[20] This purported ignorance on the part of Strategic's senior management about the company's
business model and any associated exposure contradicts the Receiver's earlier representation to
the court in the CFPB case:

> While it is clear that Senior Management was well aware that the lawfulness of
> the Law Firm Debt Relief Model stood on shaky foundations (indicated by a raft
> of consumer complaints, state AG investigations, lawsuits, and State Bar
> investigations and actions, among other things), Senior Management appears not
> to have shared these issues with lower level employees who were instead lead to
> believe that the Byzantine corporate structure had been fully vetted and the
> company had a first-class compliance department.

Preliminary Report of Temporary Receiver, dated January 31, 2024 (Dkt. 115), p. 33, n. 31.

[21] ¶¶81, 83, 84, 153, 162, 170, 171.

[22] ¶¶7, 162, 83.

[23] ¶¶83, 84, 162, 171.  The repeated allegations of harm to MEC are particularly inappropriate
given that it is a tribal entity that has claimed sovereign immunity as to Ice Legal, P.A.'s claims
for non-payment.  If MEC has waived that immunity by authorizing the Receiver to assert its
claims (e.g., to rescind the contract), it should be clearly stated so that Ice Legal can add MEC to
any counterclaim for non-payment.

Thus, Ice Legal cannot plead to these allegations without, at least, an identification of the clients allegedly harmed by certain unspecified employees and officers. Nor should Ice Legal be required to plead to claims made by companies outside the Receiver's authority.

**IV.    Legal Standard: a motion for more definite statement should be granted when a complaint fails to specifically identify the parties to the activities alleged.**

An order requiring a more definite statement is particularly appropriate when the "[s]pecific identification of the parties to the activities alleged by the plaintiffs is required … to enable the defendant to plead intelligently. *See Van Dyke Ford, Inc. v. Ford Motor Co.*, 399 F. Supp. 277, 284 (E.D. Wis. 1975) (Motion for more definite statement granted where "nothing is specifically alleged regarding two of the plaintiffs…aside from their existence, and the complaint frequently refers to 'plaintiffs' or 'defendants' without indicating which of the five plaintiffs or nine defendants are intended.").

More generally, the Receiver's 46-page, 203-paragraph, self-contradictory Complaint violates Rule 8(a)(2) Fed. R. Civ. P., which requires "a short and plain statement of the claim showing that the pleader is entitled to relief," by "fail[ing] to one degree or another...to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests." *Vibe Micro, Inc. v. Shabanets*, 878 F.3d 1291, 1294–95 (11th Cir. 2018) (quoting *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1323 (11th Cir. 2015).

Such pleadings—called "shotgun" pleadings—"are flatly forbidden by the spirit, if not the letter, of these rules" because they are "calculated to confuse the 'enemy,' and the court, so that theories for relief not provided by law and which can prejudice an opponent's case, especially before the jury, can be masked." *Weiland*, 792 at 1320 (*quoting*, *T.D.S. Inc. v. Shelby Mut. Ins. Co.*, 760 F.2d 1520, 1544 n.14 (11th Cir. 1985) (Tjoflat, J., dissenting)). Besides

violating the rules, shotgun pleadings also "waste scarce judicial resources, inexorably broaden the scope of discovery, wreak havoc on appellate court dockets, and undermine the public's respect for the courts." *Vibe Micro*, 878 F.3d at 1295 (cleaned up).

The "self-evident" purpose of the rule is "to require the pleader to present his claims discretely and succinctly, so that[] his adversary can discern what he is claiming and frame a responsive pleading." *Weiland*, 792 F.3d at 1320 (*quoting T.D.S.*, 760 F.2d at 1544 n.14 (Tjoflat, J., dissenting)). These rules were also written for the benefit of the court, which must be able to determine "which facts support which claims," "whether the plaintiff has stated any claims upon which relief can be granted," and whether evidence introduced at trial is relevant. *Id.* (quoting *T.D.S.*, 760 F.2d at 1544 n.14 (Tjoflat, J., dissenting)).

A complaint that is verbose, conclusory and confusing does not comply with Rule 8(a)(2). *Nevijel v. North Coast Life Ins. Co.*, 651 F.2d 671, 674 (9th Cir. 1981). Federal law has long held that where a complaint is so confusing that a party cannot possibly be expected to respond violates Rule 8. *Corcoran v. Yorty*, 347 F.2d 222, 223 (9th Cir. 1965).

"Where a defendant cannot reasonably respond to a complaint because of the latter's vagueness or ambiguity, a court may grant the defendant's motion for [a] more definite statement." *Clayton v. City of Middletown*, 237 F.R.D. 538, 539 (D. Conn. 2006). *See also*, *Rodriguez v. Chex Sys., Inc.*, 730 F. Supp. 3d 36, 39 (W.D.N.Y. 2024) (this Court granted a motion for more definite statement where pleading did not comply with Rule 8).

## V.    Conclusion

Accordingly, the Court should order a more definite statement of the Complaint because it is inconsistent and vague. More specifically, it is unintelligible on the most basic of issues:

who is bringing claims against Ice Legal (and who actually paid Ice Legal's retainer). As a result, Ice Legal is unfairly prejudiced in formulating its response.

## MOTION TO DISMISS THE COMPLAINT FOR LACK OF PERSONAL JURISDICTION AND INSUFFICIENT PROCESS UNDER RULES 12(b)(2) AND 12(b)(4) FED. R. CIV. P.

**I.     The Court lacks jurisdiction over the Individual Defendants because the Receiver failed to file the notice required by 28 U.S.C. § 754.**

The Receiver alleges only one basis for personal jurisdiction over the Defendants. Specifically, he claims that "[t]he Court may exercise personal jurisdiction over the Defendants pursuant to 28 U.S.C. § 1692 because the funds sought to be recovered are assets of the Receivership Estate under the Court's Orders issued [in] the CFPB Action" (¶17).

This statute does not by itself expand the Court's territorial jurisdiction beyond New York's borders. To reach the property that is out-of-state, the Receiver must look to the companion statute, 28 U.S.C. § 754 which extends "the territorial jurisdiction of the appointing court…to any district of the United States where property believed to be that of the receivership estate is found…" *S.E.C. v. Bilzerian*, 378 F.3d 1100, 1104 (D.C. Cir. 2004) (citing *Haile v. Henderson Nat'l Bank*, 657 F.2d 816, 823 (6th Cir. 1981)). However, § 754 only does so "provided that the proper documents have been filed in each such district as required by § 754." *Id.* (emphasis added). If the a copy of the complaint and the order of appointment are not filed in a district, the receiver is divested of jurisdiction over the property in that district:

> Such receiver shall, within ten days after the entry of his order of appointment, file copies of the complaint and such order of appointment in the district court for each district in which property is located. The failure to file such copies in any district shall divest the receiver of jurisdiction and control over all such property in that district.

28 U.S.C.A. § 754 (emphasis added).

In *S.E.C. v. Vision Communications, Inc.*, 74 F.3d 287, 290 (D.C. Cir. 1996), the court explained how a receiver must first comply with § 754 before § 1692 can be used to establish personal jurisdiction over out-of-state domiciliaries:

> But to invoke § 1692, a receiver first must comply with 28 U.S.C. § 754. *See Haile v. Henderson Nat'l Bank,* 657 F.2d 816, 823 (6th Cir.1981), *cert. denied,* 455 U.S. 949 (1982); 7 James W. Moore, Moore's Federal Practice ¶ 66.08[2], at 66–51 (2d ed. 1995). Under § 754, … a receiver appointed in one district may obtain jurisdiction over property located in another district by filing in the district court of that district, within ten days after the entry of his order of appointment, a copy of the complaint and his order of appointment.

> But the Receiver in this case pled nothing about compliance with § 754's notice requirement—even though he has done so in at least one other case. *See, McNamara, as the Court-Appointed Receiver for PLCMGMT LLC, dba Prometheus Law v. Allen, et al.*, Case 2:17-cv-02858-TJH-FFM (C.D.Cal. 2017):

> 9.    The Receiver has filed notices pursuant to 28 U.S.C. § 754 in the Federal District Court of each District in which each Defendant is believed to be domiciled (except the Central District of California, where the Court's own filing provided such notice).

Even this notice of compliance is incorrect since § 754 requires the notice to be filed in the district where the property is located, not where the defendant is domiciled. Here, the Receiver has never pled the location of the property at issue.[24]

Even if the domicile of the Individual Defendants were relevant to § 754, the Receiver has not clearly pled that domicile. In the Complaint, the Receiver states only that the Individual Defendants have a "last and usual place of abode" in Florida—which is a service of process

---

[24] Nor can he since the statute was never designed to extend a court's territorial jurisdiction with respect to a cause of action which, by definition, has no situs and is not subject to seizure. Ice Legal acknowledges that some cases have blurred the distinction between *in rem* and *in personam* jurisdiction when applying § 754, but that discussion is for another day.

standard, not a jurisdictional standard.  And even this representation is contradicted by the fact

that, when process was issued, the Receiver supplied addresses for them in New Hampshire.

(Dkt. 11)—which is, in fact, the domicile for the two Individual Defendants.[25]

But an electronic search of the federal court dockets does not show that the Receiver ever

filed the required notice in New Hampshire (Exhibit 6).  Thus, even if § 754 permitted the filing

of a notice in the district of a defendant's domicile, as opposed to where the Receivership

Defendants' property is located, the Receiver has not triggered § 1692 to establish  territorial

jurisdiction over these Individual Defendants.[26]

## II.    The Court lacks jurisdiction over Ice Legal, P.A. because, to the extent its principal place of business is relevant to 28 U.S.C. § 754, that place is also New Hampshire where the Receiver did not file a § 754 notice.

As to the Ice Firm, the Receiver again attempts to use the personal jurisdiction concept of

domicile—the firm's alleged principal place of business in southern Florida—as opposed to the

location of the property under § 754.  The Ice Firm submits that, to the extent that the place of

business could be relevant to § 1692 and § 754, its principal place of business for jurisdictional

purposes is at its "nerve center"—the place of operations and chief coordination of those

operations. *See Nespresso USA, Inc. v. Ethical Coffee Co. SA*, 263 F. Supp. 3d 498, 503 (D. Del.

2017) (*citing*, *Hertz Corp. v. Friend*, 559 U.S. 77, 77 (2010)).  For the two-attorney firm, the

principal place of business of the Ice Firm is again in New Hampshire where the Receiver did

not file a § 754 notice.

---

[25] Declaration of Ariane Ice (Exhibit 7).

[26] The Receiver does not plead that the Court has jurisdiction through New York's long arm statute. Nor does he plead the facts necessary for analyzing the applicability of that statute. Therefore, while Defendants contend that this alternate theory of personal jurisdiction would be equally unavailing for the Receiver, they will, at this juncture, reserve argument on the issue.

**III.    The Court lacks jurisdiction over Ice Legal, P.A. because the Receiver failed to file a new §754 notice after expiration of the Temporary Restraining Order.**

Even if the Ice Firm had its principal place of business in southern Florida, the § 754 notice that Mr. McNamara (as the "Temporary Receiver") filed in the Southern District of Florida on January 22, 2024, by its very terms, relied only on his temporary appointment under Judge Villardo's Temporary Restraining Order (TRO) in the CFPB case (Dkt. 12). That Order expired (by extension) March 4, 2024 (Excerpt of filing, Exhibit 8).

The § 754 notices filed by the Receiver after that date in other districts explicitly identify the Preliminary Injunction as the source of his power (without reference to the expired TRO). But the Receiver did not file such a notice in the Southern District of Florida ("within ten days of after the entry of his order of appointment"—or ever) even though the Receiver alleges in the Complaint that his powers arise from the Preliminary Injunction.  Accordingly, once again, the Receiver has not triggered § 1692 to establish  territorial jurisdiction over the Ice Firm.

**IV.    Process cannot issue without compliance with 28 U.S.C. § 754.**

The Receiver pled no independent basis for issuance of process, and thus, presumably relies solely upon § 1692 which provides:

> In proceedings in a district court where a receiver is appointed for property, real, personal, or mixed, situated in different districts, <u>process may issue and be executed in any such district</u> as if the property lay wholly within one district, but orders affecting the property shall be entered of record in each of such districts.

28 U.S.C.A. § 1692 (emphasis added).  Because the Receiver has not complied with § 754 with respect to any of the Defendants, he cannot invoke § 1692 and process must be deemed insufficient under Rule 12(b)(4) Fed. R. Civ. P.

**V.    Conclusion**

Accordingly, the case should be dismissed under Rules 12(b)(2) and (4) Fed. R. Civ. P.

**MOTION TO STRIKE UNDER RULE 12(f) FED. R. CIV. P.**

**I.    The paragraphs related to the terms of the settlements of the consumer cases should be stricken as immaterial or redacted from the public version of the Complaint.**

In paragraphs 31 and 34, the Receiver reveals the confidential amounts of the main group of settlements of the cases filed by Ice Legal on behalf of the consumer clients.  In paragraphs 34 and 37, he reveals the confidential amounts of nine other individual settlements (*see*, fn. 3 regarding confidentiality of the settlements).  While the Receiver may be free to breach the confidentiality requirement on behalf of his Claimants (assuming it benefits them somehow), he does not have the right to breach the requirement on behalf of the other parties to those settlements—the consumers and Consumer Case Defendants outside the receivership estate.  The paragraphs revealing the confidential amounts should be stricken or, at a minimum, they should be redacted from the public version of the Complaint.

**II.    The paragraphs related to the negotiations of the settlements of the consumer cases and purported "reduced settlements" should be stricken as immaterial and scandalous.**

The Receiver expends 19 paragraphs of the Complaint detailing the negotiations to settle the cases filed by Ice Legal on behalf of the consumer clients (¶¶3-4, 24-40).  The only apparent purpose appears to be to suggest through inuendo that Ice Legal covertly entered into an employment agreement with the Consumer Case Defendants <u>during</u> their negotiations to settle the consumer client cases (*see*, ¶¶ 3, 38 which use words such as "expressly" and "overt" when describing the post-settlement talks concerning Ice Legal's retention).

Likewise, the Receiver  implies, but does not say, that Ice Legal double-crossed their consumer clients when settling the nine individual cases so as to curry favor with the Consumer Case Defendants *(see,* ¶¶34, 37 and the title of that section which states that Ice Legal offered

23

"Reduced Settlements for Nine Plaintiffs Right Before Negotiating the Engagement

Agreement").

While Ice Legal vehemently denies all the Receiver's insinuations about backroom deals

or sweetheart settlements, the truth or falsity of these whispered accusations in the general

allegations need never be addressed because they are never mentioned as a basis for any of the

Receiver's six state law claims.  Nor could he ever articulate such a claim, because such

inappropriate behavior—had it occurred—would only have harmed Ice Legal's consumer clients

and benefited the Receiver's Claimants.

To Ice Legal's knowledge, the Receiver has never been appointed to bring claims on

behalf of the Ice Legal consumer clients.  So the only purpose of the Receiver's insinuations is to

cast Ice Legal in a false light.  These are precisely the sort of assertions (being both immaterial

and scandalous) that Rule 12(f) Fed. R. Civ. P. was intended to eliminate. *See Pigford v.

Veneman*, 215 F.R.D. 2, 4 (D.D.C. 2003) ("scandalous" includes allegations that unnecessarily

reflect on the moral character of an individual or that cast a cruelly derogatory light on a party);

*Jud. Watch, Inc. v. U.S. Dep't of Com.*, 224 F.R.D. 261, 263 (D.D.C. 2004) (A matter is

immaterial or impertinent when it is not relevant to the resolution of the issue at hand).  If

allegations in a complaint are irrelevant and prejudicial to the defendant, a motion to strike will

be granted. *Id*.

## III.  The allegations made by Ice Legal's consumer clients against the Consumer Case Defendants should be stricken as immaterial and barred by absolute litigation privilege.

The Receiver extensively quotes from complaints that Ice Legal filed on behalf of

consumer clients against the Consumer Case Defendants (¶¶20-23 and subparagraphs, 161, 200)

or otherwise relies on them (*e.g.*: ¶185).  These allegations—which were never adjudicated—

assert RICO and fraud claims against the debt settlement enterprise under attack in the CFPB case. Moreover, very few of the Receiver's Claimants were ever Consumer Case Defendants (*see*, Exhibits 5 and 9),[27] making the relevance of these consumer case allegations tenuous, at best.

But most importantly, the Receiver, once again, never actually uses these allegations to support any of the Receiver's six state law claims. The allegations, therefore, are immaterial and should be stricken under Rule 12(f) Fed. R. Civ. P.

### A. Allegations from complaints filed in actions that were never adjudicated are immaterial under Rule 12(f) Fed. R. Civ. P.

As with unproven allegations in the CFPB case, unproven allegations from these consumer cases should be stricken as immaterial. *Lipsky* v. *Commonwealth United Corp.*, 551 F.2d 887, 892-94 (2d Cir. 1976) (striking allegations that were adopted from a complaint filed in another action); *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 218 F.R.D. 76, 78-79 (S.D.N.Y. 2003) (applying *Lipsky* to strike allegations that "refer to or rely on" complaints filed in other civil actions); *see, e.g.*, *RSM Prod. Corp. v. Fridman*, 643 F. Supp. 2d 382, 403 (S.D.N.Y. 2009) (applying *Lipsky* to strike allegations lifted from "complaints filed in actions that were never resolved on the merits and, thus, did not result in any findings of law or fact"); *Footbridge Ltd.* v. *Countrywide Home Loans, Inc.*, No. 09 Civ. 4050, 2010 WL 3790810, at *5 (S.D.N.Y. Sept. 28, 2010) (granting motion to strike "allegations based on pleadings and settlements in other cases" concerning defendant's loan origination practices).

---

[27] The Receiver disguises this fact by substituting the word "Strategic" (which he defines as Strategic Financial Solutions, LLC [¶2]) in front of many of the allegations he quotes (¶23) even though they were directed against the "defendants" in those cases or an "enterprise" consisting of those defendants. (*see*, excerpt of complaint referenced, but not attached to the Complaint, [Exhibit 10]). Because there is no identity of the party-defendants in the consumer cases and those in the CFPB cases, the allegations in the consumer cases are of no value here.

### B. Statements made by attorneys during the course of litigation are absolutely privileged.

If the quoted allegations from these consumer cases have any purpose, it is to insinuate that Ice Legal is ethically or morally deficient for later providing consulting services to alleged bad actors—suggesting that attorneys whose careers transition to the opposite side of a practice area (such as a prosecutor becoming a criminal defense lawyer) are somehow unsavory.[28]

Accordingly, to the extent that the Receiver is attempting to use the statements in these pleadings against Ice Legal, such use is barred by an absolute litigation privilege. *Wiener v. Weintraub*, 22 N.Y.2d 330, 331, 239 N.E.2d 540, 540 (1968) (statements made by counsel and parties in the course of judicial proceedings are privileged). Although the privilege is usually raised in the context of defamation suits, the rationale for the rule (to protect zealous advocacy and to encourage participation and candor in judicial proceedings) is equally applicable to the Receiver's attack on Ice Legal's reputation here. *See Simms v. Seaman*, 308 Conn. 523, 538, 69 A.3d 880, 888 (2013) (expounding on the history of the litigation privilege).

As privileged statements, the quotations from the consumer-case pleadings are also immaterial and should be stricken under Rule 12(f) Fed. R. Civ. P.

### IV. Conclusion

The Court should strike the above-mentioned allegations under Rule 12(f) Fed. R. Civ. P.

---

[28] Or perhaps the Receiver is suggesting that accused bad actors are not entitled to counsel. For the record, Ice Legal disputes this "switching sides" narrative. It was not being hired to defend cases against consumers. Ice Legal understood it was being hired to bring its consumer-oriented view to effect changes in the business model of the debt settlement enterprise. But in any event, "[a] lawyer's representation of a client…does not constitute an endorsement of the client's political, economic, social or moral views or activities." Rule 1.2(b) (2013) ABA Model Rules of Professional Conduct.

**MOTION TO DISMISS UNDER RULES 12(b)(1), 12(b)(3), 12(b)(6) AND THE FEDERAL ARBITRATION ACT ON THE GROUNDS THAT THE RECEIVER'S CLAIMS MUST BE ARBITRATED.**

I.     **The retainer agreement at the center of the Claimants' allegations contains an agreement to arbitrate and an explicit delegation of all issues of arbitrability to the arbitrator.**

The Complaint admits that the Engagement Agreement at issue contained an arbitration provision (¶73; Engagement Agreement ¶5.6.2) but argues that it relates only to the termination of the agreement and that four of the six claims are unrelated to termination (¶73-74).

While Ice Legal disagrees and posits that the arbitration provision applies to all the claims in the Complaint, the Court need not—and cannot—reach that issue because the contract delegates all issues of arbitrability to the arbitrator:

> Any and all threshold issues of arbitrability, including disputes regarding the arbitrability of any claims or defenses (including disputes regarding whether claims brought by or against a non-party to this Agreement are arbitrable) must also be decided by arbitration.

Engagement Agreement, ¶5.6.2.

"When the parties' contract delegates the arbitrability question to an arbitrator, a court may not override the contract. In those circumstances, a court possesses no power to decide the arbitrability issue." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 68 (2019). "That is true even if the court thinks that the argument that the arbitration agreement applies to a particular dispute is wholly groundless." *Id; see also, Contec Corp. v. Remote Sol., Co., Ltd.*, 398 F.3d 205, 208 (2d Cir. 2005) ("[T]he incorporation [of delegation language] serves as clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator."); *All. Bernstein Inv. Research & Mgmt., Inc. v. Schaffran*, 445 F.3d 121, 125 (2d Cir. 2006) (the proper inquiry is whether there is clear and unmistakable evidence from the arbitration agreement that the parties intended that the question of arbitrability shall be decided by the arbitrators).

II.    **The liberal federal policy favoring arbitration**

Aside from the binding delegation of arbitrability to the arbitrator, federal policy favors arbitration.  The Federal Arbitration Act ("FAA"), 9 U.S.C. §1-16,  broadly provides that: "[a] written provision ... to settle by arbitration ... shall be valid, irrevocable, and enforceable…" 9 U.S.C. § 2.  In enacting the FAA, Congress intended to overcome the courts' past reluctance to enforce arbitration agreements by placing them on equal footing with other contracts and establishing a strong federal policy in favor of arbitration. *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (stating that the FAA reflects a "liberal federal policy favoring arbitration") (cleaned up); *Kindred Nursing Centers Ltd. P'Ship v. Clark*, 581 U.S. 246, 254–55 (2017) (rejecting the argument that the FAA applies only after a court has determined that a valid arbitration agreement was formed); *Perry v. Thomas*, 482 U.S. 483, 489 (1987) (observing that the FAA was "a congressional declaration of a liberal federal policy favoring arbitration").

In this case, the Receiver Claimants have brought "disputes" against Ice Legal that arise from the Engagement.  Per the terms of the parties' contract, this dispute is subject to mandatory arbitration, meaning that the Claimants cannot seek resolution of this dispute in any forum other than arbitration.

III.    **The case must be dismissed (rather than stayed) because the Receiver is not authorized to bring an arbitration case.**

Under the order granting Mr. McNamara powers as Receiver (Preliminary Injunction, dated March 4, 2024), the Receiver is authorized to initiate suits only in state, federal and foreign courts:

> L. Institute, compromise, adjust, appear in, intervene in, or become party to
> such actions or proceedings in state, federal, or foreign courts that the
> Receiver deems necessary and advisable to preserve or recover the Assets
> of the Receivership Defendants, or that the Receiver deems necessary and
> advisable to carry out the Receiver's mandate under this Order;

Conspicuous by their absence are the words "arbitration proceedings," especially when compared to this recent order in another case in which Mr. McNamara is a receiver:[29]

> M. Institute, compromise, adjust, appear in, intervene in, defend, dispose of,
> or otherwise become party to any legal action in state, federal or foreign
> courts or arbitration proceedings as the Receiver deems necessary and
> advisable to preserve or recover the Assets of the Receivership Entities,
> or to carry out the Receiver's mandate under this Order, including, but
> not limited to, actions challenging fraudulent or voidable transfers;

In fact, among the seven most recent McNamara-receivership cases that he has catalogued on his website, this case is the only one in which the words "arbitration proceedings" do not appear in the paragraph empowering him to institute actions.[30]  Accordingly, courts wishing to grant a receiver the authority to bring arbitration actions, explicitly say so.  Here, the court in the CFPB case has not granted Mr. McNamara that authority.

---

[29] Stipulated Preliminary Injunction, p. 21, *Federal Trade Commission v. Blackrock Services, Inc., et al.*, Case No. 8:25-cv-00363-HDV-ADS (Dkt. 41) (C.D. Cal., March 18, 2025).

[30] *See*, cases listed on Mr. McNamara's website: https://regulatoryresolutions.com/cases/. Likewise, the paragraph authorizing the Receiver to institute legal actions in this case does not include the words "actions challenging fraudulent or voidable transfers."  Thus the Receiver is not authorized to bring that claim.  *See*, Motion to Dismiss under Rule 12(b)(6) Fed. R. Civ. P., p. 52.

Since any claims associated with the contract—including any arguments that the claims in the Complaint are outside the scope of the arbitration—must be arbitrated and since the Receiver is not authorized to bring arbitrations actions, this case must be dismissed.  While normally, under the Supreme Court's directive in *Smith v. Spizzirri*, 601 U.S. 472 (2024), the Court would be constrained to staying the case, rather than dismissing, the situation here is the type of exception that the Supreme Court anticipated in *Smith*:

> That is not to say that the court is barred from dismissing the suit if there is a separate reason to dismiss, unrelated to the fact that an issue in the case is subject to arbitration. If, for example, the court lacks jurisdiction, § 3 is no bar to dismissing on that basis.

*Smith v. Spizzirri*, 601 U.S. 472, at 476, n.2.  Here, the Receiver lacks standing to bring an arbitration action—a fact that is related only to the scope of the powers delegated to the Receiver in the CFPB case.  Simply staying the case would be futile because, even if the Receiver were to seek an expansion of his powers in the CFPB case, "standing is to be determined as of the commencement of suit." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 571, n. 5. (1992).

Accordingly, the Complaint should be dismissed under Rule 12(b)(1) (because the Court lacks jurisdiction to decide a case that must be arbitrated), Rule 12(b)(3) (because the proper venue is arbitration), Rule 12(b)(6) (because the Receiver has failed to state a claim for which relief can be granted by this Court) and the FAA.

## IV.    Conclusion

For the reasons explained above, the Receiver cannot use this forum to pursue the claims of the entities in whose shoes he stands.  His only available forum is arbitration—a forum into which he is powerless to venture.

**MOTION TO DISMISS COMPLAINT UNDER RULE 12(b)(6) FED. R. CIV. P.**

Four of the six state law counts brought by the Receiver are based upon allegations of malpractice: 1) Professional Negligence; 2) Breach of Fiduciary Duty; 3) Breach of Contract; and 4) Unjust Enrichment. The remaining two counts seek to claw back the fee payments under New York's Uniform Voidable Transfer Act and to rescind the retainer agreement. For many and various reasons, all these counts should be dismissed for failure to state a claim.

## I.    Summary of Argument

- ***The retainer was not unconscionable:*** The Receiver failed to plead facts needed to state a plausible claim under New York law that the Engagement Agreement was unconscionable. The Receiver's own pleadings establish there was substantial consideration for the agreement, that his Claimants were fully informed, and that they repeatedly ratified the agreement over a span of years. Additionally, recasting this same unconscionability assertion as one about "per se invalidity" or a "restriction on a client's right of termination" does not save the Complaint.

- ***Deficiencies of the counts sounding in legal malpractice***: The legal malpractice count (and the identical counts under different names and legal theories) should be dismissed as: 1) duplicative; 2) time-barred; and 3) failing to allege actual, ascertainable damages.

- ***Deficiencies of the remaining counts***: The voidable transfer count should be dismissed because: 1) the Receiver has no standing; 2) there are no allegations as to which entity made any transfers to the Ice Firm; 3) the Claimants received equivalent value; and 4) the impending insolvency allegations are too conclusory and speculative. Additionally, it should be dismissed, in part, because the statute of

repose has extinguished the claim for the first payment.  The unjust enrichment count
should also be dismissed because its allegations are conclusory and because unjust
enrichment claims are not available when there is a valid contract.

## II.    Legal standard applicable to all counts: allegations cannot be conclusory or implausible.

*No conclusory statements:* A plaintiff must set out facts to show he is entitled to relief,
which requires more than generic labels, broad conclusions, or formulaic recitations of the
elements of a cause of action. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, (2007); *Ashcroft v.
Iqbal*, 556 U.S. 662, 678, (2009) (finding that the "Federal Rules do not require courts to credit a
complaint's conclusory statements without reference to its factual context." *Id*. at 685).

*Claims must be plausible on their face:* In order to survive a motion to dismiss, a
complaint must contain sufficient factual matter to "state a claim to relief that is plausible on its
face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads
factual content that allows the court to draw the reasonable inference that the defendant is liable
for the misconduct alleged" *Ashcroft v. Iqbal*, 556 U.S. at 678.  Determining whether a complaint
states a plausible claim for relief is a "context-specific task that requires the reviewing court to
draw on its judicial experience and common sense." *Id*.

## III.    Reasons for dismissal applicable to multiple counts.

This memorandum will first address a reason for dismissal (the factual allegations do not
support unconscionability), which applies to all but one of the counts of the Complaint.  It will
then address those that apply to the professional negligence count and its sister counts that allege
the same thing under different theories.  Finally, it will address the reasons for dismissal that are
particular to the individual counts.

32

**A.  No Unconscionability or "Per Se" Invalidity**

**1.  Unconscionability: The Receiver's allegations, even if taken as true, do not establish that the Engagement Agreement was unconscionable, unreasonable or invalid under New York law.**

*First,* "[a]n unconscionable agreement [is] one that no promisor (absent delusion) would make … and no honest and fair promisee would accept." *King v. Fox*, 7 N.Y.3d 181, 191, 851 N.E.2d 1184 (N.Y. 2006).  Here, the Receiver has not pled that no promisor would enter into the retainer agreement.  In fact, he has pled the opposite: that his Claimants—who sought out the relationship and drafted the agreement—did so to prevent Ice Legal from bringing more lawsuits (¶42, 58).  Given the sum of money the Claimants had already paid to settle Ice Legal's first wave of consumer cases (established by the confidential payouts disclosed by the Receiver), it is not "delusional" that they would pay <u>what the Receiver concedes is a smaller amount</u> to forever foreclose Ice Legal from bringing more.

And drawing upon the Court's judicial experience and common sense to determine plausibility (*Ashcroft v. Iqbal*, 556 U.S. at 678), the value of the engagement to the Claimants certainly included the quite considerable expense of litigation (at a minimum: their own attorneys' fees, costs, arbitration expenses, and business disruption).  Such expenses make it even more implausible that the engagement unreasonably favored the Ice Firm.

*Second*, "[t]he most important factor is whether the client was fully informed upon entering the agreement." *In re Lawrence*, 24 N.Y.3d 320, 337, 23 N.E.3d 965, 977 (N.Y. 2014), (*citing. King*, at 192).  A fee is not unconscionable if "the client executed the contract with 'full knowledge of all the material circumstances known to the attorney ... and that the contract was one free from fraud on [the attorney's] part or misconception on the part of [the client]'" *Id*. at 337.  Here, the Receiver did not plead that the fee was obtained by fraud on the part of Ice Legal or that his Claimants misunderstood the contract that their own outside and in-house attorneys

negotiated and drafted.[31]  He did not plead—nor could he—that his Claimants were not informed or did not otherwise have full knowledge, of the contract terms.

Importantly, not only were the Receiver's Claimants sophisticated companies[32] (with bargaining power equal to, if not greater than, Ice Legal), but they were represented throughout the negotiation by their own attorneys.  Where a client is sophisticated ("no naif"), a New York court will follow the general rule of enforcing clear and complete fee contracts according to their terms. *Id.* at 341; *see also Atkins & O'Brien LLP. v. ISS Int'l Serv. Sys., Inc.*, 252 A.D.2d 446, 448, 678 N.Y.S.2d 596 (1998) ("The potential for overreaching by an attorney…is simply not an issue here, where the agreement in question was fully bargained for by a sophisticated client fully aware of its prospective legal needs…"); Restatement (Third) of the Law Governing Lawyers (2000) ("Restatement"), § 34 cmt. c.  ("Fees agreed to by clients sophisticated in entering into such agreements (such as a fee contract made by inside legal counsel in behalf of a corporation) should almost invariably be found reasonable.") and Restatement, § 34 cmt. e. ("When a client experienced in retaining and compensating lawyers agrees to pay an engagement-retainer fee, the fee will almost invariably be found to fall within the range of reasonableness.").  *See also Schildiner v. Toscano*, No. A-2507-16T1, 2018 WL 4904726, at *3 (N.J. Super. App. Div. Oct. 10, 2018) ("As a former attorney, plaintiff was clearly capable of understanding the non-refundable nature of the agreement and the implications of such an agreement.").

---

[31] *See*, ¶¶51, 59, 60 ("counsel for Strategic sent its draft").

[32] *See*, Receiver's First Interim Application for Order Approving Fees and Expenses of The Receiver and Professionals, dated March 26, 2024 (CFPB Case, Dkt. 24-1), p. 3 (describing the businesses subject to the receivership as "complex by any metric" and  their operations as "sophisticated."); Declaration of Thomas W. McNamara in Support of Receiver's Third Interim Application for Order Approving Fees and Expenses of the Receiver and Professionals (CFPB case, Dkt. 669-2), p. 4 (describing the enterprise and complex and sophisticated).

Thus, the allegations do not meet the New York "uninformed" requirement.  But they also do not meet the federal pleading standard.  <u>Specifically, the Receiver wants to take his Claimants—which he and the plaintiffs in the CFPB case characterize as manipulative and cunning victimizers of thousands of consumers[33]—and recast them as dewy-eyed neophytes who were easily victimized by one of their many law firms.</u>  This fails meet the *Twombly* standard of plausibility.

***Third,*** when viewing the contract from Ice Legal's perspective, "[a]n engagement retainer fee satisfies the requirements [that fees be reasonable] if it bears a reasonable relationship to the income the lawyer sacrifices…including such costs as turning away other clients (for reasons of time or due to conflicts of interest)…" Restatement § 34 cmt. e.  Here, the Receiver has not pled that the fee did not bear a reasonable relationship to the income the Ice Firm sacrificed.  And again, he has pled the opposite.  In disclosing the confidential settlements amounts of the consumer cases, the Receiver has demonstrated that—assuming a standard contingency fee—the income that the Ice Firm sacrificed did, in fact, bear a reasonable relationship to the amount the Claimants paid for the retainer.

**2.  Ratification: In any event, the Receiver's own allegations show that the Engagement Agreement was ratified by repeated payments over the years.**

Even if the agreement had been originally voidable as unconscionable, the Engagement Clients (fully informed and with equal or superior bargaining power) ratified the Engagement

---

[33] *See*, Preliminary Report of Temporary Receiver, dated January 31, 2024 (CFPB case, Dkt. 115-1), pp. 40-45 (determining that the CFPB Defendants ran a "complex business" that could not be operated lawfully).

when—according to the Receiver himself—they continued to "promptly" pay Ice Legal's invoices for years.[34]

Where a fully informed client with equal bargaining power knowingly and voluntarily affirms an existing fee arrangement that might otherwise be considered voidable as unconscionable, ratification can occur so long as the client has both a full understanding of the facts that made the agreement voidable and knowledge of his or her rights as a client. *King v. Fox*, 7 N.Y.3d at193; *see also Kent v. Quicksilver Mining Co.*, 78 N.Y. 159, 190 (1879) ("[A]n unconscionable arrangement will not be disturbed when there has been ratification of it with knowledge of all its bearings, after time has been had for consideration."); *Jones v. De Ronde*, 255 N.Y.S. 505 (N.Y. Sup. Ct. 1932) (holding that a customer ratified unconscionable acts by stockbrokers by giving them more funds and asking them to conduct more trades); *cf. Ferguson v. Lion Holding, Inc*., 312 F.Supp.2d 484, 500 (S.D.N.Y. 2004) ("[U]nder New York law, a party may 'ratify' a voidable contract by accepting benefits flowing from it, and thereby waive the right to rescind the contract"); *Gendot Associates, Inc. v. Kaufold*, 866 N.Y.S.2d 361, 423-424 (N.Y. App. Div. 2d Dept. 2008) (unconscionable contract can be ratified.).

### 3. "Per se" Invalidity: General retainers for availability are not "per se" invalid under New York law.

Lastly, the Receiver asserts that a "true" or "classic" retainer is per se unenforceable (¶174).  The only reason given for this assertion is that such contracts are supposedly not permitted "under New York law, including, without limitation, the New York Rules of Professional Conduct and applicable case law."[35]

---

[34] ¶¶86, 91. 96, 101, 104, 108, 113, 118, 121, 125, 130.

[35]  ¶61, *see*, ¶7 specifically citing to Rule 1.5 of the New York Code of Professional Conduct.

*First*, without conceding that an availability retainer such as that in this case violates Rule 1.5 of the New York Code of Professional Conduct ("NY Code Prof. C."),[36] or any other, perhaps more applicable rules,[37] it is well-settled that such violations do not give rise to private causes of action. In *Weintraub v. Phillips, Nizer, Benjamin, Krim, & Ballon*, 172 A.D.2d 254, 568 N.Y.S.2d 84 (1991), the Court held that "[a] violation of the Code of Professional Responsibility … does not, in itself, give rise to a private cause of action against an attorney or law firm." *Id*. *See also Kantor v. Bernstein*, 225 A.D.2d 500, 501, 640 N.Y.S.2d 40 (1996) ("We also note there is no private right of action for a violation of the Code of Professional Responsibility…"); *Jones v. J.C. Penney's Dep't Stores, Inc.*, No. 03-CV-0920A(F), 2005 WL 1313442, at *3 (W.D.N.Y. May 31, 2005), *report and recommendation adopted sub nom. Jones v. J.C. Penney Corp.*, No. 03-CV-920, 2006 WL 8455728 (W.D.N.Y. Mar. 31, 2006) (*citing Daniel v. Safir,* 135 F.Supp.2d 367, 377 (E.D.N.Y. 2001) (observing that no private right of action exists under the NY Rules Prof. C.) *and United States v. Guerreiro,* 675 F.Supp. 1430, 1435 (S.D.N.Y.1987) (declining to suppress evidence to sanction federal prosecutor for violation of New York's disciplinary rule).

The Preamble (Scope) of the NY Code Prof. C. [12] explains that the disciplinary rules were not written to define conduct that would result in civil liability:

> Violation of a Rule should not itself give rise to a cause of action against a lawyer nor should it create any presumption in such a case that a legal duty has been breached. In addition, violation of a Rule does not necessarily warrant any other nondisciplinary remedy…The Rules are designed to provide guidance to lawyers

---

[36] In making this point, the Defendants do not concede that this Court should look to New York as the state whose law and rules of attorney conduct would govern this claim—or any claim in the Complaint. Defendants assume *arguendo* that New York law and professional code apply solely because it is the only law and code alleged by the Receiver.

[37] *See*, New Hampshire Rules of Professional Conduct, Ethics Committee Comment to Rule 1.15 which expressly recognizes that "classic" or "engagement" retainers are permissible and that the fees under such contracts are earned when paid.

and to provide a structure for regulating conduct through disciplinary agencies. They are not designed to be a basis for civil liability. Furthermore, the purpose of the Rules can be subverted when they are invoked by opposing parties as procedural weapons. …

*See also,* Preamble & Scope of the Model Rules of Professional Conduct [20].

Accordingly, while Ice Legal denies any violation of the NY Code Prof. C., and while the violations are inadequately pled (see Motion for More Definite Statement), the Receiver's bald allegation that there was such a violation does not rise to the level of alleging a legally cognizable claim.

The same is true for the somewhat random allegation that Ice Legal violated Rule 1.6(e) [sic] of the NY Code Prof. C. by failing to "promptly refund any unearned fees paid in advance upon termination of representation" (¶71).  First, the Rule the Receiver was attempting to cite—Rule 1.16(e)—was never violated because it pertains to an attorney terminating or declining representation (which did not occur here) and because the fees were earned.  And again, even if that rule had been violated, it would not create a cause of action.

***Second,*** New York does not, in any event, prohibit general retainer agreements for attorney availability. *Kelly v. MD Buyline, Inc.*, 2 F. Supp. 2d 420, 427 (S.D.N.Y. 1998) ("New York courts continue to treat general retainer agreements differently from special retainer agreements in contract actions."); *Agusta & Ross v. Trancamp Contracting Corp.*, 193 Misc. 2d 781, 785, 751 N.Y.S.2d 155, 158 (N.Y. Civ. Ct. 2002) ("Lawyers may legally charge for their availability. Simply for making themselves available to a client, attorneys may recover a fee, without regard to the actual time, effort, or energy that they expend. These types of agreements are called 'general retainers' or 'engagement retainers'").

### A. Likewise, the Engagement Agreement does not violate the rule against restricting a client's right of termination.

And finally, the Receiver also claims that the Engagement Agreement violates New York law that requires that a client have the unqualified right to terminate the attorney-client relationship at any time.[38]  Of course, the Engagement Agreement contains avenues for early termination and the rule's concern that a client will be denied the attorney of his choice due to financial burdens is not applicable—particularly since the Engagement Clients stopped using Ice Legal's services anyway.  But most importantly, the rule was not violated because the right of a client to terminate his attorney without financial consequence does not apply when an attorney is hired under a "general retainer." *Kelly v. MD Buyline, Inc.*, 2 F. Supp. 2d at 445 (acknowledging that a lawyer terminated without cause under a general retainer is entitled to the total contract price).  This reasoning is sensible since the attorney will have already sacrificed income when entering into the retainer agreement.

### 4.  Conclusion

Because, under the facts pled in the Complaint, the subject Engagement Agreement is not unconscionable, Count 3 (Rescission of Per Se Invalid Nonrefundable Retainer)—which relies entirely on that claim—should be dismissed.  The unconscionability theory should also be dismissed from the remaining Counts that rely in part on that theory—all but Count 4 (Voidable Transfer).

---

[38] ¶¶71-72, 177.

**B.  The professional negligence and malpractice-related counts are duplicative, time-barred, and fail to allege actual, ascertainable damages.**

The reasons for dismissal that apply to the professional negligence and malpractice-related counts are summarized in the following table:

| Reasons for Dismissal | Counts to which the dismissal reason is applicable |
|---|---|
| Duplicative of the Professional Negligence count | Breach of Fiduciary Duty<br><br>Breach of Contract<br><br>Unjust Enrichment |
| Time-barred by statute of limitations (or lack of promptness) | Professional Negligence<br><br>Breach of Fiduciary Duty<br><br>Unjust Enrichment<br><br>Recission |
| Failure to allege actual, ascertainable damages under New York law<br><br>(The damages allegations are conclusory under *Twombly*) | Professional Negligence<br><br>Breach of Fiduciary Duty<br><br>Breach of Contract<br><br>Unjust Enrichment |

**1.  Duplication: The breach of fiduciary duty, breach of contract and unjust enrichment counts should be dismissed as duplicative of the professional negligence claim.**

Under the New York law pled by the Receiver, actions that arise out of the same facts as the legal malpractice claim (such as, breach of fiduciary duty, breach of contract, and unjust enrichment) and do not seek distinct and different damages are subject to dismissal as duplicative. *Kliger-Weiss Infosystems, Inc. v. Ruskin Moscou Faltischek, P.C.*, 159 A.D.3d 683, 73 N.Y.S.3d 205 (N.Y. App. Div. 2d Dept. 2018) (breach of contract duplicative); *Barrett v. Goldstein*, 161 A.D.3d 472, 473, 76 N.Y.S.3d 148, 150 (N.Y. App. Div. 1st Dept. 2018) (breach

of fiduciary duty duplicative); *Corsello v. Verizon New York, Inc.*, 18 N.Y.3d 777, 790, 967
N.E.2d 1177, 1185 (N.Y. 2012) (unjust enrichment duplicative).

### a. The breach of duty count is duplicative of the malpractice claim.

As shown in the following table, the breach of fiduciary duty allegations are the same as
those pled for professional negligence:

| Theory | Professional Negligence | Breach of Fiduciary Duty |
|---|---|---|
| ***Contract unconscionable/ nonrefundable*** | The Receiver himself pleads that this allegation applies to both his breach of fiduciary claim and the malpractice claim (¶75). | |
| ***Advice was not "sufficient"*** | "Defendants failed to reasonably and <u>sufficiently advise the Strategic Parties and MEC of the full scope and extent of the financial liability and regulatory peril</u>" (¶169) (emphasis added). "Defendants negligently failed to provide the Strategic Parties and MEC with legal advice sufficient for their clients to comply with consumer-oriented state and federal laws and regulations" (¶168) | "Defendants failed to reasonably and <u>sufficiently advise Receivership Entities of the full scope and extent of the financial liability and regulatory risks</u> arising from the business practices of their clients, the Strategic Parties" (¶161) (emphasis added) |
| ***Failure to take advice to "higher authorities"*** (Note that this claim rests entirely on Rule 1.13 of the NY Rules of Prof C. [¶153] which cannot serve as a basis for legal liability (*see*, discussion, *supra* at p. 37) | It was apparent to Defendants that "certain Strategic Parties' officers and employees were not implementing any changes as a result of Defendants' bullet-point 'outline'" and Defendants were obligated to proceed as was reasonably necessary including "<u>referring the matter to higher authorities in the organizations...</u>" (¶¶170-171) (emphasis added). | "Defendants … became aware that the officers and employees of the Strategic Defendants were not seeking any of Ice Legal's advice" and should have undertaken measures reasonably necessary "<u>referring the matter to other management or higher authorities in the organizations...</u>" (¶162) (emphasis added). |

The damages allegations—should they be found to be sufficiently pled (*see*, discussion below)—are also identical in their vague references to increased regulatory "exposure."

The Receiver does throw in a passing request for the remedy of "disgorgement" in the breach of fiduciary duty count (¶164) and in the Prayer for Relief, but assuming he can bring such claims, this is still a request for monetary damages that does not distinguish the breach of fiduciary duty claim from a garden-variety malpractice claim. *See Access Point Med., LLC v. Mandell*, 106 A.D.3d at 44 (The demand for the return of attorneys' fees paid to defendants is a claim for monetary damages and "[t]he calculated use of the term "disgorgement" instead of other equally applicable terms such as repayment, recoupment, refund, or reimbursement, should not be permitted to distort the nature of the claim…"); *Marcum LLP v. L'Abbate, Balkan, Colavita & Contini, L.L.P.*, 222 A.D.3d 486, 488, 202 N.Y.S.3d 73 (N.Y. App. Div. 1st Dept. 2023) ("Supreme Court also correctly dismissed that part of the legal malpractice claim seeking disgorgement of attorneys' fees … which is, essentially, a claim for monetary damages in connection with its legal malpractice claim.").

Again, assuming *arguendo* that New York law applies, it requires that a cause of action for breach of fiduciary duty be dismissed where it arises from the same facts as the malpractice claim and does not allege distinct damages. *See Daniels v. Lebit*, 299 A.D.2d 310, 749 N.Y.S.2d 149 (N.Y. App. Div. 2d Dept. 2002) (breach of fiduciary duty claim properly dismissed as duplicative of the legal malpractice cause of action); *Barrett v. Goldstein*, 161 A.D.3d at 473 ("The claims for fraud and breach of fiduciary duty are duplicative of the legal malpractice claim, since they all arose from identical facts and allege the same damages"); *Mecca v. Shang*, 258 A.D.2d 569, 570, 685 N.Y.S.2d 458, 460 (N.Y. App. Div. 2d Dept. 1999) (affirming dismissal of breach of fiduciary duty claim since it arose from the same facts as the

legal malpractice claim and do not allege distinct damages); Elizabeth Wolford, *Legal Malpractice Plaintiffs Face Tough Road*, THE DAILY RECORD, TRIALS & TRIBULATIONS, October 1, 2009 ("The law is clear that any breach of fiduciary duty claim may not be duplicative of a legal malpractice claim: A breach of fiduciary duty claim against an attorney must be premised on a different set of facts and seek different relief than a legal malpractice claim.").

Accordingly, the breach of fiduciary duty claim should be dismissed as duplicative of the legal malpractice claim.

### b.  The breach of contract count is duplicative of the malpractice claim.

As shown in the following table, the Receiver pled one less theory under his count for breach of contract than in his count for professional negligence.  The remaining breach theories are duplicative:

| Theory | Professional Negligence | Breach of Contact (Pled only against the law firm) |
|---|---|---|
| *Contract unconscionable/ nonrefundable/ excessive* | "Defendants' supposed "true retainer" arrangement with the Strategic Parties is unconscionable and void as against public policy, and Defendants' conduct representing the Strategic Parties under that agreement constitutes…legal malpractice." (¶75). | Defendants "breached these obligations by … charging unreasonable and excessive fees despite their nonperformance" (¶193, *see also*, ¶70). |

| Theory | Professional Negligence | Breach of Contact (Pled only against the law firm) |
|---|---|---|
| *Advice was not "sufficient"* | "Defendants failed to reasonably and sufficiently advise the Strategic Parties and MEC of the full scope and extent of the financial liability and regulatory peril" (¶169).<br><br>"Defendants negligently failed to provide the Strategic Parties and MEC with legal advice sufficient for their clients to comply with consumer-oriented state and federal laws and regulations" (¶168) | "Ice Legal failed to reasonably and sufficiently advise the Strategic Parties of the full scope and extent of the financial liability and regulatory peril arising from their business practices" (¶192). |
| *Failure to take advice to "higher authorities"* | See, ¶¶170-171. | [Not pled.] |

Again, the damages allegations—should they be found to be sufficiently pled—are also the same in these two counts. Where, as here, the allegations of a breach of contract claim are identical to the legal malpractice cause of action, and no additional promise or duty by the attorney is alleged to have been made which would extend beyond the duty an attorney owes his or her client, the breach of contract claim will be found to be "merely a redundant pleading of the malpractice claim" and should be dismissed. *Miszko v. Leeds & Morelli*, 769 N.Y.S.2d 923 (N.Y. App. Div. 3d Dept. 2004).

### c. The unjust enrichment count is duplicative of the professional malpractice claim.

The unjust enrichment count also arises from the same facts pled to support the professional malpractice count. If the damages can be said to be pled at all, it would apparently be the amount that the Claimants allegedly paid for the availability retainer—the same as that pled in malpractice count (plus interest). But "[a]n unjust enrichment claim is not available

where it simply duplicates, or replaces, a conventional contract or tort claim." *Corsello v. Verizon New York, Inc.*, 967 N.E.2d at 790.

> **2. Expired Statute of Limitations: The breach of fiduciary duty, unjust enrichment counts, and rescission should be dismissed as time-barred.**
>
> > **a. The professional negligence count is barred by the New York statute of limitations.**

Under New York law, an action for attorney malpractice must be filed within three years from the date of accrual. N.Y. C.P.L.R. § 214(6); *Gurvey v. Cowan, Liebowitz & Latman, P.C.*, No. 06 CIV. 1202 (LGS), 2017 WL 2880554, at *5 (S.D.N.Y. July 6, 2017), aff'd, 757 F. App'x 62 (2d Cir. 2018). "A claim [for professional malpractice] accrues when the malpractice is committed, not when the client discovers it.". *Williamson ex rel. Lipper Convertibles, L.P. v. PricewaterhouseCoopers LLP*, 9 N.Y.3d 1, 7–8, 872 N.E.2d 842, 845 (2007).

The Receiver does not specifically allege when the purported malpractice occurred, but the following may be gleaned from the Complaint:

- "After submitting their meager April 21, 2021 outline, Defendants performed little or no further legal services for the Strategic Parties and MEC." (¶169) (emphasis added).

- "[V]ery shortly into the engagement, Defendants became aware that the Strategic Parties were not seeking to obtain any further legal advice from Ice Legal in any respect and that the Strategic Parties' management was not making changes to their operations to address the issues identified in Defendants' bullet-point outline" (¶82) (emphases added).

- "After performing their limited initial work in early 2021, Defendants were well aware that they were not providing any of the 'Services' discussed in the Engagement Agreement." (¶82) (emphasis added).

Accordingly, on its face, the malpractice claim (whether based on insufficiency of advice or failure to report up the chain of corporate leadership) accrued in "early 2021." Therefore, the three-year statute for the Receiver's claim of malpractice expired in early 2024.

While not specifically pled with respect to the malpractice claim, should the Tolling Agreement mentioned in the general allegations be enforceable (which Ice Legal does not concede), it only began November 1, 2024 (¶¶155-156). Thus, the Tolling Agreement could not extend the early 2024 deadline.

Nor is there tolling under the continuous representation doctrine since it only applies to when there is on-going representation in a <u>case</u>, not just a continuing general relationship between the client and the attorney. *In re Lawrence*, 24 N.Y.3d 320, 342, 23 N.E.3d 965, 980 (N.Y. 2014); *McCoy v. Feinman*, 99 N.Y.2d 295, 306, 785 N.E.2d 714 (N.Y. 2002) (there must be a "mutual understanding" of the need for further representation on the specific subject matter underlying the malpractice claim); *Offshore Express, Inc. v. Milbank, Tweed, Hadley & McCloy, LLP*, 291 F. App'x 358, 359 (2d Cir. 2008) ("[T]he rule is premised on the fact that no person should be forced to 'jeopardize <u>his pending case</u> or his relationship with the attorney handling <u>that case</u> during the period that the attorney continues to represent the person.'" (emphasis added) (*quoting*, *Glamm v. Allen*, 57 N.Y.2d 87, 94, 439 N.E.2d 390, 393 (N.Y. 1982)). Moreover, charging a fee is not enough to toll the statute of limitation. *In re Lawrence*, 24 N.Y.3d at 342.

Accordingly, on the face of the Complaint, the Receiver has attempted to plead a claim that is time-barred by the three-year statute of limitation. The count for professional negligence should therefore be dismissed.

   **b. The breach of fiduciary duty, unjust enrichment, and rescission counts are also time-barred.**

To the extent that the malpractice-related counts are not dismissed as duplicative of the malpractice claim, they should be dismissed as time-barred.

*Breach of Fiduciary Duty*: The breach of fiduciary duty count is time-barred for the same reason. *Access Point Med., LLC v. Mandell*, 963 N.Y.S.2d 44, 46 (N.Y. App. Div. 1st Dept. 2013) (where remedy primarily sought is monetary in nature, limitations period for breach of fiduciary duty claim is three years); *Lia v. Saporito*, 541 Fed. Appx. 71, 75 (2d Cir. 2013)(unpublished summary order) (same); *Noskov v. Roth*, No. 19-CV-7431 (RA), 2020 WL 4041125, at *5 (S.D.N.Y. July 17, 2020) ("Under New York law, a claim for breach of fiduciary duty that is "based on the same alleged conduct amounting to legal malpractice" is subject to the same three-year statute of limitations period as the legal malpractice claim").

*Unjust Enrichment*: Similarly, the claim of unjust enrichment is also time-barred. *Ingrami v. Rovner*, 847 N.Y.S.2d 132 (N.Y. App. Div. 2d Dept. 2007) (three-year statute of limitations applies to unjust enrichment when plaintiff is seeking monetary relief).

*Rescission*: And finally, the Receiver's rescission count is also time-barred because his Claimants needed to bring that action promptly upon learning of the alleged wrong. *New York Tel. Co. v. Jamestown Tel. Corp.*, 26 N.E.2d 295 (N.Y. 1940); *see also Capstone Enterprises of Port Chester, Inc. v. Cnty. of Westchester*, 62 A.D.2d 343, 344, 691 N.Y.S.2d 574 (N.Y. App. Div. 2d Dept. 1999) ("Where a party has accepted the benefits of an agreement … and then seeks to repudiate the agreement on the ground of coercion, it must do so in timely fashion or any objection is waived and the agreement is ratified") (citations omitted) (*see*, discussion on ratification, *supra*, at p. 35).

### 3. The Complaint fails to allege actual, ascertainable damages proximately caused by Ice Legal's purported breaches.

The causation and damages allegations are too vague to pass muster under New York's standard for pleading claims against an attorney. To state a claim of legal malpractice under New York law, a plaintiff must allege that: l) there existed an attorney-client relationship; 2) the attorney failed to exercise the ordinary reasonable skill and knowledge commonly possessed by a member of the legal profession; 3) the attorney's conduct was the proximate cause of the injury to plaintiff; and 4) as a result, the plaintiff suffered "actual and ascertainable damages." *Arnold v. Devane*, 123 A.D.3d 1202, 1203–04, 998 N.Y.S.2d 509, 511 (N.Y. App. Div. 3d Dept. 2014); *see also Ocean Ships. Inc. v. Stiles*, 315 F.3d 111 (2d Cir. 2002); *Weil, Gotshal & Manges, LLP v. Fashion Boutique of Short Hills. Inc.*, 10 A.D. 3d 267, 271, 780 N.Y.S. 2d 593 (N.Y. App. Div. 1st Dept. 2004). (the client must demonstrate that "but for" the attorney's conduct, the client would not have sustained any ascertainable damages); *Ellsworth v. Foley*, 24 A.D. 3d 1239, 805 N.Y.S. 2d 899 (N.Y. App. Div 4th Dept. 2005) (holding that the plaintiff must prove that "but for" the alleged legal malpractice, there would have been a more favorable outcome in the underlying action).

Where, as here, the plaintiff's claims of breach of fiduciary duty are essentially claims of legal malpractice, they are governed by the same standard of pleading. *Boone v. Bender*, 904 N.Y.S.2d 467 (N.Y. App. Div. 2d Dept. 2010). *See also*, Elizabeth Wolford, *Legal Malpractice Plaintiffs Face Tough Road* ("to recover under a claim for damages against an attorney arising out of the breach of the attorney's fiduciary duty, the plaintiff must establish the 'but for' element of malpractice, irrespective of how the claim is denominated in the complaint," *quoting*, *Ulico Cas. Co. v. Wilson, Elser, Moskowitz, Edelman & Dicker*, 56 A.D.3d 1, 10-11, 865 N.Y.S.2d 14 (N.Y. App. Div. 1st Dept. 2008)).

While the Complaint is deficient in its exposition of all of the necessary elements for each of the causes of action, the most glaring are the allegations of causation and damages. As shown below, the causation and damages allegations are too nebulous to state a claim, no matter how the Receiver characterizes the cause of action:

| PHANTOM CAUSATION AND DAMAGES ALLEGATIONS | | |
|---|---|---|
| **Professional Negligence** | **Breach of Fiduciary Duty** | **Breach of Contract** |
| The Claimants "were harmed in numerous ways in an amount to be determined at trial." (¶172) (emphasis added) | Aside from the payment of purportedly unreasonable fees, the Receiver's Claimants suffered "identifiable losses" [even though they are never actually identified] (¶163) | The Claimants "were harmed in an amount to be determined at trial, including payment of excess legal fees." (¶194) (emphasis added) |

Despite using the term "numerous," when describing the ways in which the Claimants were allegedly harmed by malpractice, the Receiver specifies only one: that it "increased their liabilities and regulatory exposure" (¶171).

*First*, the notion that Ice Legal was responsible for an increase in the Claimants' "liability and regulatory exposure"—when the only advice they sought from Ice Legal pointedly warned about that exposure—is simply not plausible under *Twombly*. It is also speculative—and implausible under *Twombly*—that some "sufficient" advice (whatever that may look like) would have caused the Claimants to change some unspecified aspect of a business model that: 1) they had been operating for years; and 2) had been thoroughly vetted by other lawyers.[39] Moreover,

---

[39] This is fair deduction from the fact that Ice Legal's consumer cases referenced in the Complaint were heavily defended on the merits by attorneys. And because the Complaint relies on those complaints, the Court is entitled to know the specifics of that litigation (which can be supplied if the Receiver denies that the cases were defended by attorneys). Defendants also ask this Court to take judicial notice of the documents filed in the CFPB case that establish that:

- Dennis Vacco, a former New York State Attorney General, provided a formal opinion in 2016 that the "in-person face-to-face presentation [was] sufficient to withstand a claim

the Receiver never alleges what would constitute "sufficient advice," but if it means <u>more of the</u> <u>same advice</u>, its effect is too speculative to state a claim for malpractice. *See AmBase Corp. v. Davis Polk & Wardwell*, 8 N.Y.3d 428, 436, 834 N.Y.S.2d 705 (2007) (The effect of a lack of advice is purely speculative and cannot support a legal malpractice claim).

***Second***, "exposure" is simply an increased risk of harm, which is not a legally cognizable damage and cannot be quantified. As such, it does not meet New York's pleading requirement that malpractice damages be "actual" and "ascertainable." *Arnold v. Devane*, 123 A.D.3d at 1203–04). Nor does it meet New York's requirement that damages be based upon more than mere conclusory and speculative allegations. *Denisco v. Uysal*, 195 A.D.3d 989, 991, 146 N.Y.S.3d 813 (N.Y. App. Div. 2d Dept. 2021) ("Conclusory allegations of damages or injuries predicated on speculation cannot suffice for a malpractice action, and dismissal is warranted where the allegations in the complaint are merely conclusory and speculative").

Similarly, there is no allegation as to what "liabilities" the Claimants have incurred or how they would be measured. If the Receiver is alluding to the CFPB action, there has been no final determination in that regulatory action that the Claimants violated a regulation or that they are liable to anyone.

---

by an enforcement agency that the exemption to the TSR does not apply." (CFPB case, Dkt. 533-5).

- An attorney, Michael Thurman—whom Judge Roemer in the CFPB case found credible—testified how he, as Strategic's ethics and regulatory compliance counsel, consulted over a period of years with Strategic to make the face-to-face meetings compliant with the TSR. (CFPB Case, Decision and Order (Dkt. 183), Evidentiary Hearing Transcript (Dkt. 123, p. 49-96). *See also*, spreadsheet attached to Letter from Richard Gustafson, dated March 15, 2024 which shows Thurman Legal Invoices for "General Regulatory Advi[c]e," and Robinson Stewart Invoices for "Ethics Consult" (CFPB Case, Dkt. 234-2)).

***Intervening cause:*** Moreover, the only Ice Legal advice identified in the Complaint as having caused harm is the Memorandum dated April 19, 2021 which was addressed to the two Liaisons under the contract (¶87), both of whom are attorneys with an independent responsibility of advising the same Claimants on the same issues. This comports with Ice Legal's contracted-for role as "supporting counsel advising the Clients' primary litigation or regulatory outside counsel or in house counsel" (Engagement Agreement, p. 9).

The Receiver, therefore, has pled an intervening cause for his Claimant's unspecified damages—intermediary counsel's advice to the Claimants after receiving Ice Legal's advice. The Receiver does not disclose what the intermediary counsel's advice to the Claimants was even though, in his role as Receiver, he knows or should know. However, by loosely implying that the Liaisons (i.e. the intermediate attorneys) were among the "officers and employees [who] were not acting in the best interests of the Claimants" (¶83), the Receiver suggests that, in his view, the intermediary attorneys "were not taking any steps to address the legal issues Defendants had identified" (¶83). If, as the Receiver seems to say, they did not relay Ice Legal's advice (or substituted it with their own advice), then the Receiver has sued the wrong parties. *See Perks v. Lauto & Garabedian*, 306 A.D.2d 261, 262, 760 N.Y.S.2d 231 (N.Y. App. Div. 2d Dept. 2003) ("subsequent counsel had a sufficient opportunity to protect the plaintiffs' rights, and any negligence by the appellants was not the proximate cause of the plaintiffs' alleged damages").

### 4. Conclusion

Accordingly, based on the Receiver's failure to plead that actual, ascertainable damages were proximately caused by Ice Legal, three of the Receiver's counts (professional negligence, breach of fiduciary duty and breach of contract) do not state a claim upon which relief can be granted. They should be dismissed.

IV.    **Additional reasons for dismissal applicable to the individual counts.**

    A.    **Motion to Dismiss Count 3: Rescission of Per Se Invalid Nonrefundable Retainer**

As explained above, the Receiver cannot state a claim for rescission under New York law because:

- The Receiver has not pled which entities made the retainer payments or on whose behalf they were paid.

- The claim was not brought "promptly" (and the contract was ratified by repeated payments over a span of years).

- The claim is based entirely on unconscionability—a theory which has been eviscerated by the Receiver's own allegations.

The claim should also be dismissed for the following additional reasons:

    1.    **The parties cannot be put back in their original positions.**

The most serious defect in the Receiver's rescission count is that the Court cannot put the parties back in their original positions before the Engagement Clients retained the Ice Firm. *See Rudman v. Cowles Commun., Inc.*, 280 N.E.2d 867, 874 (N.Y. 1972) (Rescission may only be invoked when there is no adequate remedy at law and where the status quo may be substantially restored); *E. T. C. Corp. v. Title Guarantee & Tr. Co.*, 2 N.E.2d 284, 286 (N.Y. 1936) ("Where a contract has been wholly or partly executed before an action at law can be maintained based on a rescission, the parties must be restored to the position they occupied before the contract was entered into").

Here, the Ice Firm can never be put back in the position it occupied before the retainer agreement was executed.  The income stream that the Ice Firm sacrificed by allowing itself to be conflicted out of representing consumers against the debt settlement enterprise cannot be

restored.  The ethical conflict that prevented Ice Legal from representing consumers against the Receiver's Claimants—the very conflict the Claimants bargained for—cannot simply be removed by judicial fiat such that Ice Legal could resume representing their adversaries. Likewise, the Receiver's Claimants cannot be put back in their original position: an ongoing business enterprise motivated to pay, and capable of paying, settlements with consumers.

### 2.  The Claimants have legal remedies.

Rescission may only be invoked when there is no adequate remedy at law. *See Rudman v. Cowles Commun., Inc.*, at 874 (N.Y. 1972); *Empire Outlet Builders LLC v. Constr. Resources Corp. of New York*, 97 N.Y.S.3d 68, 69 (N.Y. App. Div. 1st Dept. 2019) ("[T]he equitable remedy of rescission is not available where there is an adequate legal remedy, and plaintiff does not explain why damages—a legal remedy—would be insufficient.").

### 3.  The Individual Defendants were not parties to the contract.

While the Receiver acknowledges that the retainer agreement was between the Ice Firm and the Engagement Clients (*see*, Engagement Agreement attached to Complaint) and properly confines his breach of contract count to that entity, he brings his rescission claim against all three defendants: the Ice Firm and the Individual Defendants.  The rescission claim should be dismissed as to the Individual Defendants as they have no contract with the Claimants to rescind.

### 4.  Conclusion

For the reasons stated above, the Rescission count should be dismissed for failure to state a claim under Rule 12(b)(6) Fed. R. Civ. P., or at a minimum, it should be dismissed as to the Individual Defendants.

### B. Motion to Dismiss Count 4: Voidable Transfer

The fourth count of the Complaint seeks to allege a claim under the Uniform Voidable Transactions Act ("UVTA"), codified at N.Y. Debt. & Cred. Law §§ 270, *et seq.* (the "NY-UVTA") (¶ 181). Ice Legal does not concede the applicability of New York statutory law to this case but points out that: 1) the court in the CFPB case did not authorize the Receiver to bring such a claim; and 2) the Receiver's allegations do not state a claim under that law anyway.

#### 1. The Receiver lacks standing to bring a voidable transfer action.

##### a. The Receiver was not granted authority by the appointing court to bring a voidable transfer action.

Similar to the Receiver's lack of authority to bring an arbitration action, he also has no authority to bring a voidable transfer action. Among the seven most recent McNamara-receivership cases that he has catalogued on his website, this case is the only one in which the

words "including but not limited to, action challenging fraudulent or voidable transfers" do not appear in the paragraph empowering him to bring actions. (*see*, discussion, *supra*, at p. 28). Accordingly, courts wishing to grant a receiver the authority to bring voidable transfer actions, explicitly say so. Here, the court in the CFPB case has not granted Mr. McNamara that authority.

**Exemplar of other orders appointing Mr. McNamara as Receiver.**

M. Institute, compromise, adjust, appear in, intervene in, defend, dispose of, or otherwise become party to any legal action in state, federal or foreign courts or arbitration proceedings as the Receiver deems necessary and advisable to preserve or recover the Assets of the Receivership Entities, or to carry out the Receiver's mandate under this Order, including, but not limited to, actions challenging fraudulent or voidable transfers;



"…including but not limited to, action challenging fraudulent or voidable transfers"

##### b. The Receiver lacks standing because the Claimants are not creditors.

The NY-UVTA applies to "[a] transfer made or obligation incurred by a debtor is voidable <u>as to a creditor</u>…" (emphasis added). Because the Claimants are not creditors, the

Receiver cannot invoke the NY-UTVA.  Stated differently, the Receiver has no standing to bring claims on behalf third party beneficiaries of the receivership: A receiver generally "'stands in the shoes of the corporation and can assert only those claims which the corporation could have asserted.'" *Eberhard v. Marcu*, 530 F.3d 122, 132 (2d Cir. 2008) (quoting *Lank v. New York Stock Exch*., 548 F.2d 61, 67 (2d Cir.1977)).  The Receiver cannot bring claims belonging to creditors just because his work conserving assets may eventually benefit them. *See Cobalt Multifamily Invs. I, LLC v. Arden*, 46 F. Supp. 3d 357, 361 (S.D.N.Y. 2014) (despite the admirable goal of obtaining money to compensate investors, the Receiver cannot assert claims belonging to those outside the receivership entities simply because he was appointed for their benefit).

Nor has the Receiver pled that his claims fit within exceptions espoused in other Circuits. For example, he did not plead that his Claimants  were "evil zombies" that he freed from the coercion of individual wrongdoers so as to trigger the exception for Ponzi scheme cases such as *Scholes v. Lehmann*, 56 F.3d 750 (7th Cir. 1995) and its progeny.  Nor has he pled that his Claimants were "separate and distinct" from the business model being denounced by the CFPB. *See Wiand v. ATC Brokers Ltd.*, 96 F.4th 1303, 1310 (11th Cir. 2024).  Presumably, he has not pled these exceptions because they are not applicable.

In short, the NY-UVTA claim should be dismissed because the Receiver has not alleged any facts that would give him standing.

### 2. The Receiver failed to allege which of his Claimants made the payments.

The Receiver alleges simply that the "Strategic Parties" paid Defendants (¶183), but does not say which of those three parties—at least one of which is not an entity for whom the Receiver is authorized to bring claims—made the payments.  And since the payments were made

on behalf of over one hundred clients—most of whom are not CFPB Defendants—the representation (without explanation) that these three parties are entitled to the return of <u>all</u> the fee payments is disingenuous.

If it turns out that the payments were not made by anyone that the Receiver is authorized to represent, then no one is a transferor under the NY-UTVA and the claim must be dismissed.

### 3. In the voidable transfer count, the Receiver contradicts his averments in the general allegations that the transfers were made only to the Ice Firm, not the Individual Defendants.

In ten out of eleven occasions in the "Allegations Common to All Counts," the Receiver states that the transfers (the payments) were to the Ice Firm, not the Individual Defendants.[40] But in the voidable transfer count, he contradicts himself by saying all the transfers were to all Defendants.[41]   The notion that the Individual Defendants received payments is also contradicted by the Engagement Agreement which establishes that the Ice Firm was the party entitled to receive payments.  Even the Receiver's breach of contract count is directed solely against the Ice Firm.   Yet, the voidable transfer count is directed against all Defendants.  The Individual Defendants should be dismissed from this count on the grounds that the Receiver has not clearly pled they were the recipients of any transfers from the Claimants.

### 4. The Receiver must plead and prove that the Claimant's did not receive reasonably equivalent value for Ice Legal's fees.

The Receiver concedes that "[t]he NY-UVTA defines a voidable transfer to include a transfer made by a debtor '[w]ithout receiving a reasonably equivalent value in exchange for the transfer,'" (¶182).  And the Receiver pleads that his Claimants received no equivalent value because they paid $2.625 million "in exchange for only 63.4 invoiced hours of legal work"

---

[40] *Compare*, ¶86 *with*, ¶¶91, 96, 101, 104, 108, 113, 118, 121, 125, 130.

[41] ¶¶183-184, 186-187.

(¶183).  But as discussed above, the idea that the payments were "in exchange" for hours of legal work is contradicted by the Receiver's own allegations and documents attached to the Complaint.  According to the Complaint itself, the "equivalent value" or "consideration" sought and bargained for by the Claimants was to forever preclude Ice Legal from representing their adversaries (*see*, discussion *supra*, at p. 33).

### 5.  The Receiver must also plead that his Claimants had knowledge of an impending insolvency.

In addition to the necessity of pleading a plausible basis for concluding that the Claimants did not receive equivalent value for the transfer, the Receiver must show that, at the time of each transfer, his Claimants had knowledge of a purported impending insolvency.  Specifically, the Receiver must plead that the Claimants were "engaged or about to engage in a business or transaction" for which the remaining assets of the Claimants were unreasonably small in relation to the business or transaction. N.Y. Debt. & Cred. Law § 273(a)(2)(i).  The Receiver has not pled the value of any Claimant's assets—much less, all the Claimants' assets—at the time of each of the transactions or how those compare to each of the transfers.

Alternatively, the Receiver must plead or prove that the Claimants "[i]ntended to incur, or believed or reasonably should have believed that [they] would incur, debts beyond [their] ability to pay as they became due." N.Y. Debt. & Cred. Law § 273(a)(2)(ii).  The Claimants, however, had operated the same business for years without incurring debts beyond their ability to pay when due.

Other than reciting the statute (which is a "formulaic recitation of the elements of a cause of action" prohibited by *Twombly*), the Receiver alleged only one theory regarding his Claimants' "knowledge of insolvency."  Specifically, the Receiver alleges that, because Ice Legal's consumer clients had alleged that the advance fees the Claimants were collecting was

unlawful, the Claimants believed, or should have believed, they were incurring "liabilities to creditors, including consumers, that exceeded their ability to pay when due" (¶186)  The reference to the collection of unlawful "advance fees" apparently alludes to the CFPB case which has not adjudicated any TSR-related liability to creditors or consumers (and arguably cannot do so).  But even if the Claimants are found to have violated the TSR, the implication that the debt settlement enterprise would not have been able to pay any resulting fine or restitution is speculative at best.  The same may be said for liabilities to consumers where a determination would have to be made as to whether, and how much, each consumer was harmed by the taking of an advance fee.

Worse, the Receiver seems to be saying that the Claimants knew, or should have known, about insolvency-causing future liabilities years before the CFPB case was filed, even though the Receiver, with the benefit of hindsight, cannot quantify any TSR-based liability to consumers even now.  Worse still, if the Claimants are insolvent now, it is because the Receiver has shut down most of the debt settlement enterprise—an occurrence which the Receiver has not pled should have been predicted by his Claimants.[42]

### 6. On the face of the Complaint, the Statute of Repose has extinguished the Receiver's claim for the first transfer.

Section 278 of the NY-UVTA—entitled Extinguishment of claim for relief—states that a claim to void a transfer must be brought within four years of the transfer (N.Y. Debt. & Cred. Law § 278(b)).  Again, the Receiver fails to allege the dates that transfers were made but does

---

[42] The Receiver's failure to properly plead insolvency or the absence of reasonable equivalent value is not a one off.  *See McNamara v. Voltage Pay Inc.*, No. 2:15-cv-02177-JAD-GWF, 2017 WL 3709057 (D. Nev. Aug. 28, 2017) ("As to the first element, the complaint does not allege sufficient facts suggesting that the Receiver Entities were insolvent at the time they paid fees …[and]…[t]here are also sparse facts about whether the Receiver Entities were truly insolvent at the time of the transfers.").

say that "[t]he Strategic Parties <u>promptly</u> paid [Ice Legal's March 15, 2021 invoice for]

$500,000" (¶86) (emphasis added).  Assuming that "prompt" means something less than two

weeks, then the claim to void that transfer was extinguished prior to the filing date of March 27,

2025.

Notably, the Receiver does not attach the Tolling Agreement mentioned in the general

allegations (¶155-156) to the Complaint.  Nor does he allege it could ever be applicable to a

statute of repose or that all his Claimants were parties to that agreement (possibly because non-

Receivership Defendants, such as Hedgewick, were not).

Since, on the face of the Complaint, the statute of repose has extinguished the Receiver's

claim to void the first transfer, that portion of the claim should be dismissed.

### 7.  Conclusion

For the reasons stated above, the Voidable Transfer count should be dismissed for failure

to state a claim under Rule 12(b)(6) Fed. R. Civ. P., or at a minimum, it should be dismissed as

to the Individual Defendants and as to the first payment.

### C.  Motion to Dismiss Count 6: Unjust Enrichment

As stated above, the unjust enrichment claim is time-barred (*see*, *supra*, at p. 47).  But

there are other reasons that require the claim to be dismissed.

### 1.  The Complaint's unjust enrichment allegations are impermissibly conclusory under *Twombly*.

The unjust enrichment count is a hodgepodge of undeveloped concepts and disconnected

insinuations that either contradict other facts that were pled or do not rise to the level of

cognizable legal theories, or both.  First, the Receiver alleges that "Defendants received $2.625

million...in exchange for only 63.4 invoiced hours of legal services" (¶197).  This statement is

belied by the Engagement Agreement attached to the Complaint which shows that the money

was for a general retainer—not payment for hours worked. (*see also*, ¶42 where the Receiver alleges that "[t]here is scant evidence that the parties were attempting to tie the money that Ice Legal would receive to the amount of actual legal work to be performed").

Next, the Receiver seems to suggest that Ice Legal <u>coerced</u> the Claimants to make these payments by telling them "that Ice Legal planned to bring future litigation ('100 suits a year')" (¶198).  Since the Receiver never specifically alleges which of the Engagement Clients made the payments, it is impossible to know who was supposedly coerced to make them.  Leaving that aside, this coercion insinuation is not plausible in light of the pleaded facts that: 1) it was the Receiver's Claimants—part of a large, sophisticated, multi-million dollar business—that proposed the engagement to the Ice Firm (*see*, ¶3); and 2) the negotiations went many rounds with the Ice Firm settling for much less than it requested (¶¶42-52).

For good measure, the Receiver alleges that the Ice Firm should not have accepted the payments from the Engagement Clients because pleadings that Ice Legal filed on behalf of consumers accused them of fraud (¶¶199-200).  Assuming *arguendo* that the Receiver's Claimants were, in fact, fraudsters, how that would entitle them to a return of fee payments—particularly on the basis of a claim arising from equity—is never explained.

But regardless, as pointed out above, allegations from complaints filed in actions that were never adjudicated are immaterial and should be stricken under Rule 12(f) Fed. R. Civ. P. (*see*, *supra*, at p. 25).  Moreover, Ice Legal is protected from this sort of attack by an absolute litigation privilege (*see*, *supra*, at p. 26).  If the Receiver intends to take the position that his own Claimants were villains, he will need to plead and prove that without the crutch of citing unadjudicated allegations either in Ice Legal's consumer cases or the CFPB case.

In the end, the Receiver never connects these insinuations to a legal theory, stating only that:

> 201.    As a result of said payments, Defendants were unjustly enriched.

Accordingly, the unjust enrichment count should be dismissed as a failure to meet the *Twombly* standard that allegations in pleadings not be conclusory.

Under New York law, an unjust enrichment claim requires a showing that: 1) the other party was enriched, 2) at that party's expense, and 3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered. *See Greene v. Clean Rite Centers, LLC*, 714 F. Supp. 3d 134, 149 (E.D.N.Y. 2024). It is available only in unusual situations when, though the defendant has not breached a contract nor committed a recognized tort, circumstances create an equitable obligation running from the defendant to the plaintiff. *Corsello v. Verizon New York, Inc*., 967 N.E.2d 1177, 1185 (N.Y. 2012).  The Receiver's allegations do not meet these requirements under New York Law.

### 2.    An unjust enrichment claim not available when there is a valid contract.

The existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract—such as unjust enrichment—for events arising out of the same subject matter. *Clark-Fitzpatrick, Inc. v. Long Island R. Co.*, 70 N.Y.2d 382, 388, 516 N.E.2d 190, 193 (N.Y. 1987).

### 3.    Because the payments were made to the Ice Firm, the Individual Defendants should be dismissed from this count.

Moreover, by the Receiver's own admission in the general allegations, the Ice Firm accepted these payments, not the Individual Defendants, so they should be dismissed from this

count. (*see*, discussion regarding allegations as to which Defendant received payments (or

transfers, *supra*, at p. 56).

### 4. Conclusion

The Court should dismiss all the Receiver's unjust enrichment claims for failure to state a

claim under Rule 12(b)(6) Fed. R. Civ. P., or at a minimum, dismiss the claims against the

Individual Defendants.

## V.    Conclusion as to all counts

The Court should dismiss all the Receiver's claims under Rule 12(b)(6) Fed. R. Civ. P.

## MOTION TO STAY (IN THE ALTERNATIVE)

In the event that the Receiver's claims survive the Rule 12 Fed. R. Civ. P. motions, the

action should be stayed during the resolution of the CFPB Defendants' appeal before the Second

Circuit. *Consumer Financial Protection Bureau v. Stratfs, LLC (f/k/a Strategic Financial*

*Solutions, LLC)*, Case No. 24-697 (2d Cir.).

The "power to stay proceedings is incidental to the power inherent in every court to

control the disposition of the causes on its docket with economy of time and effort for itself, for

counsel, and for litigants." *Landis v. N. Am. Co.*, 299 U.S. 248, 254–255 (1936). "How this can

best be done calls for the exercise of judgment, which must weigh competing interests and

maintain an even balance." *Id*. at 255.

A motion to stay pending appeal turns on four considerations: 1) the probability of

appellant's success on the merits; 2) whether the movant will be irreparably harmed without a

stay; 3) whether a stay will substantially injure other parties; and 4) where the public interest lies.

*See In re World Trade Ctr. Disaster Site Litig.*, 503 F.3d 167, 170 (2d Cir. 2007); *Nken v.*

*Holder*, 556 U.S. 418, 434 (2009).  The necessary degree of possibility of success will vary

according to the Court's assessment of the other stay factors. *Mohammed v. Reno*, 309 F.3d 95,

101 (2d Cir. 2002).

### A.  The appellants' probability of success is enhanced by the *Loper Bright* decision.

Here, the CFPB Defendants' appeal seeks to undo the Preliminary Injunction that was

entered prior to the Supreme Court's decision in *Loper Bright Enterprises v. Raimondo*, 603 U.S.

369 (2024).  Before *Loper Bright*, the CFPB Defendants were handcuffed by the law on agency

interpretations of statutes.  In response to the CFPB's claim that the CFPB Defendants engaged

in abusive telemarketing practices and did not satisfy the TSR's face-to-face exemption, the

CFPB Defendants were limited, for the most part, to arguing that they did in fact satisfy the

TSR's face-to-face exemption.  The law, as it existed, did not provide the CFPB Defendants with

a basis to press a more fundamental defense—that the CFPB is trying to enforce the TSR in ways

that are inconsistent with the TSR's implementing statute, the Telemarketing Act, 15 U.S.C.

§ 6101 *et seq.*

In *Loper Bright*, the Supreme Court changed the ground rules for a case such as this one.

No longer must litigants effectively concede that agency regulations represent the will of

Congress.  Instead, litigants (and the courts) must start at the beginning—with the language of

the statute itself.  Here, the Telemarketing Act does not support the regulations and

interpretations advanced by the CFPB.  Specifically, the CFPB Defendants may argue that: 1) the

Telemarketing Act does not govern legal services; 2) the Telemarketing Act does not authorize

claims for "assisting and facilitating" the violations alleged here; 3) the Telemarketing Act does

not govern face-to-face interactions; and 4) the Telemarketing Act does not permit a burden shift

to the CFPB Defendants. *Loper Bright*, therefore, substantially increases the CFPB Defendants'
likelihood of success on appeal.

**B. Ice Legal will be irreparably harmed without the stay.**

As shown above, the Second Circuit may reverse on the merits (i.e. find that the decision
was not supported by the evidence) or it may determine that *Loper Bright* requires a new hearing
on the Preliminary Injunction, with new findings of fact and new conclusions of law. Either
decision may ultimately result in the elimination of the Preliminary Injunction, and with it, the
need for the Receiver. The Receiver would then have no standing to pursue this case.

Proceeding with this case during the pendency of the appeal will irreparably harm Ice
Legal by subjecting it to costly litigation that may ultimately be unnecessary. While monetary
loss alone will generally not amount to irreparable harm, it will suffice if that loss cannot be
rectified by financial compensation. *Borey v. Nat'l Union Fire Ins. Co. of Pittsburgh,
Pennsylvania*, 934 F.2d 30, 34 (2d Cir. 1991). Here, Ice Legal's costs of litigation cannot be
rectified by financial compensation, either from the Receiver (who will no longer exist) or the
CFPB Defendants involved in this case (who may also be nonexistent or insolvent).

**C. The stay will not substantially injure other parties.**

The Receiver has filed this case which will preserve the claims from any (further)
expiration of statutes of limitation or repose. A stay will not harm the receivership estate and
may actually benefit it. As with Ice Legal, proceeding with costly litigation that may ultimately
be unnecessary will harm the estate that the Receiver is tasked with preserving. Just in the
months between August of 2024 and January of 2025, the Receiver and his firm has already

spent nearly $40,000 of the estate's money on this case—an amount that does not include the preparation and filing of the Complaint itself.[43]

Additionally, if it is found that the Preliminary Injunction was improvidently granted, then the brief delay in liquidating what the Receiver believes is an asset of the receivership estate will not injure the estate since it will no longer exist.  Even if the Preliminary Injunction is upheld, the delay will not be a substantial injury to the Receiver who seeks only monetary damages not injunctive relief.

### D.  Where the public interest lies.

The public has an interest in promoting judicial economy and in avoiding an investment of court resources in proceedings that may prove to have been unnecessary. *Sutherland v. Ernst & Young LLP*, 856 F. Supp. 2d 638, 644 (S.D.N.Y. 2012).

### E.  The purpose of a stay is the same as the purpose of the Preliminary Injunction and the mandate of the Receiver—to preserve the status quo.

Finally, the court should "weigh the [motion to stay] factors in light of the purpose of a stay pending appeal, which is to maintain the status quo." *United States v. Am. Express Co.*, No. 10CV4496NGGRER, 2015 WL 13735045, at *3 (E.D.N.Y. May 19, 2015) (*quoting Safeco Ins. Co. of Am. v. M.E.S., Inc.*, No. 09-CV-3312 (ARR) (ALC), 2010 WL 5437208, at *10 (E.D.N.Y. Dec. 17, 2010) (*citing Kidder, Peabody & Co. v. Maxus Energy Corp.*, 925 F.2d 556, 565 (2d Cir. 1991).

---

[43] Invoices submitted with Third Motion for Attorney Fees and Expenses of the Receiver and Professionals, filed April 23, 2025 in the CFPB case (Dkt. 669) of which Ice Legal invites the Court to take judicial notice.  Note that this only includes time entries that specifically mention Ice Legal by name. There are undoubtedly more under the generic term, "third party."

That purpose—keeping the status quo—is the same as the purpose of the preliminary injunction. *See Meineke Discount Muffler Shops, Inc. v. Noto*, 603 F. Supp. 443, 444 (E.D.N.Y. 1985) (the purpose a preliminary injunction is also to preserve the status quo); *Sierra Club v. U.S. Army Corps of Engineers*, 732 F.2d 253, 256 (2d Cir. 1984) ("[a] preliminary injunction is issued to maintain the status quo until there can be a hearing on the merits"); *Danielson v. Local 275, Laborers Intern. Union of N.A.*, 479 F.2d 1033, 1037 (2d Cir. 1973) (same).  The Preliminary Injunction in the CFPB action is no different. *See* CFPB case, Decision and Order, dated March 4, 2024 (Dkt. 183), p. 54.  Similarly, the purpose of the Receiver is to maintain the status quo until the underlying litigation is resolved. *Id*., at 55.

Accordingly, the objective of keeping the status quo is intertwined with the motion-to-stay factors and consideration of those factors "in light of the purpose of a stay pending appeal," militates in favor of granting the stay.

### F.  Conclusion

Ice Legal, therefore requests that an order be entered granting a motion to stay during the pendency of the appeal.

Dated: May 1, 2025

**Lundergan Legal, LLC**

*/s/ Amanda L. Lundergan*
Amanda L. Lundergan, Esq.
Post Office Box 211474
Royal Palm Beach, FL 33421
Direct: (561) 779-4126
Assistant: (561) 629-2643
Email:  amanda@lunderganlegal.com

*Attorneys for Defendants,*
*Ice Legal, P.A., Thomas Ice and*
*Ariane Ice*
