# EXHIBIT 1

**MEMORANDUM IN SUPPORT OF JOINED RULE 12 MOTIONS:**

**MOTION FOR MORE DEFINITE STATEMENT; MOTIONS TO DISMISS FOR LACK OF PERSONAL JURISDICTION AND INSUFFICIENT PROCESS, ON THE GROUNDS THAT CLAIMS MUST BE ARBITRATED, AND FAILURE TO STATE A CLAIM; AND MOTION TO STRIKE;**

**AND IN THE ALTERNATIVE, MOTION TO STAY THE PROCEEDINGS**



6586 Hypoluxo Road ~ Suite 350
Lake Worth, FL 33467
www.icelegal.com

# **M E M O R A N D U M**

(Attorney-Client Privileged)

To: Marc Lemberg and Jason Blust

From: Ice Legal, P.A.

Date: April 19, 2021

Re: Identification of compliance issues.

## INTRODUCTION

The clients have requested a review of their business model as it is currently known to Ice Legal, P.A. with the goal of identifying and ranking compliance issues. The following is an initial outline of those issues that can be elaborated upon through discussion, particularly with respect to current practices. This preliminary assessment does not include an evaluation of any changes to the business models of the clients that have not been communicated to Ice Legal, P.A. either before or after the client's retention of Ice Legal, P.A.[1]

## EXECUTIVE SUMMARY

The business models of Strategic Family, Inc. ("Strategic"), Hedgewick, LLC ("Law Firms") and MEC Distribution, LLC ("MEC") are intertwined such that some comments as to the practices of one client may be equally applicable to another client to the extent that the latter knows and supports the practice. Additionally, it should be noted that, although we have organized the comments into "buckets," there is a considerable overlap between these groupings. For example, any act that could be characterized as non-complaint with a federal regulation designed to minimize fraudulent business practices, when practiced or knowingly permitted by a law firm, that act may also amount to a violation of a bar rule against misleading clients and potential clients.

The overarching practice that produces the most exposure to the clients—in terms of what can be most easily discovered, articulated, and proven—is the operation of a single attorney

---

[1] To date Ice Legal, P.A. has been provided only with the depositions of Sara Flores, James Gleason, Cory Mattocks, Lauren Montanile and Stacy Robinson (taken in the Johnson and Proulx cases).

network as multiple, ostensibly unrelated firms—separate from each other and separate from Strategic. The practice involves numerous representations that will appear to regulators and juries alike to be designed to mislead. Indeed, it is difficult to formulate a manner of—or even a reason for—operating a single network in this way that does not involve what can easily be characterized as duplicity. The fact that the same network of attorneys arises phoenix-like with a new name after an old name is retired provides fodder for suggesting to the trier-of-fact that the purpose of the multiple-firm model is to escape negative consumer reviews and regulator enforcement. Accordingly, if we were limited to one suggestion to vastly reduce exposure, it would be to simply operate the network as a single, multi-state firm.

Another key area of exposure—in terms of what produces the most unhappiness in clients (and the motivation to bring lawsuits)—is the failure to defend when they are sued by creditors. If it is the Law Firms' position that such suits cannot be defended, then that should be expressly excluded from the contract and that fact clearly explained to the potential client before enrolling. As the contract stands now, the Law Firms should never leave a client to defend a case by themselves or allow defaults to be entered.

# OUTLINE

I. **LAW FIRM ISSUES**

   A. **A single attorney network operating as multiple firms.**

   - Shared work product/client confidences may not comply with bar rules of applicable state.

     o Shared settlement letters reveal that multiple firms are treated as one firm.

     o Presents misleading advertising issue when another firm's work product (or Strategic's work product) is presented as one's own (*see*, website section).

   - Cycling through different firm names that serve same market—no apparent purpose other than to avoid negative ratings.

   - Managing attorneys working for both Strategic and multiple law firms.

     o Mixing of vendor and law firm relationships may not comply with fiduciary role of law firm.

     o Working for different firms with different client cost and fee structures is an inherent conflict.

- Use of trade names is inconsistent and contradictory.

    - Use of real law firms as trade names for others is inherently deceptive where the only relationship is a shared principal (*see*, use of Law Office of Camron Hoorfar, PC as tradename for Boulder Legal Group, LLC).

    - Confused use of trade name on contracts and even court proceedings (*see*, use of Law Offices of Camron Hoorfar in *Hanley* case and contradictory affidavits of Cory Mattocks in *Crook* case).

    - This confusion occurs because law firms typically are named after their members and the trade (or "dba") names are typically more descriptive of a practice area. Here, the actual firm names are generic (Boulder, Anchor, etc.) and the registered trade name incorporates the name of an involved lawyer—the reverse of what normally occurs.

- Use of law firm main offices around the country that are merely mail drops. While many states permit virtual offices, failure to disclose this fact can be a violation of advertising bar rules.

- Higher responsibility of payment processors to screen the law firms they do business with may expose these business partners to liability for failure to detect multiple names for the same network.

- Class B membership definition in contracts with network attorneys indicates no real ownership or management responsibility.

    - Conflicts with "ownership" or "partnership" status claimed in litigation.

    - Conflicts with bar-required independence of locally licensed attorney.

- Deceptive or apparently deceptive elements:

    - Multiple firm approach leads to unusual practices or hiring network attorneys, such as the simultaneous presentation of multiple firm contracts to prospective new hires.

    - Firm documentation suspiciously incomplete. Nearly all contracts with Class A and Class B members undated or unsigned or both.

    - The incorporation of the firms in states where they will not practice law (*e.g.* Anchor did no debt settlement work in Arkansas).

    - Network attorneys are confused as to whether they are "partners," "members" or simply affiliates in a network receiving assignments (*see e.g.*, Sarah Flores).

B. **Compliance with the "face-to-face" presentation exception to TSR**

- Holding out third-party notaries as attorneys or staff or even "representatives" of the firm may not comply with TSR or bar rules regarding misleading potential clients. (*see* compliance with bar rules).

    o The FTC has already said that using notaries does not comply with the rule—that a face-to-face sales presentation must involve a member of the seller who is able to answer consumer questions and speak to the material components of the services. (*see*, https://www.ftc.gov/news-events/press-releases/2017/03/ftc-reaches-settlement-nationwide-debt-relief-provider/)

    o Whether FTC will expand "face-to-face" meeting requirement to include remote video synchronous communication remains to be seen. If so, the necessity of using notaries may be obviated.

- There was a factual contradiction regarding whether the firms train the notaries to present details of contract which the FTC and the bar rules appear to require.

    o The firm's model of having an attorney explain the contract after it is signed by the client and holding the contract open until that occurs is fraught with conceptual difficulties (such as controlling when the attorney-client relationship arises), as well as, practical problems of proof.

C. **Compliance with the Bar rules**

- Must comply with all laws and must not mislead clients. Accordingly, most problems identified in other categories are also problems in this category.

- *See*, opinion of the Hearing Board of the Illinois Attorney Registration and Disciplinary Commission in *In the Matter of Jeffrey John Aleman and Thomas George Macey* ("Illinois Opinion") and Comparison of Legal Helpers and Hedgwick Model ("Comparison Table") provided with this outline.

    o The Comparison Table shows the many similarities between the thoroughly condemned LHDR model and the Hedgewick Model such that the later could be characterized as "Legal Helpers 2.0." The Legal Helpers 2.0 analogy is bolstered by the many ties between leadership of Hedgewick Model and leadership of Legal Helpers.

    o Illinois Opinion concludes that Legal Helpers violated bar rules by:

        ▪ Failing to have attorneys consult with clients about the means by which the representation was to be accomplished. While Hedgewick's post-signing "welcome call" by attorneys was undoubtedly intended to remedy this, as noted above, the scripts and recordings provide little or no support for the type of consultation contemplated by the rule.

- - Failing to make reasonable efforts to ensure that a non-attorney's conduct (notary) is compatible with the professional obligations of the lawyer.

    - Assisting the notaries in the unlicensed practice of law.

- Signing contract without establishing existence of attorney-client fiduciary relationship prior to client signing. (*see*, J. Wellerson decision in *Ference*).

- Potentially misleading statements on websites

  - Advertising practice areas that the firm does not actually practice. The only apparent purpose for such advertising is to evading some state's debt settlement laws that have exceptions to their licensing requirements for attorneys settling debt as an ancillary function of their general practice.

    - In particular, the firm states that it practices bankruptcy, but: 1) some scripts suggest that clients are steered away from bankruptcy; and 2) some clients who want bankruptcy after entering the program are either referred to other firms or are represented by the local attorney under a separate contract or name.

  - Statements regarding a firm's Better Business Bureau rating that is not accurate or current.

  - Statements indicating that additional information about the firm or its members is available upon request, even though no such information appears to be available.

  - Statements indicating that the locally licensed attorney has responsibility for website, when they do not.

  - Statements that the settlement letters on the website or representative of the work of a particular firm when they are the work of other firms or of Strategic.

  - The listing of phone numbers and emails that direct the consumer to Strategic rather than the law firm.

  - The failure to disclose the principals of the firm.

- Locally licensed attorneys are not taking responsibility for the business model and activities in their state when bar require such responsibility. For example:

  - Communications (email, letters) forwarded to Strategic with no attorney involvement in the communications.

  - Clients not provided contracts executed by the law firms.

- o   No attorney contact with client until after client has signed contract.

- o   Attorney contact is scripted by out-of-state attorneys or non-attorneys. The scripts do not include detailed explanations of legal alternatives (such as bankruptcy) and are not designed to elicit real questions about the client's particular situation. Recordings of these scripted calls indicate that the script is not followed and that the calls are even less informational. Often referred to as "welcome calls," it appears they often are limited to just that—essentially, "Welcome. Have any questions? No? Great."

- o   Upon deposition, Class B (and to a great extent, Class A) profess little or no knowledge of the management of the business and how legal decisions are made outside of their narrow assignments.

- Principals don't know the names of purported firm employees (such as negotiators) that perform their work out of Strategic offices.

- The Hedgewick model presents inherent problems of noncompliance with bar rules concerning confidentiality:

    - o   The sharing of various databases of client information between firms and third-parties.

    - o   Meetings and procedures in which client information is shared across law firms and third-parties.

- Participating in and permitting non-complaint actions by Strategic (listed in the Strategic section below)

- Participating in and permitting non-complaint lead generation actions by Strategic and MEC. As attorneys, the managers and each attorney in the network are responsible for any misrepresentations to client by MEC and Strategic in the process of generating a new client.

    - o   The rules governing advertising and referrals do not permit turning a blind eye to how clients are obtained.

    - o   The "parameters" given to third parties do not insure compliance with bar rules, but merely direct how the income leads will be distributed to the various firms.

- Keep quality control recordings, but not actually what is told to client by sales consultant

- Repeated failure to appear and defend creditor lawsuits.

- Allowing non-attorneys to advise clients as to what to say and do in court when sued by a creditor.

D.  **Versara Loans**

- Allowing third-parties to offer loans to debt settlement clients, including the sharing of client information to screen for loan candidates.

II. **STRATEGIC ISSUES**

A. **Participation in the multiple law firm/single network model and intentional simulation of "attorney model" of debt settlement.**

- Knowingly participating in the actions identified as Law Firm Issues, above.

- The model can easily be characterized by regulators as simply simulating a "law firm" model of debt resolution, to wit: that Strategic enrolls all willing consumers in the same Strategic debt settlement program, but through its partnership with Hedgewick, creates the appearance that the clients are retaining law firms who, in reality, will perform little or no actual legal or debt settlement services.

B. **Engaging in "bait and switch" lead generation for debt settlement by:**

- Contracting with MEC to promise loans.

- Providing scripts for sales consultants that appear to be designed to steer consumers away from the promised loans in favor of enrollment in a debt settlement program.

C. **Participation in obscuring the line between the law firms and itself.**

- Sharing purported "co-located" employees of the law firms. The employees are hired and paid by Strategic entities and work in Strategic offices on Strategic equipment.

- Naming of Strategic client-servicing subsidiaries to match firm names (*e.g.*, Anchor Client Services") for the apparent purpose of obscuring Strategic's relationship to the client as a third party.

- Having employees hold themselves out to law firm clients as law firm employees:

    o Non-attorney practice of law by Finance Solutions' Sales Consultants:

        ▪ listed as "law firm contact" on law firm contracts.

        ▪ tasked with explaining what services the law firm can provide (*see*, Rogus deposition).

    o Drafting law firm contracts and obtaining client signatures.

- o   Instructing clients what to do and say in court when no attorney appears for them.

- o   In recent employment search statements on its website, stating that it is a law firm.

- o   Using scripts and instructing employees to speak to law firm clients in ways that suggest that the notary is an attorney or law firm employee.

- Some information suggests that Strategic owns or is paying for the domain names of the law firm websites.

### D.  Corporate naming and branding

- Using the generic name, "Strategic," for multiple different companies, such that statements to the press and taxing authorities regarding number of clients, number of employees, and number of debts settled are in conflict with other representations.  For example:

    - o   Statements to tax authorities regarding the number of full-time Strategic employees conflict with: 1) the fact that many are employed by subsidiaries; and 2) representations that many of are actually employed by the law firms.

- Using the unregistered trade name, Finance Solutions.

### E.  Compliance with privacy laws.

- Recording prospective clients without notifying them.

### F.  Fair Credit Reporting Act.

- Checking credit without express permission.

- Failing to disclose what entity is performing a credit check.

## MEC ISSUES

- Promising that consumers have been approved for a loan for which they must still qualify.

- Using promises of loans if the primary intent is to sell debt settlement to consumers—a classic "bait and switch."

## COMPARISON OF LEGAL HELPERS AND HEDGEWICK MODEL

| PG | STATEMENTS IN OPINION SUSPENDING MACEY AND ALEMAN FROM PRACTICE OF LAW | HEDGEWICK MODEL |
|---|---|---|
| 4 | Pursuant to the model, the debt settlement companies would market the law firm's services and refer clients to the law firm. | Same. SFS Family, Inc. markets law firms.[1] |
| 4 | After the law firm approved a client, it would refer the client back to the debt settlement company for "law-related services," which included managing the client's file and negotiating the client's debts with creditors | Same. |
| 5 | Respondents implemented their business model and formed LHDR, which also did business as Macey, Aleman, Hyslip & Searns. | Hedgewick predecessors formed generically named law firm LLCs which do business under trade names using attorney names (*e.g.* Anchor does business as Law Offices of Stacy Robinson; Boulder does business as Law Offices of Camron Hoorfar; etc.). |
| 5 | After LHDR was formed, it entered into reciprocal referral strategic alliance agreements with nine debt settlement companies | After each law firm entity is formed (hereafter referred to as "[Company]") was formed, it entered into an agreement with SFS Group (the debt settlement company) |
| 6 | LHDR's operations also included LHDR staff in its Chicago office and "Class B" attorneys located throughout the country. | [Company's] operations included staff in Chicago office and Class B attorneys located throughout the country. |
| 6 | LHDR represented it would negotiate a minimum 35% reduction of the original face value of clients' debts. | Same (substitute "[Company]" for "LHDR") |
| 6 | In order to accumulate funds to pay the settlements, clients authorized monthly electronic payments from their bank accounts to special purpose accounts with Global Client Solutions (Global). | Same |
| 6 | Global then paid LHDR and the strategic alliance partners their fees into accounts set up at Global. | Global then paid [Company] and SFS Group their fees into their accounts. |
| 6 | LHDR did not make payments to creditors or begin negotiations until a client had accumulated enough funds in the Global account to settle a particular debt. | Same (substitute "[Company]" for "LHDR") |
| 6 | LHDR charged each client a $500 retainer fee (later raised to $900, pg.12) | Company charged each client a $900 retainer fee. |

---

[1] Based upon relationship between MEC and Strategic which develops leads for the Hedgewick firms.

| PG | STATEMENTS IN OPINION SUSPENDING MACEY AND ALEMAN FROM PRACTICE OF LAW | HEDGEWICK MODEL |
|---|---|---|
| 6 | This fee was deducted from clients' Global accounts during the first three months of enrollment. | This fee was deducted from clients' Global accounts during the first **nine** months of enrollment. |
| 6 | The strategic alliance partners also took service fees up front, which totaled 15% of the total amount of each client's debt. | SFS Group takes their service fees up front, which totaled 17% of the total amount of each client's debt. |
| 6 | In addition, LHDR usually charged a $50 monthly maintenance fee for the duration of the client's enrollment. | [Company] charges $55 monthly Legal Administration Fee. |
| 6-7 | In many instances, most of clients' monthly payments for approximately the first year of enrollment went toward retainer and service fees. …In many instances, most of clients' monthly payments for approximately the first year of enrollment went toward retainer and service fees. | Same. |
| 7 | Nonattorney employees of the strategic alliance partners (nonattorneys) performed client intake and file set-up tasks, managed client files and negotiated debts. | Same (substitute SFS Group for "strategic alliance partners") |
| 7 | When a prospective client called to inquire about the program, the call was answered by a nonattorney who described the program and gathered financial information. If the prospective client wanted to proceed, the nonattorney went over documents, including a retainer agreement between the client and LHDR and a power of attorney authorizing LHDR to negotiate with creditors on the client's behalf. | Same accept that no one "goes over" the retainer agreement and the power of attorney. |
| 7 | If a prospective client decided to join the program, a nonattorney conducted a compliance call to make sure he or she understood the program and the retainer agreement. If the prospective client gave appropriate responses in the compliance call, he or she would then receive documents including the retainer agreement, power of attorney form, budget information and payout sheet. | Same (except that the non-attorneys are discouraged from sending the retainer agreement in advance as this would decrease the sign-up rate) |
| 7 | Prospective clients were told they were not LHDR clients until they signed the retainer agreement and made the first payment. | Same (substitute "[Company]" for "LHDR") |
| 8 | the client agreed to binding arbitration in the event of a dispute with LHDR | Same (substitute "[Company]" for "LHDR") |

2

| PG | STATEMENTS IN OPINION SUSPENDING MACEY AND ALEMAN FROM PRACTICE OF LAW | HEDGEWICK MODEL |
|---|---|---|
| 8 | The retainer agreement also contained a "Disclosure and Election of Services" which purported to explain debt resolution options including bankruptcy and credit counseling. Clients were required to sign the disclosure, indicating their understanding of the options and agreement to proceed with debt settlement. | Same |
| 11-12 | The 2010 amendment [for the Federal Trade Commission telemarketing sales rule] provided that if debt relief services were discussed with a consumer in person before the agreement was signed, the telemarketing sales rule, which prohibited advance fees and required other disclosures, would not apply. … Consequently, LHDR instituted a policy that every new client was to have a face-to-face meeting with a paralegal or attorney prior to enrolling in the program….<br><br>The paralegals who conducted face-to-face meetings were trained independent contractors in a paralegal network, paid and supervised by LHDR. | [Company] purports to have a policy that every new client has a face-to-face meeting with a paralegal or attorney prior to enrolling in the program.<br><br>**The "paralegals" are mobile notaries who are <u>not</u> trained, paid, or supervised by [Company]**. |
| 8 | After a prospective client completed the intake and file set-up procedures, the file was sent to LHDR for three levels of review, consisting of a compliance review by Jason Searns and his staff, a feasibility review by Jeffrey Hyslip and his staff, and review by a Class B attorney, in which the Class B attorney considered the applicability of any state laws to a client's particular circumstances. | The file is purportedly sent for review by a Class B attorney, in which the Class B purportedly considers the applicability of any state laws to a client's particular circumstances. |
| 10 | When asked how LHDR consulted with clients about the means by which the objectives of the representation were to be pursued, Respondent Aleman stated that nonattorneys specifically described to clients over the phone how they would get out of debt… To make sure matters were explained to the extent necessary to permit clients to make informed decisions, nonattorneys used scripts drafted by Jason Searns, made quality control calls and welcome calls, and provided documents to the clients. | [Company] has non-attorneys describe to clients over the phone how they would get out of debt.  [Company] uses scripts **(copyrighted by the SFS Group)**, welcome calls and provides documents to the clients. |
| 11 | LHDR intake personnel were not LHDR employees. | Same (substitute "[Company]" for "LHDR") |

3

| PG | STATEMENTS IN OPINION SUSPENDING MACEY AND ALEMAN FROM PRACTICE OF LAW | HEDGEWICK MODEL |
|---|---|---|
| 12 | Also, LHDR began providing litigation defense for all of its clients … The Class B attorneys provided the litigation defense on behalf of LHDR | [Company] promises a defense through its Class B attorneys, which often does not materialize. The "defense" consists of negotiating a settlement that the client may not be able to afford. |
| 27 | Respondents do not dispute that very little or no direct communication between an LHDR attorney and LHDR clients occurred, either about the means by which the objectives of the representation were to be pursued or to explain the scope of the representation to the extent necessary for clients to make informed decisions. Instead, Respondents rely on the scripted presentations nonattorneys made to LHDR clients, [and] the written materials provided to clients... | [Company] has no direct communication with the prospective client, either about the means by which the objectives of the representation were to be pursued or to explain the scope of the representation to the extent necessary for clients to make informed decisions. Instead, [Company] relies on the scripted presentations nonattorneys made to its clients, and the written materials provided to clients. |

| PG | STATEMENTS IN OPINION SUSPENDING MACEY AND ALEMAN FROM PRACTICE OF LAW | HEDGEWICK MODEL |
|---|---|---|
| 27-28 | … Respondents failed to consult with clients about the means by which the objectives of the representation were to be accomplished. The language of Rules 1.2(a) and 1.4(a)(2) pertaining to consultation is specifically directed to "a lawyer." We interpret "consult" to require two-way communication between lawyer and client and find no support in the language of the Rules or the case law that allows a lawyer to delegate all or virtually all client communications to a nonattorney. There are times when a nonattorney may relay information from a lawyer to a client or vice versa but we cannot envision a scenario in which it would be acceptable for a nonattorney to take over the lawyer's duties of communication with a client. This is especially true in this case, when the nonattorneys responsible for communicating with clients were not Respondents' employees and were not under Respondents' direct control.<br><br>**Rule 1.2(a) [Illinois]**<br>A lawyer shall abide by a client's decisions concerning the objectives of representation, subject to paragraphs (c), (d) and (e), and shall consult with the client as to the means by which they are to be pursued.<br><br>**Rule 1.4 [Illinois]**<br>(a) A lawyer shall:<br>    (2) reasonably consult with the client about the means by which the client's objectives are to be accomplished;<br><br>(b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation. | All [Company's] pre-signing communications with client (and most post-signing communications) are through non-attorneys who are not employees of [Company] and are not under [Company's] direct control.<br><br><br><br><br><br><br><br><br><br><br><br>Because these are based on model rules, the rules of most other states are similar. |

5

| PG | STATEMENTS IN OPINION SUSPENDING MACEY AND ALEMAN FROM PRACTICE OF LAW | HEDGEWICK MODEL |
|---|---|---|
| 36-37 | We … find clear and convincing evidence that Respondents violated Rule 5.3(a). As equity partners of LHDR, Respondents had managerial authority that required them to make reasonable efforts to ensure LHDR had measures in place giving reasonable assurance that the conduct of the nonattorneys associated with LHDR was compatible with Respondents' professional obligations. … LHDR's measures for monitoring the nonattorneys did not provide the necessary reasonable assurance that they were acting consistently with Respondents' professional obligations. Nor were Respondents' efforts in this regard reasonable.<br>…<br>The nonattorneys were responsible for virtually all communications with clients, yet neither Searns nor any LHDR attorney had direct knowledge of the nonattorneys' communications or other important aspects of the nonattorneys' daily activities. Scripts and lists of policies and procedures provide some helpful information to nonattorneys but they are not a substitution for an attorney's actual observation and communication. LHDR attorneys had very minimal if not zero knowledge whether the nonattorneys adhered to LHDR's scripts and procedures. Nor did they have the ability to enforce adherence given the vast numbers of clients and Searns' very limited review of actual files. The evidence showed nonattorneys, in fact, did stray from the scripts and policies without the knowledge of LHDR's attorneys….<br><br>**Rule 5.3 a. [Illinois]** A partner, and a lawyer who individually or together with other lawyers possesses comparable managerial authority in a law firm shall make reasonable efforts to ensure that the firm has in effect measures giving reasonable assurance that the person's conduct is compatible with the professional obligations of the lawyer; | Non-attorneys were responsible for virtually all communications with clients. No [Company] attorney had direct knowledge of the non-attorneys' communications. [Company's] measures for monitoring the non-attorneys did not provide the necessary reasonable assurance that they were acting consistently with professional obligations.<br><br>This problem is amplified for the network model since the network attorneys licensed in the individual states are ultimately responsible for each [Company's] compliance with the bar rules of that state—a responsibility that cannot be delegated to a third-party manager, particularly since that manager is not licensed in the relevant state.<br><br>Because these are based on model rules, the rules of most other states are similar. |

| PG | STATEMENTS IN OPINION SUSPENDING MACEY AND ALEMAN FROM PRACTICE OF LAW | HEDGEWICK MODEL |
|---|---|---|
| 39-40 | Here, all versions of the retainer agreements were complicated multi-page documents containing multiple provisions of significant legal import. The power of attorney form also gave significant legal authority to LHDR and its designees. It was not reasonable for Respondents, or any attorney who reviewed these documents, to conclude that a nonattorney could present and explain them to clients without engaging in the unauthorized practice of law. Accordingly, we find the nonattorney employees of the strategic alliance partners, as well as the paralegals who conducted face-to-face meetings, engaged in the unauthorized practice of law in presenting and facilitating the execution of the retainer agreements and powers of attorney.<br><br>Respondents assisted in the unauthorized practice of law described above. They, along with Jason Searns, created and approved the business model that delegated to the nonattorneys all responsibility for explaining the debt resolution program and the terms of legal representation. Despite Searns' scripts and protocols, it was inevitable that legal questions would arise, given the complexity of the LHDR documents and the nature of the clients' financial situations. Regardless of Searns' claim of responsibility for LHDR's business model, Respondents themselves are accountable for complying with the Illinois Rules of Professional Conduct.<br><br>**Rule 5.5(a) [Illinois]** A lawyer shall not practice law in a jurisdiction in violation of the regulation of the legal profession in that jurisdiction, or assist another in doing so. | The retainer agreements was a complicated multi-page document containing multiple provisions of significant legal import. The power of attorney form also gave significant legal authority to [Company] and its designees. It was not reasonable for any attorney who reviewed these documents, to conclude that a non-attorney could present and explain them to clients without engaging in the unauthorized practice of law. The non-attorney employees of the Strategic Financial Solutions, as well as the paralegals who conducted face-to-face meetings, engaged in the unauthorized practice of law in presenting and facilitating the execution of the retainer agreements and powers of attorney.<br><br>The principals of the [Company] assisted in the unauthorized practice of law described above.<br><br>Because these are based on model rules, the rules of most other states are similar. |