UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

THOMAS W. MCNAMARA, as the Court-Appointed
Receiver for StratFS, LLC (f/k/a Strategic Financial
Solutions, LLC); Strategic Client Support, LLC (f/k/a
Pioneer Client Services, LLC); Strategic CS, LLC;
Strategic FS Buffalo, LLC; Strategic NYC, LLC; BCF
Capital, LLC; T Fin, LLC; Strategic Consulting, LLC;
Versara Lending, LLC; Strategic Family, Inc.; Anchor
Client Services, LLC (now known as CS 1 Paas
Services, LLC); Bedrock Client Services, LLC;
Boulder Client Services, LLC; Canyon Client Services,
LLC; Carolina Client Services, LLC; Great Lakes
Client Services, LLC; Guidestone Client Services,
LLC; Harbor Client Services, LLC; Heartland Client
Services, LLC; Monarch Client Services, LLC (now
known as CS 2 Paas Services, LLC); Newport Client
Services, LLC; Northstar Client Services, LLC;
Option 1 Client Services, LLC; Pioneer Client
Servicing, LLC; Rockwell Client Services, LLC; Royal
Client Services, LLC; Stonepoint Client Services, LLC;
Summit Client Services, LLC (now known as CS 3
Paas Services, LLC); Whitestone Client Services, LLC;
Twist Financial, LLC; Duke Enterprises, LLC; Blaise
Investments, LLC; Lit Def Strategies, LLC; Relialit,
LLC; Atlas Debt Relief, LLC; Timberline Financial,
LLC; Acorn 21 Services, LLC; Atlas Client Services,
LLC; Chinn Client Services, LLC; Cs0621Jade, LLC;
Cs0821Creek, LLC; Cseternal1121, LLC;
Csstorm1121, LLC; Gardner Client Services, LLC;
Hallock Client Services, LLC; Spring Client Services,
LLC; Fidelis Legal Support Services, LLC; Hedgewick
Consulting, LLC; The Blust Family 2019 Irrevocable
Trust Through Paul Hull, Jr., Trustee; The Bush Lake
Trust Through Timothy Miller, Trustee; Cell Gramercy
2 of Contego Insurance, Inc.; Strategic LD, LLC;
Versara DST 2019-2; Fusion Capital, LLC; Axel
Development Sag Harbor LLC; MyG Investments,
LLC; T.C.I.G., LLC; Timberline Capital LLC; Fidelis
Legal Support Services, LLC; Two Square Enterprises,
Inc.; BDC Group, LLC; and Veteris Capital, LLC,

Plaintiff,

Case No. 1:25-cv-00275-EAW

**RECEIVER'S FIRST AMENDED
COMPLAINT FOR:
(1) BREACH OF FIDUCIARY
DUTY;
(2) PROFESSIONAL
NEGLIGENCE;
(3) RESCISSION OF INVALID
ENGAGEMENT AGREEMENT;
(4) VOIDABLE OR
FRAUDULENT TRANSFER;
(5) BREACH OF CONTRACT;
(6) UNJUST ENRICHMENT**

Related Cases:
*Consumer Financial Protection
Bureau, et al. v. StratFS, LLC, et al.*
Western District of New York
Case No. 1:24-cv-00040-EAW-MJR

*McNamara v. Monevo Inc.*
Western District of New York
Case No. 1:24-cv-00977-EAW

vs.

ICE LEGAL, P.A., a Florida Profit Corporation,
THOMAS ICE, an individual, and ARIANE ICE, an
individual,

Defendants.

Plaintiff, Thomas W. McNamara ("Plaintiff" or "Receiver"), in his capacity as the Court-appointed receiver in *Consumer Financial Protection Bureau, et al. v. StratFS, LLC (f/k/a Strategic Financial Solutions, LLC), et al.*, 1:24-cv-00040-EAW-MJR (W.D.N.Y.) (the "Regulatory Enforcement Action"), brings this action against defendants Ice Legal, P.A, Thomas Ice, and Ariane Ice (collectively, "Ice Legal" or "Defendants").

## INTRODUCTION

1.    This lawsuit arises from an unlawful attorney arrangement, breaches of fiduciary duties, and deficient legal services provided by Ice Legal to certain Receivership Defendants that operated a large debt settlement operation at issue in the Regulatory Enforcement Action, as well as from Ice Legal's use of an unenforceable and void nonrefundable retainer agreement.

2.    By way of background, in 2019 and 2020, Ice Legal sued Strategic Financial Solutions, LLC ("Strategic"), various associated law firms, and several other related entities at least eighteen times in various courts.  By late 2020, Ice Legal had represented substantially more than fifty clients against Strategic and related entities and had threatened to continue bringing one hundred suits per year.  In these actions, Defendants alleged fraud and claimed Strategic and related entities were operating a RICO racketeering enterprise.

3.    During settlement discussions about these lawsuits, representatives for Strategic and related entities raised the concern that they did not want to settle the Ice Legal cases only to be sued again by the firm in dozens more lawsuits.  Defendants and Strategic and related entities were aware that entering settlement agreements for clients which restrict a lawyer's right to represent parties in the future are prohibited; they began to explore ways to get around this restriction.  The workaround discussed was that Strategic and related entities could engage Defendants in the future.  In other words, the parties discussed having Ice Legal flip sides, stop

representing consumers suing the Strategic Parties, and begin representing the very parties Ice Legal had claimed in dozens of cases constituted a RICO enterprise.

4.      The parties initially discussed this change in sides while continuing to negotiate the claims of Ice Legal's clients.  Both sides were eager to do this, but they agreed to first settle the clients' claims before proceeding to negotiate the specific terms of Defendants' representation of Strategic and related entities.

5.      In August 2020, the parties reached agreement on the majority of Ice Legal's clients claims, and Strategic paid the settlement in October 2020.  After quickly settling the final nine claims against the Strategic Parties in November 2020 for reduced settlement amounts, Defendants immediately began formal negotiations to enter into an attorney-client "consulting" relationship with Strategic and related entities.

6.      As a result of these negotiations, in March 2021, Defendants entered into an Engagement Agreement memorializing their arrangement, which four clients specifically signed: (1) Strategic; (2) Lit Def Strategies, LLC ("Lit Def," an entity owned by Jason Blust which acted as a liaison between Strategic and the associated Law Firms, which Blust controlled); (4) Hedgewick Consulting, LLC ("Hedgewick," another entity owned by Jason Blust); and (4) MEC Distribution LLC ("MEC"), a tribal entity doing business with Strategic.  *See* **Exhibit A**.

7.      Strategic, Lit Def, and Hedgewick, (collectively, the "Strategic Parties") are now Receivership Defendants as that term is understood in the Preliminary Injunction in the Regulatory Enforcement Action.  MEC is not a Receivership Defendant.  While Strategic, Lit Def, and Hedgewick were separate companies, at all material times they were collectively operating a common debt settlement enterprise.  The Receiver stands in the shoes of Receivership Defendants in pursuing this litigation.

8.      The Engagement Agreement, at Attachment A entitled "Clients" (**Exhibit A** at 7), purported to make hundreds, if not thousands, of other related entities and individuals Ice Legal's "clients," even though the Defendants had not had direct contact with these entities and individuals, did not have signed engagement agreements with them, had not discussed conflicts with them, and do not appear to have obtained signed conflict waivers from them or otherwise obtain their informed consent.  Most of these supposed "clients" were not specifically named in the Engagement Agreement.

9.      A motivating reason for Strategic and related entities to list so many supposed "clients" was to restrict Defendants' ability in the future to represent any consumers against Strategic Parties, Lit Def, Hedgewick, MEC, and as many parties and individuals related to Strategic's debt settlement enterprise as possible going forward.

10.     Making any type of agreement, whether included in a settlement agreement or memorialized in a separate "consulting" arrangement or an "engagement agreement," which is intended to restrict the future legal practice and/or buy off a law firm that has just sued and settled claims with an opposing party is fraught with ethical and legal complications.  Such arrangements cannot be made in connection with the settlements of clients' claims, as that is violative of attorney ethical rules, such as ABA Model Rule 5.6(b), New York Rule of Professional Conduct 5.6, and other similar rules, and void as against public policy.  Former clients may need to provide consent.  The amount of fees charged in the new representation must be reasonable, and actual legal services must be provided.

11.     Here, the Engagement Agreement entered by Ice Legal and Strategic and related entities, on the surface, creates an appearance of being an agreement to provide legal services to

clients, but it has numerous improper, prohibited, and confusing terms, including, among other things:

   a.  Exorbitant and unreasonable "fees" for legal services;

   b.  A strange, internally-contradictory, and unlawful fee structure that mixed elements of fixed fee, classic retainer, and hourly fee agreements;

   c.  An unlawful termination provision that both improperly restricted the clients' right to discharge Defendants, and improperly restricted the attorney's ability to comply with mandatory ethical obligations (which was included in an effort to incentivize Defendants financially and keep them loyal to Strategic); and

   d.  An open-ended and ill-defined set of "clients" that included, for instance, all employees of every subsidiary and "related entity" of the Strategic Parties, and "All law firms, and their current and future members, managers, partners, employees and attorneys, who receive services from Hedgewick or Lit Def Strategies" (and which thus likely included over a thousand "clients"), giving rise to a web of unresolved potential and actual conflicts between said "clients."

   12.    After executing an Engagement Agreement in March 2021, Ice Legal was paid more than $2.625 million over the next three years.  Over that time period, it performed approximately 60 total hours of legal work.  In the initial weeks after entering the Engagement Agreement, Defendants' services essentially consisted of providing information they had gathered in their prior lawsuits against Strategic, which they provided in a cursory, informal 8-page "initial outline" with bullet points identifying potential legal issues affecting the Strategic debt relief enterprise and a related chart.  While issues were identified, limited legal advice was provided.

13.    After that, Ice Legal was paid for doing almost nothing over the next three years and routinely submitted zero-hour invoices for payment.  Indeed, on an hourly basis, Ice Legal was paid more than $40,000 per hour (based on invoices showing Ice Legal worked approximately 60 hours in total on the engagement).

14.    The Engagement Agreement as a whole is unlawful and void as against public policy for numerous reasons, and the fee structure of the agreement is also specifically unlawful because it charges prohibited nonrefundable retainer fees.

15.     The agreement set out a series of nonrefundable advance fees the clients, including the Strategic Parties, were required to pay Ice Legal for a capped annual maximum number of hours (with hours worked beyond the annual maximum resulting in additional hourly fees).  Specifically, the clients, including Strategic, Lit Def, and Hedgewick, were required to pay a nonrefundable advance fee of $1 million for up to 700 hours of work in 2021, a nonrefundable advance fee of $1 million for up to 500 hours of work in 2022, a nonrefundable advance fee of $625,000 for up to 200 hours of work in 2023, and a nonrefundable advance fee of $625,000 for up to 50 hours of work in 2024.  All fees were required to be paid in advance in accordance with a schedule set forth in the Engagement Agreement, and all fees were deemed nonrefundable ("earned upon receipt") regardless of the amount of work actually performed. Any work exceeding the annual hourly maximum amount would be charged at a separate "incremental" rate of $500/hour.  There was no mechanism in place for any of their clients, including Strategic, Lit Def, and Hedgewick, to receive a refund in the event that work was not performed by Ice legal.

16.    It is unlawful for attorneys to charge their clients nonrefundable advance fixed fees, except in limited circumstances not applicable here.  Attorneys working under fixed fee

agreements are still required to actually do work to earn any fees charged by providing services, and attorneys cannot evade the prohibition on charging a nonrefundable advance fee merely by calling the fee "earned upon receipt."

17.     In all cases, even in the limited circumstances where nonrefundable advance fees are allowed, the fees charged must be reasonable in relation to work performed.  Moreover, it is no defense to claim that such an agreement was negotiated at arm's length, as the law is clear that attorneys are prohibited from charging prohibited or excessive fees even if the client is willing to pay them.

18.     Despite the fact that the substance of the Engagement Agreement reflected otherwise, Defendants included a sentence in the Engagement Agreement calling the fees a "'true' or 'classic' retainer that secures the Firm's availability for each year during the Term for the maximum number of hours described below and are earned upon receipt."

19.     But by its terms, the engagement agreement was not a "true" or "classic" retainer and did not merely secure Ice Legal's "availability."  For example,  unlike a "true" or "classic" retainer, the Engagement Agreement required Ice Legal to perform a list of specific legal services set forth in the Engagement Agreement.  Moreover, the Agreement did *not* secure Ice Legal's general availability, but instead only provided for legal services up to a maximum number of hours, with amounts above the maximum being charged at an additional hourly rate after that.  In short, the fee structure was not a "true" or "classic" retainer, but rather a series of nonrefundable pre-payments for an annual maximum of  legal services (up to 700 hours in 2021, 500 hours in 2022, 200 hours in 2023, and 50 hours in 2024).  Moreover, while the agreement states that payments were for both "Services" and for "availability for each year during the Term

for the maximum number of hours described," there is no distinction drawn between the amount paid for availability versus the amount paid for Services.

20.     Under the New York Rules of Professional Conduct, which were enacted in 2009, "[a] lawyer shall not enter into an arrangement for, charge or collect: …(4) a nonrefundable retainer fee[.]"  N.Y.R.P.C. 1.5(d)(4).  The Engagement Agreement charged the Strategic Parties nonrefundable retainer fees, in violation of N.Y.R.P.C. 1.5(d)(4), and is therefore unlawful, unenforceable, and void.

21.     Moreover, the legal fees Ice Legal invoiced and were paid were unreasonable, excessive, and untethered to any work actually done.  Incredibly, Defendants continued pursuit of payment of their no-work invoices even *after* a Court issued a Preliminary Injunction and implemented a receivership in 2024.  Defendants – who did no work to entitle them to payment – advocated for prioritizing Ice Legal's payments *over* the claims of other creditors, including consumers.

22.     These payments to Ice Legal also constituted fraudulent transfers made by a company that was financially underwater as a result of its liability to consumers.

23.     After the Engagement Agreement was entered, Strategic, Lit Def, and Hedgewick continued to operate in the same manner – like the alleged RICO enterprise Ice Legal sued dozens of times.   Nevertheless, Defendants took no steps to correct the conduct.  Instead, they sent zero-hour invoices every quarter.  Defendants' conduct, in failing to take any action, violated their obligations to their corporate clients under Rule 1.13 of the Rules of Professional Conduct, which required them to act in the best interests of the organizations they represented.

24.     As detailed herein, Defendants' receipt of millions of dollars in payments from their clients, including Strategic, and Defendants' conduct prior to and while receiving these

payments, gives rise to numerous actionable legal claims, including (1) breach of their fiduciary duties, (2) professional negligence, (3) rescission of Ice Legal's invalid Engagement Agreement, with concomitant restitution, (4) voidable or fraudulent transfer, (5) breach of contract, and (6) unjust enrichment.

## PARTIES

25.    Plaintiff is the Court-appointed Receiver in the Regulatory Enforcement Action, appointed by the Preliminary Injunction entered March 4, 2024 (Dkt. No. 184).

26.    The Preliminary Injunction directs the Receiver, *inter alia*, to preserve the value of the Assets in the receivership estate and authorizes the Receiver to institute actions to preserve or recover those Assets.  It further authorizes the Receiver to "sue for, collect, receive, take possession of, hold, and manage all Assets and Document of the Receivership Defendants" and to "[i]nstitute, compromise, adjust, appear in, intervene in, or become party to such actions or proceedings in state, federal, or foreign courts that the Receiver deems necessary and advisable to preserve or recover the Assets of the Receivership Defendants[.]"

27.    The Preliminary Injunction defines the Receivership Estate to include the "Receivership Defendants."  As of the time of filing this Amended Complaint, the Receivership Defendants are: StratFS, LLC (f/k/a Strategic Financial Solutions, LLC); Strategic Client Support, LLC (f/k/a Pioneer Client Services, LLC); Strategic CS, LLC; Strategic FS Buffalo, LLC; Strategic NYC, LLC; BCF Capital, LLC; T Fin, LLC; Strategic Consulting, LLC; Versara Lending, LLC; Strategic Family, Inc.; Anchor Client Services, LLC (now known as CS 1 Paas Services, LLC); Bedrock Client Services, LLC; Boulder Client Services, LLC; Canyon Client Services, LLC; Carolina Client Services, LLC; Great Lakes Client Services, LLC; Guidestone Client Services, LLC; Harbor Client Services, LLC; Heartland Client Services, LLC; Monarch

Client Services, LLC (now known as CS 2 Paas Services, LLC); Newport Client Services, LLC; Northstar Client Services, LLC; Option 1 Client Services, LLC; Pioneer Client Servicing, LLC; Rockwell Client Services, LLC; Royal Client Services, LLC; Stonepoint Client Services, LLC; Summit Client Services, LLC (now known as CS 3 Paas Services, LLC); Whitestone Client Services, LLC; Twist Financial, LLC; Duke Enterprises, LLC; Blaise Investments, LLC; Lit Def Strategies, LLC; Relialit, LLC; Atlas Debt Relief, LLC; Timberline Financial, LLC; Acorn 21 Services, LLC; Atlas Client Services, LLC; Chinn Client Services, LLC; Cs0621Jade, LLC; Cs0821Creek, LLC; Cseternal1121, LLC; Csstorm1121, LLC; Gardner Client Services, LLC; Hallock Client Services, LLC; Spring Client Services, LLC; Fidelis Legal Support Services, LLC; Hedgewick Consulting, LLC; The Blust Family 2019 Irrevocable Trust Through Paul Hull, Jr., Trustee; The Bush Lake Trust Through Timothy Miller, Trustee; Cell Gramercy 2 of Contego Insurance, Inc.; Strategic LD, LLC; Versara DST 2019-2; Fusion Capital, LLC; Axel Development Sag Harbor LLC; MyG Investments, LLC; T.C.I.G., LLC; Timberline Capital LLC; Fidelis Legal Support Services, LLC; Two Square Enterprises, Inc.; BDC Group, LLC; and Veteris Capital, LLC.

28.    Under the Preliminary Injunction, the Receiver is authorized to identify and name new Receivership Defendants, and pursuant to that authorization, the Receiver provided notice that he had identified Hedgewick as a Receivership Defendant on August 16, 2024.  The Receiver has also named other Receivership Defendants under this authorization, including: Fidelis Legal Support Services; the Bush Lake Trust Through Timothy Miller, Trustee; Cell Gramercy 2 of Contego Insurance, Inc.; Strategic LD, LLC; Versara DST 2019-2; Fusion Capital, LLC; Axel Development Sag Harbor LLC; MyG Investments, LLC; T.C.I.G., LLC;

Timberline Capital LLC; Two Square Enterprises, Inc.; BDC Group, LLC; and Veteris Capital, LLC.

29.     While some of these newly-identified Receivership Defendants, like Strategic, LD, LLC, were named "clients" in the Engagement Agreement, other entities may have been unnamed "clients," given the expansive and ill-defined scope of those identified as "Clients," which covered any number of "subsidiaries and related entities" of Strategic Family, Inc.

30.     Three Receivership Defendants signed the Engagement Agreement with Ice Legal: Strategic Family, Inc.; Hedgewick (which signed as Hedgewick, LLC); and Lit Def. Other Receivership Defendants were expressly identified as clients in the Engagement Agreement on Attachment A to the Engagement Agreement, including Strategic Financial Solutions, LLC; Strategic Client Support, LLC; Strategic CS, LLC; Strategic Consulting, LLC; Strategic LD, LLC; T Fin, LLC; Timberline Financial, LLC; Atlas Debt Relief, LLC; Anchor Client Services, LLC; Boulder Client Services, LLC; Canyon Client Services, LLC; Heartland Client Services, LLC; Rockwell Client Services, LLC; Summit Client Services, LLC; and Versara Lending, LLC.

31.     Defendant Ice Legal, P.A. is a Florida Profit Corporation, organized and existing under the laws of the State of Florida, with a current or most recent principal place of business at 6586 Hypoluxo Road, Suite 350, Lake Worth, Florida 33467 and a registered agent for service located at 3458 Lakeshore Drive, Tallahassee, Florida 32312.

32.     Upon information and belief, Defendant Thomas Ice is an individual formerly residing in Florida, where Ice Legal is incorporated, and currently having a last and usual place of abode in New Hampshire.  Mr. Ice was, at all relevant times, an owner of Ice Legal, President of Ice Legal, and an attorney employed by Ice Legal.

33.     Upon information and belief, Defendant Ariane Ice is an individual formerly residing in Florida, where Ice Legal is incorporated, and currently having a last and usual place of abode in New Hampshire, and was, at all relevant times, an owner of Ice Legal and an attorney employed by Ice Legal.

34.     Non-party MEC Distribution, LLC ("MEC"), which is not a Receivership Defendant, was a signatory to the Engagement Agreement with Ice Legal in addition to the three Receivership Defendants, Strategic, Lit Def, and Hedgewick.  MEC is a company affiliated with the MHA Nation (the Mandan, Hidatsa, and Arikara affiliated tribes), which provided lead generation services to Strategic through a variety of trade names.  In its complaints against Strategic and related parties, Ice Legal alleged MEC was a "non-party co-conspirator."  For the sake of avoidance of doubt, the Receiver is not bringing any claims that seeking to recover for harm caused to MEC.

## JURISDICTION AND VENUE

35.     This Court has jurisdiction over this matter under 28 U.S.C. § 1345 and 28 U.S.C. § 1367(a), and the doctrines of supplemental and ancillary jurisdiction.  *See S.E.C. v. Bilzerian*, 378 F.3d 1100, 1107 (D.C. Cir. 2004) ("the receiver's complaint was brought to accomplish the objectives of the Receivership Order and was thus ancillary to the court's exclusive jurisdiction over the receivership estate").

36.     Venue in the District of Western District of New York is proper pursuant to 28 U.S.C. § 1391.  Additionally, the Court retained jurisdiction of the Regulatory Enforcement Action for all purposes (*see* Preliminary Injunction at 39), and this proceeding is supplemental to the Regulatory Enforcement Action.  *See Haile v. Henderson Nat'l Bank*, 657 F.2d 816, 822 n.6 (6th Cir. 1981) ("where jurisdiction is ancillary, the post-jurisdictional consideration of venue is

ancillary as well").  The Court may exercise personal jurisdiction over the Defendants pursuant to New York Civil Practice Law and Rules (CPLR) § 302, as Defendants, *inter alia*, contracted to supply services in New York, derived substantial revenue from services rendered in New York, and committed tortious acts causing injury to persons or property within New York.

## ALLEGATIONS COMMON TO ALL COUNTS

37.    As part of their arrangement with their clients, including Strategic, Lit Def, and Hedgewick, Ice Legal was paid $2.625 million in supposed "legal fees," which it knew were proceeds from Strategic's debt relief operation.  Ice Legal collected these fees, despite doing essentially no legal work to earn these fees over the course of three years.

38.    At first, in 2021, Ice Legal provided minimal work and failed to make any substantive effort to remedy any issues in the Strategic business.  Before long, as is facially evident from Ice Legal's zero-hour invoices, no work was being done, or was going to be done, to earn any of the advance nonrefundable fees being charged by the firm.  In fact, Ice Legal ceased doing any work at all for these Receivership Defendants, providing no legal services whatsoever during 2022 and 2023.  Nevertheless, Ice Legal invoiced and was paid $1.625 million over that two-year period.

39.    All, or nearly all, of Ice Legal's fees during the representation were paid by Strategic, Lit Def, or Hedgwick, directly or indirectly.

A.    **Ice Legal's Prior Lawsuits *Against* Strategic on Behalf of 51 Plaintiffs**

40.    At the time that Defendants received these payments from their clients, in the form of supposed "legal fees," they had only recently filed, and threatened to file, lawsuits on behalf of more than 50 individuals against Strategic, several related law firms, and other related parties.  In those lawsuits, Defendants made stunning allegations, specifically alleging that Strategic's law-firm-based debt relief model was a fraudulent enterprise and this group of entities

and individuals were a running a massive corrupt scheme. Initially, Ice Legal demanded that **each** of its individual plaintiff clients should recover hundreds of thousands of dollars.

41.    For example, on or about July 4, 2019, Defendants filed suit against Strategic and various affiliated companies and individuals on behalf of a putative class of "victims" of Strategic's "scheme." Defendants' lawsuit alleged, *inter alia*, fraud, conspiracy, violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962 *et seq.*, breach of fiduciary duty, unjust enrichment, and violation of consumer protection laws.

42.    In 2019-20, Defendants filed at least 18 separate civil actions against Strategic and/or Strategic-affiliated law firms in Colorado, Connecticut, Florida, New Hampshire, New Jersey, and Wyoming.

43.    Among the many serious allegations Defendants made against Strategic in the complaints they filed in the foregoing lawsuits were the following:

a.    Strategic is a "a debt settlement scheme involving numerous entities that conspire to defraud Florida consumers";

b.    "The scheme begins with bait-and-switch advertising through interstate mailings to initiate contact with the consumers. The mailers promise the consumer a low-interest loan, but upon calling the number on the mailer, they are pressured to instead enter into a debt settlement program";

c.    Strategic "defrauds consumers by posing as lawyers and law firms and by enlisting real lawyers and law firms to provide their names for the scheme even though they do not—and generally, cannot—perform legal services themselves in Florida where the consumers reside";

d.    Strategic "adopted a business structure that fraudulently mimics the 'attorney model' of debt settlement—a controversial structure in its own right—in order to evade the licensing and fee-limitation requirements for non-attorney settlement companies in various states and to project an aura of trustworthiness to lure unsuspecting consumers";

e.    Strategic "creates and maintains a collection of entities being held out as law firms…  It does so with the complicity of lawyers in various states for the purpose of evading laws relating to non-lawyer debt settlement companies and to falsely create an aura of trustworthiness that will attract and entrap consumers";

f.    "Consumers responding to [Strategic's] 'mailers' never receive a loan at the advertised terms.  The lead generation letters are a bait-and-switch scheme designed by SFS to provide it with leads for its unlawful 'debt relief' program";

g.    "As is typically the case, the Plaintiff's monthly payments were consumed by the costs of the debt management programs during the first several months of the program and were substantially consumed by such fees throughout the remainder of her participation in the program";

h.    "The Defendants engaged in a centrally orchestrated scheme to mislead consumers through a standardized protocol that SFS sales agents were carefully trained to perform";

i.    Strategic is a "fraudulent debt settlement enterprise, whose members and associates engaged in fraudulent and deceptive practices designed to enroll consumers in useless 'debt settlement' plans and extract unearned fees from them";

j.      Strategic "fraudulently induc[ed] Class Members to enter into illegal contracts through which members of the SFS Enterprise extracted illegal fees directly from Class Members' bank accounts";

k.      Strategic "conducted and participated in the affairs of the above-referenced SFS Enterprise through a pattern of racketeering activity, including acts that are indictable under 18 U.S.C. § 2314 (relating to the interstate transportation of stolen property); 18 U.S.C. § 1341 (relating to mail fraud); 18 U.S.C. § 1343 (relating to wire fraud); and 18 U.S.C. § 1344 (relating to bank fraud)"; and

l.      Strategic's "racketeering activities amounted to a common course of conduct, with similar pattern and purpose, intended to defraud Class Members."

44.     In 2019, Defendants began settlement negotiations with Strategic and its related entities regarding claims of numerous clients they represented in pending and anticipated civil actions.

45.     During these negotiations, Defendants took the position that their clients' claims were worth millions of dollars in total and demanded hundreds of thousands of dollars for each individual claimant Defendants represented.

46.     By August 2020, Defendants represented more than 50 claimants and were in the process of negotiating settlements with the Strategic and related entities on those clients' behalf.

47.     During these settlement negotiations, legal counsel for Strategic and related entities indicated they were reluctant to settle these claims unless they received assurances that Ice Legal would not bring new claims after the pending claims were settled.  Strategic's counsel raised this as a barrier to settlement and invited Defendants to come up with a solution.

48.     Faced with the prospect that settlements would not be achieved without a limitation on future litigation, Defendants and counsel representing Strategic and related entities began exploring solutions to limit Ice Legal's ability to represent other clients in the future and discussed the possibility of having Ice Legal become legal counsel to the Strategic Parties – the parties they were presently suing – after the pending claims were resolved.  The direct engagement of Ice Legal by Strategic and related entities would then preclude Defendants from further representation of consumers against them.

49.     During a phone call with Strategic's counsel on August 20, 2020 to discuss resolution of Ice Legal's consumer clients' claims, counsel representing Strategic and related entities raised the possibility of having Defendants execute an affidavit that would restrict their ability to represent consumers against Strategic going forward.  Mr. Ice responded that he viewed it as a demand for Ice Legal to limit its future business and that he was surprised ethics counsel would allow Strategic to propose an affidavit limiting Defendants' future representation of clients.  However, Thomas Ice also stated that he didn't know why Defendants were requesting an affidavit when he understood that they would discuss forming a relationship once the consumers' claims were settled.  He also commented that, because he is licensed in so many states, he would be an ideal person to represent Strategic on ethics and compliance.

50.     For attorneys to discuss a future consulting engagement with a party they are currently representing clients against, and to do so during their clients' settlement discussions, raises numerous ethical and legal concerns and is highly disfavored.  Contemporaneous negotiations over settlement and consulting agreements with attorneys violate public policy, given the direct conflict of interest created between attorneys and their current clients, and

entering into agreements that restrict attorneys' right to practice when the agreement is in connection with or done as part of a settlement is prohibited.

51.     Here, while settlement discussions were ongoing, the parties discussed the proposed consulting arrangement at a preliminary level, such as Mr. Ice's above-referenced statements about his "ideal" fit for a future relationship.  Both sides were receptive to forming a future relationship and agreed that they would need to settle Ice Legal's current clients' claims before proceeding to negotiate the terms of the proposed representation of Strategic and related entities.

52.     On or about August 27, 2020, Ice Legal agreed to settle the claims of its fifty-one clients for a total of $3.7 million, or approximately $75,000 for each client, which Ariane Ice characterized as a "very fair and reasonable number."

53.     Defendants, Strategic, and related entities executed these settlements in September 2020 and Strategic ultimately wired settlement funds of $3,700,050 to Ice Legal by October 27, 2020.

**B.      Ice Legal's Offer of Reduced Settlements for Nine Plaintiffs Right Before Defendants Negotiated the Engagement Agreement**

54.     In September and October 2020, Defendants informed Strategic and related entities that they had been retained by additional consumers, eight of whom possessed claims against Strategic-associated law firms and one of whom had a claim against a Timberline, another Strategic-related entity.

55.     Despite having just completed settlements with Strategic and related entities on behalf of fifty-one clients for approximately $75,000 per client, which Ms. Ice had characterized as "very fair," Ice Legal made substantially lower demands in settlement discussions for the new clients between $20,000 and $30,000.

17

56.     In October and November 2020, Strategic and related entities and the Defendants worked to quickly resolve the pending Ice Legal client claims, with a mutual understanding that once those claims were resolved, they could move forward with the proposed attorney-client "consulting" relationship between Defendants and Strategic and related parties.

57.     Strategic and Ice Legal agreed that they needed to find a lull when Defendants were not representing any clients with active claims against Strategic and related entities so that the Parties could discuss and enter into the attorney-client agreement they had been contemplating.

58.     Strategic and related entities quickly settled these last cases with Defendants; in many instances, they did not even bother to counter the much lower demands made by Ice Legal and simply accepted the initial settlement demands.  By November 6, 2020, Strategic and related entities had already settled seven of the eight cases for $20,000 per case.  The case against Timberline was settled for $15,000.  Ms. Ice also identified a ninth client in November 2020, and that case also quickly settled for $20,000 that same month.  Ms. Ice also identified another client in November, and that case also quickly settled for $20,000.

59.     Once these pending claims were settled, Defendants and representatives for Strategic and related entities began to expressly negotiate having Ice Legal become lawyers for Strategic and related entities, which would create a conflict of interest preventing Ice Legal from representing clients suing Strategic.

60.     To achieve that end, while in the midst of finalizing the November 2020 settlements for clients, Ariane Ice conveyed to a representative of Strategic and related parties that she was expecting someone from Strategic to reach out to Defendants about the proposed consulting agreement and wondered if that would be happening soon.

61.    At that time, however, of Ms. Ice's inquiry, the settlements were not yet finalized. Thus, the representative of Strategic and related parties indicated he was not yet able to talk with Defendants about entering into an attorney-client relationship, because Strategic was still technically adverse as not all settlements had been finalized.  But by late November, Strategic and related entities funded the final settlements, and Ice Legal and Strategic immediately launched into monetary negotiations concerning their own proposed "consulting" arrangement.

62.    It is not known whether any of Ice Legal's recent, and now former, consumer clients took part in and/or were informed about these negotiations with Ice Legal, nor whether any consumer provided their consent.  For the sake of clarity, the Receiver does not represent and is not bringing any claims on behalf of any former consumer clients of Ice Legal, and all allegations regarding them are provided as relevant facts supporting the claims herein.

63.    On December 4, 2020, Ariane Ice conveyed to a representative of Strategic:

> Given the nature of the proposed role you outlined yesterday, we feel we must now take steps to remain 'non-adverse' to [the Strategic Parties] until these negotiations conclude.  As you can imagine, it's not preferable to our firm to refrain from consulting with potential plaintiffs.  This period of limbo necessitates a need for these talks to conclude sooner than later.  We ask that we move toward conclusion of these discussions (one way or the other) very quickly.

In other words, if Strategic did not act fast, Ice Legal would start signing up more consumers to sue them and again become adverse.

64.    Negotiations continued throughout the month of December, with the parties going back and forth as two adverse parties, making demands and counterdemands.  There is scant evidence that the parties were attempting to tie the money that Ice Legal would receive to the amount of actual legal work to be performed; rather, the parties appear instead to have been negotiating as two adverse parties making numerous counterdemands and counteroffers, with Ice

Legal seeking to obtain more money and the Strategic and related parties desiring to buy off Ice Legal so it would stop bringing lawsuits.

65.     Defendants initially demanded total fees of $8 million over 4 years. After Strategic and related parties countered, Defendants brought their demand down to $7.2 million, and then to $6 million. In December, Defendants' posture grew more aggressive: on December 18, 2020, Ms. Ice wrote to counsel for Strategic and related parties: "we really need to finalize these discussions. Can we jump on a call?" In the subsequent call, Ice Legal offered to take $6 million ($1.5 million per year for each of four years), and informed counsel for Strategic and related parties that if no settlement was reached, they would bring 100 suits per year against them.

66.     On December 22, 2020, Ice Legal offered two options: Strategic and related parties could pay Ice Legal either: (1) $3.6 million for a three-year engagement, plus $500 per hour for any work they actually do; or (2) $4.5 million, front-loaded with $2 million at the start of year 1, $1.5 million at the start of year two, and $1 million at the start of year 3. Under the second proposal, Ice Legal would provide: up to 800 hours of work in year 1; 600 hours in year 2; and 400 hours in year 3.

67.     In late December, counsel for Strategic and related parties suggested that Ice Legal could be paid some combination of money and "phantom equity," which Strategic used as a form of deferred employee compensation that was linked to the company's valuation.

68.     On January 5, 2021, Defendants made another offer. This time, Defendants offered to take $3.5 million in total fees paid over three years and $775,000 in phantom equity in Strategic. Ms. Ice specifically indicated that Defendants were willing to take phantom equity but wanted to see a copy of the plan documents for the Employee Stock Ownership Plan (ESOP),

which was the mechanism by which the phantom equity had been created. Defendants' proposal to receive phantom equity – having a financial stake tied to Strategic's business performance – is particularly shocking given that, up until that point, Defendants had repeatedly alleged in court pleadings that Strategic was operating a RICO enterprise.

69.     The Strategic and related parties offered $2.9 million over four years on January 7, 2021. And back and forth it went, with Ms. Ice proposing the following fee structure on January 8, 2021: "Your clients showed some movement by doubling ours so we have doubled theirs.

> "$3,750,000
> Year 1 $1.6 hours 700
> Year 2 $1.1 hours 500
> Year 3 $700,000 hours 200
> Year 4 $350,000 hours 50."

70.     After several more rounds of negotiations, on January 14, 2021, counsel for Strategic and related parties conveyed a best and final offer of $3.1 million in total fees.

71.     By January 20, 2021, the parties reached agreement as to the basic terms of the proposed attorney-client relationship, including the following: that Ice Legal was being retained to provide legal representation, which would consist of advising and consulting with the clients regarding compliance with state and federal laws and regulations, offering counsel regarding best practices and operational and structural changes to mitigate risk vis-à-vis private and governmental entities, advising the clients regarding strategic growth, and advising the clients regarding current and potential litigation, as requested by the clients; that the clients would make payments to Ice Legal to secure its availability for a certain number of hours each year; that there was no requirement that Ice Legal spend the number of hours retained; that if Ice Legal performed work in excess of the annual hourly cap, it would be paid at its customary and

reasonable rates; that the total fee would be $3.25 million; that in year 1, Ice Legal would receive

$1 million (paid $500,000 upon signing, and then $250,000 at the mid-point of Q3 and Q4) in

exchange for up to 700 hours of legal work; that in year 2, $1 million (paid $250,000 at the mid-

point of each quarter) for up to 500 hours of legal work; that in year 3, $625,000 (paid in equal

installments at the mid-point of each quarter) for up to 200 hours work; and that in year 4,

$625,000 (paid in equal installments at the mid-point of each quarter) for up to 50 hours of legal

work.

72.     Over the course of February 2021, the parties continued to negotiate the terms of

the engagement.  Ultimately, in March 2021, Defendants reached an agreement with Strategic

and numerous other clients, which was memorialized in a written Engagement Agreement.  *See*

**Exhibit A**.

73.     Immediately after executing the Engagement Agreement, Ice Legal radically

revised its website and altogether scrubbed it clean of any mention of its prior primary Practice

Area, entitled "Debt Relief Scams," which had been exclusively devoted to cases against

Strategic and related parties.  Previously, Ice Legal's website claimed, among other things: "our

latest industry targets are fraudulent debt resolution companies.  Often fronted by facade law

firms, the real players behind these debt relief schemes have been taking advantage of consumers

for more than a decade…."  The website contained pages of negative information specific to

Strategic and related parties.  In contrast, Ice Legal's the sanitized website removed any

reference to its primary Practice Area of "Debt Relief Scams" or to Strategic and instead

generically described Ice Legal as a "consumer protection" firm.

**C.**    **Ice Legal's Atypical Engagement Agreement with Strategic and Related Entities**

74.    According to its website, Ice Legal markets itself as a "multi-state, online law firm" that "practice[s] in an office-free environment so that [it] may serve you more affordably and without geographical limitation."

75.    The attorney-client relationship between Ice Legal and Strategic Parties was not a traditional legal relationship.

76.    There were four signatories to the Engagement Agreement: "Strategic Family, Inc. (on behalf of the "Strategic group of Clients")", "Hedgewick, LLC (on behalf of itself and the law firms which receive its services")", "Litigation Defense Strategies, LLC (on behalf of itself and the firms which receive its services")", and non-party MEC Distribution, LLC ("MEC").

77.    The services described in the Engagement Agreement were principally for the benefit of Strategic Family, Inc. and its various subsidiaries listed in the Agreement on "Attachment A" (*see* **Exhibit A** at 7), including Strategic itself, all of which are domiciled in New York, headquartered in New York, and maintain their business operations in New York.

78.    Hundreds, if not thousands, of other entities and unnamed persons were included as supposed "Clients" under the Engagement Agreement, all of which are listed (at least by category) on "Attachment A."  The first sentence of the Engagement Agreement states that Ice Legal "represent[s] the clients identified on Attachment A."  **Exhibit A** at 1.  The list included not only the Strategic web of entities, but also all of the law firms receiving services from Hedgewick or Lit Def.  It also included every entity and person related to Strategic in any way, including unnamed "officers, employees and consultants" who were collectively referred to as "Strategic."

79.    The Engagement Agreement contained no governing law provision. There is an especially complex web of entities in the Strategic debt settlement enterprise, who are nominally

listed as "clients" under the Engagement Agreement, but the primary clients were Strategic (now a Receivership Defendant), based in New York, and Lit Def/Hedgewick, (now Receivership Defendants), based in Illinois.  While there are technically clients located in numerous states, the attorney-client relationship between Ice Legal and Strategic, Lit Def should be governed by New York law.  No matter what States' law applies, this Engagement Agreement was impermissible for numerous reasons.

       1.    <u>The Purported "Clients" Under the Engagement Agreement</u>

80.    The Engagement Agreement listed as supposed clients Strategic, numerous Strategic entities, including entities that provided customer services for related law firms, and Versara Lending, as well as its directly owned and indirect subsidiaries and related entities, and their directors, members, managers, officers, employees and consultants.

81.    It also specifically named as clients Hedgewick's "current and future members, managers and employee[s]," who were collectively referred to as "Hedgewick."

82.    It also listed as clients all of Lit Def's "current and future members, managers and employees" who were collectively referred to as "Lit Def Strategies."

83.    Nonparty MEC and its affiliates, and their directors, managers, officers, and employees to the extent they were acting in the scope of their employment or director roles were also identified as clients.

84.    Beyond this, the Engagement Agreement also listed an open-ended and undefined group of law firms as "clients,": "All law firms, and their current and future members, managers, partners, employees and attorneys, who receive services from Hedgewick or Lit Def."

85.    The Engagement Agreement included a representation that Ice Legal "had received and reviewed a list of Hedgewick's and Lit Def Strategies' current clients, and that those law firms shall have the status of clients of the Firm."  There is no indication that

Defendants had discussions with any of the people in whose names these firms were listed or that Ice Legal obtained written conflicts waivers from individuals associated with these law firms.

86.    On Attachment A listing "Clients," the Engagement Agreement contained a provision stating: "The parties understand and acknowledge that: (1) both Hedgewick and Lit Def Strategies provide consulting services to various law firms (and those firms' members, partners, and managers) that represent consumers; (2) the legal services and advice provided by the Firm under this Agreement are intended to benefit not only Hedgewick and Lit Def Strategies, but also Hedgewick's and Lit Def Strategies' present and future clients; and (3) as part of this engagement, the Firm is likely to receive confidential and privileged information relating to the present and future clients of Hedgewick and Lit Def Strategies.  The Firm acknowledges that it has received and reviewed a list of Hedgewick's and Lit Def Strategies' current clients, and that those law firms shall have the status of clients of the Firm."  The Engagement Agreement then stated that, "The Firm represents and warrants that it is not aware of any conflicts with those entities that would preclude the Firm from providing legal advice to (or for the benefit of) those entities or receiving confidential or privileged information from (or regarding) those entities."

87.    The Engagement Agreement further included an expansion provision whereby Hedgewick or Lit Def Strategies's new clients, i.e., new law firms created to be a part of the Strategic debt relief enterprise, would become new clients of Ice Legal.

88.    The "law firms, and their current and future members, managers, partners, employees and attorneys, who receive services from Hedgewick or Lit Def Strategies" was a constantly changing group of entities and individuals, none of whom executed or are identified in the Engagement Agreement.  The Engagement Agreement itself fails to show clear consent on

the part of these unidentified "law firms" or their employees to be bound to the agreement as clients of Ice Legal, or even their level of knowledge of the agreement, yet they purportedly had "the status of clients of the Firm."  **Exhibit A** at 7.

89.    But, as Ice Legal understood, based on the allegations it had made in its previous lawsuits against Strategic, these law firms were not independently operating law firms but were all connected to one another, using front persons who were lawyers to circumvent the law. According to a complaint drafted by Ice Legal, Strategic's debt settlement program was set up through this confusing web of law firms located throughout the United States, but with all of the negotiators, customer service, and counsel all based in New York City at Strategic's offices. This was done, according to Ice Legal, "to circumvent FTC regulations in order to collect upfront fees (debt settlement companies are not allowed to collect fees until each debt is settled)."

90.    Despite the fact that the Engagement Agreement purported to include hundreds, if not thousands, of "clients" (once all employees of Strategic and employees of all its affiliates, all employees of all the law firms, and even all of MEC's affiliates and employees, were considered), there was only a single brief paragraph discussing conflicts.  Paragraph 4.1 of the Engagement Agreement stated in full:

4. CONFLICTS AMONG CLIENTS

    4.1. The Firm and each client acknowledges that numerous of the clients are separately owned, separately controlled and do not constitute and are not part of a single entity. Therefore, each client acknowledges that the Firm will be representing multiple persons and entities in connection with the Engagement. At this time, neither the clients nor the Firm are aware of any conflicts of interest among the clients. While the Firm may provide a single invoice for convenience of administration, and the clients may benefit from the sharing of costs and resources, each client recognizes that there are also disadvantages to such representation, including the possibility of miscommunication or disagreement amongst clients directing the Firm with respect to its representation in the Engagement and hereby waives any conflict or potential conflicts. The Firm advises that each client should consult independent counsel regarding this waiver. Each client's signature on this agreement is a representation that each client has consulted, or had a reasonable opportunity to consult, independent counsel regarding this waiver.

91.    The Engagement Agreement states: "Each client … acknowledges that the Firm will be representing multiple persons in connection with Engagement," and that "**neither the Firm nor the clients are aware of any conflicts of interests among the clients**." **Exhibit A** at 3 (emphasis added). Then, the Engagement Agreement contained a specific waiver clause, stating "each client … hereby waives any conflict or potential conflict." The Firm then expressly "advises that each client should consult independent counsel regarding this waiver." The Conflicts Among Clients clause ended with a statement that "Each client's signature on this agreement is a representation that each client has consulted, or had a reasonable opportunity to consult, independent counsel regarding this waiver."

92.    But all parties, including Ice Legal, knew that these representations in this Conflict waiver were not accurate for many "Clients." There were only four clients who had specifically signed the Engagement Agreement: Strategic Family, Inc,; Hedgewick, LLC; Litigations Defense Strategies, LLC; and MEC Distribution, LLC. *Id.* at 6. The hundreds, if not thousands, of unnamed "clients" listed on Attachment A do not appear to have seen the

Engagement Agreement, been advised to consult counsel about the waiver, much less actually waived conflicts. This does not constitute knowing waiver by all "Clients."

93.    Moreover, Defendants knew at the time that there were obvious conflicts and potential conflicts of interest among the "Clients." This is evident from the allegations in its prior lawsuits and from the "initial outline" of issues Ice Legal's produced after executing the Engagement Agreement (as further discussed below), which was essentially the only legal work that Ice Legal did under the Engagement Agreement.

94.    There were obvious actual or potential conflicts among and between the various entities that Ice Legal purported to represent under the Engagement Agreement. Further, there were also conflicts of interest between these entities/organizations and the employees and officers who worked for those entities (whom Ice Legal also purported to represent).

95.    As an example, in Ice Legal's April 19, 2021 outline, which they sent to the two Client Liaisons, Ice Legal's discussion of "Law Firm Issues" raised numerous concerns, including "inherent conflicts" "deceptive or apparently deceptive elements," violations of the face-to-face exemption to the Telemarketing Sales Rule, and issues involving compliance with state bar requirements. *See* Dkt. No. 18-2 at 3-4.

96.    Ice Legal also identified as two specific "Law Firm Issues": "Participating in and permitting non-compliant actions by Strategic" and "Participating and permitting non-compliant lead generation actions by Strategic and MEC." Ice Legal further noted under "Law Firm Issues": "As attorneys, the managers and each attorney in the network are responsible for any misrepresentations to the client by MEC and Strategic in the process of generating a new client." These issue alone reveal unresolved conflicts between and among Strategic, MEC, and the Law Firms.

97.     There is no indication that Ice Legal ever communicated with any of the supposed "Clients" (including MEC and the law firms) about these conflicts, and Ice Legal have not obtained any conflicts waivers from "the Law Firms."  It had obtained a waiver from Blust and Lit Def.

98.     And, of course, during the representation, Ice Legal should have been well aware of an embedded and problematic conflict of interest between putative law firm "owners" and Blust, given its knowledge of the State Bar's action taken against Daniel Rufty.  *See e.g.*, Dkt. No. 212-6, *North Carolina State Bar v. Rufty*, at 3 (Findings of Fact) ¶¶ 12-14 (Apr. 8, 2021). The State Bar found: "Blust hired Defendant [Rufty] to provide legal services to clients of CLS [law firm Carolina Legal Services], the same year Defendant graduated from Charlotte Law School.  At the time Blust hired Defendants, Defendant had limited experience in the practice of law… While Blust arranged for Defendant to be the majority owner of CLS in name only, Blust arranged for 97% of the profits of CLS to be distributed to Blust and Kelly Seibert, another out-of-state attorney, as 'consultant fees.'"  *Id.*

99.     Most of the purported "clients" in the Engagement Agreement were not really clients at all, never spoke with Ice Legal, and never received any legal advice from Ice Legal.

100.     The invoices and records available to Strategic indicate that Ice Legal only ever spoke with and gave any advice to the Receivership Defendant clients Strategic and Lit Def/Hedgewick, and even then on an especially limited basis.  The Engagement Agreement specifically listed only two Client Liaisons: for Strategic, its General Counsel Marc Lemberg; and for "other Clients": Jason Blust.

101.     Despite the complicated web of supposed clients listed on paper, Ice Legal only had ever a direct client relationship with Strategic and Lit Def/Hedgewick (both of which were

29

controlled by Jason Blust).  Ice Legal never communicated with, much less provided any legal advice to, the vast majority of its supposed "clients" during the course of the attorney-client relationship.

102.    In reality, the Engagement Agreement which appeared to have Defendants representing scores of clients to provide specific legal advice on identified topics appears to have quickly become a sham arrangement that is void against public policy, where no legal advice was provided to any clients.  Strategic's intent with such a bizarre arrangement was as a means to buy off Defendants and avoid more lawsuits they were threatening to file.  That is the reason that they insisted on identifying such a broad list of unnamed entities and individuals, including even future law firms, as clients.

2.    The Engagement Agreement's Improper and Unlawful Fee Structure

103.    Ice Legal did not use a standard, or even its own, attorney fee agreement with Strategic Parties.  Rather, Strategic was the initial author of the Engagement Agreement.

104.    In the first draft of the Engagement Agreement, counsel for Strategic interpreted the Parties' agreement to include the fee structure as a "fixed annual fee retainer."

105.    The "FEES" section proposed by Strategic's General Counsel stated: "The representation will be in the form of a fixed annual fee retainer which will be applied against a maximum annual number of hours of Services provided by Thomas Erskine Ice or Ariane Ice, as follows:

| Year | Retainer Fee | When Retainer Fee is Paid | Maximum Hours | Incremental Hourly Services Rate |
|------|------|------|------|------|
| 2021 | $1,000,000 | $500,000 upon signing<br>$250,000 by July 15<br>$250,000 by November 15 | 700 | |
| 2022 | $1,000,000 | $250,000 by February 15<br>$250,000 by April 15<br>$250,000 by July 15<br>$250,000 by November 15 | 500 | May be adjusted per agreement |

30

| Year | Retainer Fee | When Retainer Fee is Paid | Maximum Hours | Incremental Hourly Services Rate |
|------|------|------|------|------|
| 2023 | $625,000 | $156,250 by February 15<br>$156,250 by April 15<br>$156,250 by July 15<br>$156,250 by November 15 | 200 | May be adjusted per agreement |
| 2024 | $625,000 | $156,250 by February 15<br>$156,250 by April 15<br>$156,250 by July 15<br>$156,250 by November 15 | 50 | May be adjusted per agreement |

106.    But the language describing the fee structure as a "fixed annual fee retainer which will be applied against a maximum annual number of hours of Services" was not acceptable to the Defendants, who offered a different interpretation of the parties' agreement.   Ice Legal kept the very same chart of hours and payments but revised this language to make these fees nonrefundable by stating that all of the fees would be considered a "'true' or 'classic' retainer that secures the Firm's availability for each year during the Term for the maximum number of hours described below and are earned upon receipt."   The Clients accepted this new language.

107.    There is no indication that Ice Legal ever discussed with any of its clients, or their representatives, the requirements and limitations on when attorneys can enter into true retainers or accept fees on an earned-on-receipt basis.   The substance of the Engagement Agreement makes clear that Ice Legal was charging its clients to perform services that it agreed to perform, which could not be provided on a nonrefundable basis under the law.   Such an arrangement is unlawful, void, unenforceable, and contrary to public policy under New York law, including, without limitation, the New York Rules of Professional Conduct and applicable case law.

108.    The Engagement Agreement does not include a reasonable minimum fee clause meeting the requirements of the New York Rules of Professional Conduct.

109.    The agreement is also not a properly structured "true retainer" or "classic retainer" or "general retainer," which would only ensure an attorney's **availability** and would not compensate an attorney **to any extent** for legal services provided or to be provided.   The

Engagement Agreement here was a confusing amalgamation of nonrefundable fee, fixed fee, and hourly fee arrangements, which charged a series of advance fees for specific legal services to be provided, with caps set on the maximum number of hours to be worked on an annual basis (at which point additional hourly fees would kick in). And under these circumstances, the purported "earned upon receipt" provision must be highly scrutinized under the law and strictly construed against Ice Legal as its drafter.

110.    In exchange for its fees, Ice Legal specifically promised to provide "Services" specified in Attachment B to the agreement, which included, *inter alia*, comprehensive legal advice and counsel regarding the "marketing, sale and delivery" of Strategic's debt settlement program and compliance with "state consumer protection laws, state debt settlement or debt resolution laws as well as regulations promulgated by the Consumer Finance Protection Bureau, Federal Trade Commission, Federal Reserve and similar laws." *See* **Exhibit A** at Attachment B, entitled "Scope of Engagement and Fees," including: 1) "Advice Regarding Compliance with Consumer Protection and Debt Reduction Laws"; 2) "Advice Regarding Compliance with Bar Ethics Rules and Rules of Professional Conduct"; and 3) "Regulatory Investigations."

111.    The Engagement Agreement itself explained in Sections 2.3 and 2.4 that Ice Legal was required to provide monthly statements describing "Services" performed during the representation; Ice Legal agreed not to incur additional hours of "Services" beyond the pre-paid maximum hours unless agreed by the parties, and these additional hours would be billed at the rate of $500/hour.

112.    The Engagement Agreement included a chart of "Fees", which provided thee schedule for required fee pre-payments and the annual maximum of hours for each year of the contract (700 hours for 2021, 500 hours for 2022, 200 hours for 2023, and 50 hours for 2024),

plus an incremental hourly services rate of $500/per hour for 2021.  *See* **Exhibit A** at Attachment B, "Fees."  Given numerous concerning aspects of the Engagement Agreement, including this confusing and impermissible mix of nonrefundable fee, fixed fee, and hourly fee arrangements and other provisions, detailed herein, the Engagement Agreement would not be valid and enforceable in any U.S. jurisdiction.

113.    Despite the language calling the agreement a "'true' or 'classic' retainer," the Engagement Agreement was not in fact structured, and does not legally qualify, as a "'true' or 'classic' retainer" because: unlike a "true" or "classic" retainer, it did not merely secure Ice Legal's availability but it required Ice Legal to perform specific legal services; unlike a "true" or "classic" retainer, it secured Ice Legal's services only up to a specific maximum number of hours of work; and unlike a "true" or "classic" retainer, it included an additional "incremental" hourly fee of $500 per hour.  Thus, while the Engagement Agreement was styled as a "'true' or 'classic' retainer," it was in fact an agreement to make nonrefundable pre-payments for legal services up to a capped hourly amount.  This type of attorney fee agreement is prohibited in New York.

114.    All attorney fee agreements, including even properly structured nonrefundable and "classic" retainer agreements where permitted by law, must be reasonable, and attorneys are always prohibited from charging unreasonable, excessive, or unconscionable fees.

115.     The Engagement Agreement, which purported to charge the Strategic Parties a "true retainer" in the total amount of $3.25 million ($2.625 million of which was actually paid) for minimal legal services totaling 63.4 hours of work, was unreasonable, unconscionable, and unenforceable.

116.    Attorneys are not permitted to contract their way out of their obligations to charge reasonable fees based on the work they actually perform, and attorneys are required to refund

any portion of fixed or flat fee where work originally contemplated in the engagement agreement was never done.

117.    Here, regardless of the fact the fees are characterized as "earned upon receipt", they do not qualify as earned-on-receipt fees under the law because they were not paid solely to secure Defendants' general availability, and therefore had to be *earned* through actual work completed by Ice Legal.  Actual services under the Engagement Agreement needed to be performed.  At the most, Ice Legal is entitled to receive in quantum meruit the amount based on the very limited work done.

118.    Ice Legal's invoices confirm that Ice Legal provided minimal legal services, totaling 63.4 hours of work.  *See* **Exhibits B and C** (gathering invoices and supporting time records).  In fact, Ice Legal's 2022-2023 invoices are literally blank, reflecting that Ice Legal provided ***no*** legal services whatsoever for the benefit of any of their clients (including several Receivership Defendants) during those two years, and yet the firm was paid $1.625 million for the period.

119.    Defendants breached their fiduciary duty to its clients with respect to the Engagement Agreement by, among other things: structuring Ice Legal's fee as a prohibited nonrefundable pre-paid fee; characterizing a refundable pre-paid fee arrangement as "earned upon receipt" or as a "true retainer"; and charging an unreasonable, excessive, and unconscionable fee in light of the limited work that was actually performed.

       3.    The Engagement Agreement's Improper and Unlawful Termination Provision

120.    Additionally, the Engagement Agreement included an unlawful "Termination of Engagement Agreement" provision.  New York law requires that a client always possesses the unqualified right to terminate the attorney-client relationship at any time.  Rule 1.16(e) of the

New York Rules of Professional Conduct also requires that an attorney promptly refund any unearned fees paid in advance upon termination of representation.  In instances where a client terminates an attorney, the discharged attorney is protected because he is entitled to receive compensation measured by the fair and reasonable value of the *completed* legal services.

121.    Attorney retainer agreements must be terminable at will, but the Engagement Agreement here was not.  Notwithstanding this bedrock legal principle protecting the client, the Engagement Agreement contained the following unlawful provision (Section 5.4 of the Agreement), which impinged on the Strategic Parties' absolute right to terminate Ice Legal:  "If Client terminates the Engagement [for certain reasons], such termination ***will not relieve Client from the obligation to pay for all retainer fees contemplated through the end of the Term*** …." *See* **Exhibit A** § 5.4 (emphasis added).

122.    Under the Engagement Agreement, for a Client to terminate the agreement and be relieved of ongoing fee payments they were required following confusing and burdensome multi-step process:

   i.    **Written Notice of Early Termination:** First, provide written notice of early termination (**Exhibit A** ¶ 5.2).

   ii.    **Rebuttable Presumptions:** If terminating on the grounds that Defendants failed to provide services, then the Client's obligation to continue paying Defendants would end (**Exhibit A** § 5.4).  If seeking to terminate for any reason included in ABA Model Rule 1.16(a) or (b) (which concern mandatory and permissive attorney withdrawal), there would be a "rebuttable presumption" that the Client would be required to continue paying Defendants through the end of the agreement (**Exhibit A** § 5.3).  If seeking to terminate for any other reason (for

example, financial hardship), the Client would be required to keep paying Defendants through the end of 2024 no matter what.

iii.     **Written Notice of Demand Disputing Rebuttable Presumptions:** Next, if seeking to dispute the "rebuttable presumption" described in § 5.3, the Client would be required to "submit a written notice of demand to the other Parties that fairly summarizes the factual and legal grounds of any dispute within 21 days of the date of termination" (**Exhibit A** § 5.6.1).  If no such notice were sent, then the "rebuttable presumption" would be "deemed conclusive" (**Exhibit A** § 5.6.1).

iv.     **Written Response to Written Notice of Demand Disputing Presumptions:** Next, Defendants would have an opportunity to "serve a written response to such notice within 21 days of receipt of the notice of demand" (**Exhibit A** § 5.6.1).

v.     **Arbitration:** Finally, "*If a timely notice of demand and response are served*, then the subject matter of any disputes *raised therein* … must be resolved by binding confidential arbitration" (**Exhibit A** § 5.6.2).

123.    Based on the terms of the "Termination of Engagement" Provision as written, if the Client terminated for any reason other than "failure to perform Services in accordance with this letter," then "such termination will not relieve Client from the obligation to pay for all retainer fees contemplated through the end of the Term…"  **Exhibit A** at 4.  Thus, if the Clients wanted to terminate Ice Legal because the Clients had become dissatisfied with Ice Legal's services, could not afford to pay Ice Legal, disagreed with Ice Legal's advice, or simply no longer wanted or needed Ice Legal's advice, they would nevertheless be required to continue paying Ice Legal through the end of the Term (i.e., December 31, 2024).

124.    The Engagement Agreement specifically addressed terminations by Ice Legal and by the Clients on the grounds that such termination is permitted or required under ABA Model Rule 1.16(a) or (b), but it created opposite rules for terminations by the Clients and by Ice Legal, which dramatically favored Ice Legal.  Model Rule 1.16(a)-(b) and similar state rules, among other things, require that attorneys must withdraw if continuing the representation would result in violations of the law, if a client was using a lawyer to commit a crime or fraud, or if a lawyer's physical or mental condition materially impairs the lawyer's ability to represent the client.

125.    Under the Engagement Agreement, if Ice Legal sought to terminate the relationship, because, for instance, it had determined that the Clients were violating the law, then the rebuttable presumption would be that the clients would ***not*** be required to pay for legal services through the end of term.  However, if the Clients sought to terminate the contract on any of those same grounds under Model Rule 1.16(a)-(b), then the rebuttable presumption would be that the Clients were still obligated to pay Ice Legal through the end of the Term.  In these circumstances, the Engagement Agreement presumably forced the clients to go through an arbitration process just to challenge paying their lawyers' ongoing unearned fees after termination.

126.    The Termination Provision was structured to disincentivize Ice Legal from ever raising any concerns that Strategic was operating in an illegal manner.  This was not done by accident: Strategic and related parties wanted to keep Ice Legal quiet and to prevent Ice Legal from noisily withdrawing on ethical grounds in the future.  To that end, counsel for Strategic proposed a provision whereby if Ice Legal wanted to terminate the Agreement because it was required by Model Rules (for instance, if Ice Legal thought the Clients were engaged in a fraud that its legal services were furthering), Ice Legal was required "first to convey its concerns in

writing to the other part(ies) and must employ its best efforts to remedy or resolve any issue(s) under the rules of professional conduct that might preclude the continuation of the Engagement." If this did not resolve the issue, the parties were required to take these types of disputes to confidential arbitration. On the other hand, if Ice Legal were to simply keep quiet about its concerns, the Clients would be obligated to continue paying them their nonrefundable, "earned upon receipt" fees, regardless of the amount of work done.

127. This Termination Provision therefore both unlawfully restricted the Clients' right to discharge Ice Legal and incentivized Ice Legal to remain quiet and loyal in the fact of legal and ethical concerns. The Termination Provision is unlawful, unenforceable, against public policy, and void (irrespective of whether those incentives actually influence Ice Legal's conduct).

128. The arbitration language in the "Termination of Engagement" Provision applies in a limited number of situations *relating to early termination of the agreement only. See* **Exhibit A** § 5. On its face, it does not apply to any of Receiver's claims. The agreement to arbitrate expressly and solely applies: (1) to disputes regarding payment of ongoing post-termination fees following early termination of the Engagement Agreement, and (2) only "If a timely notice of demand and response are served." Neither of these conditions even arguably applies here: the Receiver is not seeking to terminate the agreement early (it already expired by its own terms in 2024), and, therefore, the "written notice and demand" process set forth in ¶ 5.6.1 was also not followed by either the Receiver or Defendants.

129. The language in the Termination Provision referring to threshold arbitrability issues to arbitration does not apply to the Receiver's claims, because that arbitrability language only relates to disputes following termination and only "*If a timely notice of demand and*

*response are served*", not other types of disputes like the ones alleged here. Further, disputes regarding the legality of the Engagement Agreement itself, rescission, and the validity of the arbitration provision (as is the case here) must be decided by the Court, not through arbitration.

130.    During the negotiations regarding the Engagement Agreement, counsel for Strategic had proposed an expansive arbitration provision under which ***all*** disputes relating to the Engagement Agreement would be arbitrated, but Defendants rejected this proposal and agreed only to arbitration in a very narrow set of circumstances relating to early termination of the agreement not applicable here.

**D.    Ice Legal Charged More than Two and Half Million Dollars for Minimal and Deficient Legal Services**

131.    The Engagement Agreement, including particularly the fee structure and the Termination Provision, is unconscionable and void as against public policy, and Defendants' conduct representing the Strategic Parties under that agreement also constitutes a breach of Defendants' fiduciary duties and legal malpractice.

132.    During Ice Legal's fiduciary relationship with the Strategic Parties, it did not provide reasonably equivalent value, or any value, in exchange for the millions of dollars in payments it received. It also did not earn the fees, as it was required to do, since it did not perform the legal work described in the Engagement Agreement.

133.    Defendants did not take any of these payments in good faith, since, among other things, Defendants were aware that these payments were in fact the proceeds of businesses Ice Legal had expressly alleged constituted an illegal RICO enterprise.

134.    As detailed below, Ice Legal was paid a total of $2.625 million for its "legal work" for Strategic. Specifically, it was paid $1,000,000 in 2021, $1,000,000 in 2022, and $625,000 in 2023.

135.     Based on invoices and records of Ice Legal's time records sent to Strategic, during the entire engagement, Ice Legal worked a *total* of 63.4 hours over three years.

136.     The "legal work" that Defendants actually performed consisted of the following: providing an 8-page outline of bullet-point "issues" for the Strategic Parties' consideration and a chart shortly after being engaged, which were based on Ice Legal's prior knowledge; participating in 4 one-hour meetings and a phone call with Strategic; and doing limited "research" and "preparation" for these meetings.

137.     Ice Legal breached the fiduciary duties they owed to their clients, including Strategic, Lit Def, and Hedgewick, by violating the applicable rules of professional conduct requiring that fees charged and earned be reasonable.  Based on the work done, and the $2.625 million paid, Defendants charged an unreasonable and excessive fee, which would equate to an effective hourly rate of *$41,403.79 per hour.*  This was neither earned nor reasonable.

138.     By comparison, at the rate of $500 per hour, which is the rate listed in the Engagement Agreement as the "Incremental Hourly Services Rate" for Defendants Thomas and Ariane Ice, the work performed would have cost a total of $31,700.

139.     Moreover, as evidenced by what Ice Legal identified in its 8-page initial outline of bullet-point "issues" and by facts Ice Legal had previously alleged in its lawsuits against Strategic and related entities, Defendants were aware and/or became aware that the officers and employees of the Strategic Parties were not acting in the best interests of the organizations whom Ice Legal represented and were engaged in activity that was a violation of a legal obligation to the organization or a violation of law that reasonably might be imputed to the organization, and which was likely to result, and did in fact result, in substantial injury to the organization.

140.    Additionally, within a very short time into the engagement, it became obvious that Strategic, Lit Def, and the related entities were not seeking to obtain any further legal advice from Ice Legal in any respect and did not wish to obtain any of the legal advice discussed in the Engagement Agreement.  Defendants also were, or should have been, aware that Strategic and Lit Def's management were not making any changes to operations to address the issues identified in Defendants' bullet-point initial outline.

141.    While Defendants in theory had numerous clients on paper, in reality they interacted with a limited number of Strategic and Lit Def's' officers and employees; in many cases, Defendants did not ever communicate with their supposed clients (like MEC and its affiliates or any of the principals of the law firms), who were ostensibly as "Clients" under the agreement.  Defendants did not apprise MEC or any of the principals of the law firms of their actual conflicts with the other clients.

142.    Indeed, Ice Legal barely even had interactions with either of the two "Client Liaisons" (Strategic's General Counsel and Jason Blust), who had been designated as the client contacts for all of the clients.

143.    Defendants would send their monthly invoices to the two Client Liaisons, and there is no indication that Ice Legal had any interactions with others at Receivership Defendants Strategic, Lit Def, or Hedgewick during the course of their legal representation.  At best, such interactions were marginal.  Nor did they have any discussions with the other supposed "Clients," including MEC and the law firms.

144.    Based on Defendants' knowledge that certain of Strategic Parties' officers and employees were not acting in the best interests of their clients and were not taking any steps to address the legal issues Defendants had identified, Defendants were obligated to proceed as was

41

reasonably necessary in the best interests of all of their clients, which included Strategic, Lit Def, Hedgewick, and non-parties MEC and the law firms, all of which were organizational clients (as discussed in ABA Model Rule 1.13 and New York Rule of Professional Conduct 1.3).

145.    To the extent Defendants purported to have among their clients the officers and employees of Strategic, Lit Def, Hedgewick, the law firms, and MEC, Ice Legal knew and understood there were numerous conflicts of interest among such clients, because, among other reasons, certain officers and/or employees were not acting in the best interests of the organizational clients.  Ice Legal did not apprise any of its clients of these conflicts of interest.

146.    Ice Legal's failure to recognize and acknowledge the obvious conflicts of interest is concerning, given that Ice Legal twice relied upon the existence of "adverse interests" as a basis to refuse to turn over any documents from its client file to the Receiver after he requested it during the summer of 2024.  Specifically, in response to the request, on August 30th, Mr. Ice stated, "We do have some concerns about the assertion of client status in connection with a proceeding that is, not only outside the scope of our engagement, but adverse to other clients in that same engagement.  It would appear ethics rules would require Ice Legal to bow out of any such relationship should it arise."  Mr. Ice reiterated that stance: "We appreciate the caselaw that will inform our thoughts on the thorny ethical issues here, but it does not really address our responsibilities to our formed clients in our engagement, some of which appear to have adverse interests."

147.    Under these circumstances, Defendants were required to undertake measures reasonably necessary to protect their corporate clients – including Strategic, Lit Def, Hedgewick, and non-party MEC – from harm.  Such measures should have included, without limitation: following up directly with numerous clients and not simply relying upon its limited interactions

with the two designated "Client Liaisons"; following up with the Strategic Parties' and MEC's

management regarding the "issues" identified in their 8-page initial outline; referring the matter

to higher authorities in the organizations, like other management of Clients (and not only Client

Liaisons or certain officers and employees), Boards of Directors, Boards of Advisors, and

affiliates/parent companies; identifying and addressing the conflicts of interest; and, if those

measures were unsuccessful, taking steps to withdraw from and terminate the representation and

stop collecting fees for doing no work.  There is no indication that Ice Legal took any of the

appropriate steps to protect all their clients, namely Strategic Parties and MEC, despite their

knowledge of the conduct of certain officers and employees.  What Ice Legal was not permitted

to do was to sit back and do nothing other than sending zero-hour invoices and collecting fees

that had not been earned.

148.    Defendants were negligent by failing to undertake reasonable measures to protect

their clients who were organizational clients, including Strategic, Lit Def, Hedgewick, and non-

party MEC, upon becoming aware that the officers and employees of the organizations were

engaged in activities that were violations of  legal obligations to the organizations or violations

of law that reasonably might be imputed to the organizations and were failing to implement

necessary changes to prevent harm to the organizations.

149.    For instance, as one example of the required steps, Ice Legal was required to

communicate with non-party MEC and not simply rely upon a "Client Liaison" as the interface

with MEC.  This is especially the case where Ice Legal had identified conflicts between MEC

and the law firm.  *See* Dkt. No. 18-2 at 7.  Had Ice Legal done so, it could have directly

communicated with MEC as to the legal peril it faced by virtue of its role in this enterprise and

could have informed it of the fact that it knew that officers and employees of other organizations

were engaged in violations of legal obligations to the organizations or violations of law that reasonably might be imputed to the organizations, including non-party MEC, and were failing to implement necessary changes to prevent harm to the organizations. With that knowledge, non-party MEC could have taken steps to mitigate harm being caused to the organizations and stopped the illegality by, among other things, coming into compliance with the law and refusing to participate in sending illegal mailers.

150.    But, as confirmed by their own invoices and emails in Strategic's possession, Ice Legal never provided any legal advice to non-party MEC, even though Ice Legal had previously identified MEC's mailers as fraudulent "bait-and-switch" marketing of the debt settlement services offered by Strategic. Other than speaking briefly with MEC at the time of signing the Engagement Agreement in early 2021, Ice Legal did not speak to Mr. Driscoll or anyone else at MEC during the entirety of their attorney-client relationship.

151.    In fact, the only time it had any discussions with non-party MEC was in an attempt to enforce the Engagement Agreement by sticking non-party MEC with the bill after the filing of the Regulatory Enforcement Action. Specifically, on February 14, 2024, Mr. Ice emailed Frank Driscoll, who was the signatory for MEC. He copied Mr. Blust, Strategic's CEO Ryan Sasson, and Strategic's General Counsel Lemberg. Notwithstanding that, Mr. Ice sought to collect the invoice for $156,250 from MEC/Driscoll after he had not heard back from Blust or Lemberg.

152.    Mr. Ice informed Driscoll, "Please know we have every intention of continuing our representation through the end of 2024 and hope that payment will be forthcoming so we may be able to do so." Mr. Driscoll promptly wrote back: "I suggest you step up your efforts to contact Jason Blust. I have no knowledge of the services and deliverables you have provided

and I suggest you suspend any further activity regarding this engagement until you have made contact with Jason, our designated liaison.  Thanks Frank D."

153.    Mr. Ice responded to Mr. Driscoll, "Thanks for the quick reply.  The agreement as you may remember is primarily a true retainer agreement contemplating our availability through 2024.  Therefore, 'suspending' our activity does not reduce the fees that are and will be owed. Are you indicating you want to terminate the agreement on behalf of MEC.  I would hope that is not the case, we believe we have provided value to MEC and your co-clients and will continue to do until our contract ends later this year."

154.    This response by Ice Legal confirms the problematic nature of the Engagement Agreement – and its onerous and unlawful termination provision and requirement that clients pay for work that they did not want, did not receive, and wanted to stop.  Here, non-party MEC – a party that had never once had sought, received advice from, or even spoken with Ice Legal during the representation, desired to end the attorney-client relationship *after* the implementation of a government regulatory action by the CFPB and several State Attorneys General's Offices.

155.    At the time of the outreach, that lawsuit had caused the implementation of a Temporary Restraining Order, which was followed by a Preliminary Injunction, had led to the appointment of a receiver by the Court, and had led to the stoppage of the debt settlement business after the Receiver determined that it could not continue to be operated lawfully and profitably.  Despite all of this, Ice Legal, which had nominally been hired by Strategic and Lit Def (two of the Defendants in the Regulatory Enforcement Action) to provide regulatory and compliance legal advice, took the position that it was *still* owed fees, even though it had done zero work to earn them – the clients no longer wanted any work done, and the clients no longer

45

needed any regulatory legal advice because it was too late: they had already been sued by state and federal regulators.

      1.    <u>Ice Legal Provided Negligent Legal Services in 2021</u>

156.    In March 2021, Strategic and other clients and Defendants entered into the Engagement Agreement with an effective date of March 10, 2021. On March 15, 2021, Ms. Ice emailed the two client liaisons identified in the Engagement Agreement for the Strategic Parties – Jason Blust, the principal of Lit Def, and Marc Lemberg, the General Counsel for Strategic and numerous affiliated entities – a copy of Ice Legal's initial invoice for $500,000.  The invoice listed the clients as "Strategic Family, Inc., Hedgewick, LLC, Litigation Defense Strategies, LLC, and MEC Distribution, LLC."  The amount charged was $500,000 and was described as the "Initial Payment upon signing of agreement."  The clients promptly paid Defendants $500,000.

157.    Based on Ice Legal's invoice and time records for March and April 2021, Defendants' 49.5 hours of legal work consisted of writing an 8-page introductory bullet-point "initial outline" listing various "issues" addressed on to the Client Liaisons' for their consideration.  This outline included Defendants' belief and legal opinions that the Strategic Parties were violating the law and engaged in numerous deceptive and illegal practices, including the unauthorized practice of law, and facially described conduct that created numerous conflicts of interest among Ice Legal's "clients," but Ice Legal offered limited specific advice to remedy these issues or identify, discuss, or resolve the existence of conflicts.

158.    After April 2021, Ice Legal performed approximately 10 more hours of legal work, all of which was completed by the end of 2021. For the month of May 2021, Ice Legal performed 2.9 hours of work in connection with a one-hour meeting with client representatives, based on Defendants' time records sent to the clients. For the month of June 2021, Ice Legal

performed zero hours of work, based on Defendants' time records sent to the clients. For the month of July 2021, Defendants Thomas and Ariane Ice met with client representatives for one hour, based on Ice Legal's time records sent to the clients.

159.    On July 2, 2021, Ms. Ice emailed Lit Def's Jason Blust and Strategic's Marc Lemberg a copy of the Ice Legal's invoice for $250,000.  The clients promptly paid Ice Legal.

160.    For the month of August 2021, Ice Legal performed zero hours of work for the clients, based on Defendants' time records sent to the clients.  For the month of September 2021, Ice Legal performed zero hours of work, based on Defendants' time records sent to the clients. For the month of October 2021, Ice Legal performed 5 hours of work, consisting of legal research, based on Ice Legal's time records sent to the clients. For the month of November 2021, Mr. and Mrs. Ice met with client representatives for one hour, based on Ice Legal's time records sent to the clients.

161.    On November 5, 2021, Ms. Ice emailed Lit Def's Blust and Strategic's Lemberg a copy of Ice Legal's invoice for $250,000.  The clients promptly paid Ice Legal.

162.    For the month of December, Defendant had a one hour call on December 15th with client representatives, based on Ice Legal's time records sent to the clients.

163.    ***Ice Legal did not perform any legal work for Strategic, Lit Def, or any other client listed in the Engagement Agreement after the December 15, 2021 call***, based on Defendants' own time records sent to the clients.  Apart from sending the invoices, there was little to no communication between Ice Legal and the clients or their representatives after this point.

2.    Ice Legal Provided No Legal Services in 2022

164.    Ice Legal performed no legal work for Strategic, Lit Def, or any other client listed in the Engagement Agreement during the entirety of 2022, based on Defendants' time records sent to their clients.

165.    For the month of January 2022, Ice Legal performed no legal work for Strategic, Lit Def, or any other client listed in the Engagement Agreement and sent no time records to their clients for work done that month.

166.    On February 1, 2022, Ms. Ice emailed Lit Def's Blust and Strategic's Lemberg a copy of Ice Legal's invoice for $250,000. The clients promptly paid Ice Legal.

167.    For the month of February 2022, Ice Legal performed no legal work Strategic, Lit Def, or any other client listed in the Engagement Agreement and sent no time records to their clients for work done that month. For the month of March 2022, Ice Legal performed no legal work for Strategic, Lit Def, or any other client listed in the Engagement Agreement and sent no time records to their clients for work done that month.

168.    On April 1, 2022, Ms. Ice emailed Lit Def's Blust and Strategic's Lemberg a copy of Ice Legal's invoice to their clients for $250,000. The clients promptly paid Ice Legal.

169.    For the month of April 2022, Ice Legal performed no legal work for Strategic, Lit Def, or any other client listed in the Engagement Agreement and sent no time records to their clients for work done that month. For the month of May 2022, Ice Legal performed no legal work for Strategic, Lit Def, or any other client listed in the Engagement Agreement and sent no time records to their clients for work done that month. For the month of June 2022, Ice Legal performed no legal work for Strategic, Lit Def, or any other client listed in the Engagement Agreement and sent no time records to their clients for work done that month.

170.    In July 2022, Ms. Ice emailed Lit Def's Blust and Strategic's Lemberg a copy of Ice Legal's invoice for $250,000.  The clients promptly paid Ice Legal.

171.    For the month of July 2022, Ice Legal performed no legal work for Strategic, Lit Def, or any other client listed in the Engagement Agreement and sent no time records to their clients for work done that month.  For the month of August 2022, Ice Legal performed no legal work for Strategic, Lit Def, or any other client listed in the Engagement Agreement and sent no time records to their clients for work done that month.  For the month of September 2022, Ice Legal performed no legal work for Strategic, Lit Def, or any other client listed in the Engagement Agreement and sent no time records to their clients for work done that month.  For the month of October 2022, Ice Legal performed no legal work for Strategic, Lit Def, or any other client listed in the Engagement Agreement and sent no time records to their clients for work done that month.

172.    On October 31, 2022, Ms. Ice emailed Lit Def's Blust and Strategic's Lemberg a copy of Ice Legal's invoice for $250,000.  Their clients promptly paid Ice Legal.

173.    For the month of November 2022, Ice Legal performed no legal work and sent no time records to their clients for work done that month.  For the month of December 2022, Ice Legal performed no legal work for Strategic, Lit Def, or any other client listed in the Engagement Agreement and sent no time records to their clients for work done that month.

3.    Ice Legal Provided No Legal Services in 2023

174.    Ice Legal performed no legal work for Strategic, Lit Def, or any other client listed in the Engagement Agreement during the entirety of 2023, based on Defendants' time records sent to their clients.

175.    For the month of January 2023, Ice Legal performed no legal work for the Strategic Parties and sent no time records to their clients for work done that month.

176.    On January 31, 2023, Ms. Ice emailed Lit Def's Blust and Strategic's Lemberg a copy of Ice Legal's invoice for $156,250.  The clients promptly paid Ice Legal.

177.    For the month of February 2023, Ice Legal performed no legal work Strategic, Lit Def, or any other client listed in the Engagement Agreement and sent no time records to their clients for work done that month.  For the month of March 2023, Ice Legal performed no legal work for Strategic, Lit Def, or any other client listed in the Engagement Agreement and sent no time records to their clients for work done that month.

178.    On March 31, 2023, Ms. Ice emailed Lit Def's Blust and Strategic's Lemberg a copy of Ice Legal's invoice for $156,250.  The clients promptly paid Ice Legal.

179.    For the month of April 2023, Ice Legal performed no legal work for Strategic, Lit Def, or any other client listed in the Engagement Agreement and sent no time records to their clients for work done that month.  For the month of May 2023, Ice Legal performed no legal work for Strategic, Lit Def, or any other client listed in the Engagement Agreement and sent no time records to their clients for work done that month.  For the month of June 2023, Ice Legal performed no legal work for Strategic, Lit Def, or any other client listed in the Engagement Agreement and sent no time records to their clients for work done that month.

180.    On June 29, 2023, Ms. Ice emailed Lit Def's Blust and Strategic's Lemberg a copy of Ice Legal's invoice for $156,250.  The clients promptly paid Ice Legal.

181.    For the month of July 2023, Ice Legal performed no legal work for Strategic, Lit Def, or any other client listed in the Engagement Agreement and sent no time records to their clients for work done that month.  For the month of August 2023, Ice Legal performed no legal work for Strategic, Lit Def, or any other client listed in the Engagement Agreement and sent no time records to their clients for work done that month.  For the month of September 2023, Ice

Legal performed no legal work for Strategic, Lit Def, or any other client listed in the Engagement Agreement and sent no time records to their clients for work done that month.

182.    For the month of October 2023, Ice Legal performed no legal work for Strategic, Lit Def, or any other client listed in the Engagement Agreement and sent no time records to their clients for work done that month.

183.    On October 31, 2023, Ms. Ice emailed Lit Def's Blust and Strategic's Lemberg a copy of Ice Legal's invoice for $156,250.  The clients promptly paid Ice Legal.

184.    For the month of November 2023, Ice Legal performed no legal work for Strategic, Lit Def, or any other client listed in the Engagement Agreement and sent no time records to their clients for work done that month.  For the month of December 2023, Ice Legal performed no legal work for Strategic, Lit Def, or any other client listed in the Engagement Agreement and sent no time records to their clients for work done that month.

**E.    Defendants Demand That the Receiver Pay Ice Legal Invoices on a Priority Basis Ahead of Alleged Consumer Victims and Other Creditors**

185.    During January 2024, Ice Legal performed no legal work for Strategic, Lit Def, or any other client listed in the Engagement Agreement and sent no time records to their clients for work done that month.

186.    The Court appointed the Receiver on January 11, 2024, initially temporarily in connection with a Temporary Restraining Order, and the Court then re-appointed the Receiver in March 2024 when issuing the Preliminary Injunction.

187.    On January 31, 2024, *after the issuance of the Temporary Restraining Order against Strategic, and after appointment of the Receiver,* Ms. Ice sent an email to Blust and Lemberg with a copy of Ice Legal's invoice for $156,250.  Strategic and Lit Def, which were

now under the control of the Receiver, did not receive a copy of this invoice and did not pay this amount.

188.    During February 2024, Ice Legal performed no legal work for Strategic, Lit Def, or any other client listed in the Engagement Agreement and sent no time records to their clients for work done that month.

189.    Ice Legal's continued position that it is owed money under the Engagement Agreement, regardless of the actual amount of work that it performed, is inconsistent with established law, including that its fees must be reasonable and earned.

190.    On March 4, 2024, the Court entered the Preliminary Injunction, continuing the appointment of the Receiver.

191.    During March 2024, Ice Legal performed no legal work for Strategic, Lit Def, or any other client listed in the Engagement Agreement and sent no time records to their clients for work done that month.

192.    On March 31, 2024, *after the issuance of the Preliminary Injunction against numerous individuals and entities, including many entities and individuals related to Strategic, and with the continued appointment of the Receiver,* Ice Legal sent an invoice for $156,250.  No client, including Strategic and Lit Def, which were now Receivership Defendants under the control of the Receiver, paid this amount, and the Receiver did not obtain a copy of this invoice at the time.

193.    Even though Ice Legal had performed no legal work for several years, Defendants continued to demand payment even after a United States District Court issued the Preliminary Injunction in March 2024, finding that Strategic along with other entities, including Lit Def, had

likely been operating illegally by charging consumers millions of dollars in prohibited advance fees (while Ice Legal was ostensibly serving as compliance counsel for Strategic).

194.    In May 2024, Defendants reached out to the Receiver, demanding that the Receiver pay Ice Legal's two unpaid invoices.  All told, after having received $2.625 million for approximately 60 hours of work, Ice Legal wanted to be paid more.  This time, it demanded that the money be paid out of Receivership Estate funds in advance of creditors, including any potential consumer victims.

195.    In their demand to the Receiver, Defendants took credit for "spearhead[ing] far-ranging multistate litigation against these entities" and highlighted the purported "successful settlements for each of our consumer clients."  In other words, Defendants attempted to justify further billing their clients after Strategic was no longer operational and a Preliminary Injunction was in place on the grounds that Ice Legal had successfully sued these very same clients years ago.  Defendants then vaguely claimed that "[a]fter these settlements, we were engaged by the Defendants in a multiyear retainer agreement (2021-2024) to directly do what our consumer litigation had indirectly done — help them comply with consumer-oriented 'state and federal laws and regulations.'"  Defendants claimed that Ice Legal's scope of engagement included providing legal advice to comply with the law.  Specifically, Defendants claimed that "[u]nder this agreement, we provided, and have been available to provide, legal advice that would ultimately benefit the consumer."

196.    Mr. Ice's email to the Receiver omitted several key facts.  Nowhere did he mention the fact that Defendants had done no legal work for Strategic, Lit Def, or any other client for more than three years, as Defendants had provided no legal work at all for Strategic, Lit Def, or any other client listed in the Engagement Agreement since December 2021.  Nowhere

did Mr. Ice mention that in total Defendants had only worked for these clients for approximately 60 hours over the course of nearly three years, with approximately 50 of those hours occurring within the first two months of the representation.  Nor did he mention the fact that Defendants had given only limited legal advice that had failed to remedy any issues for Strategic, Lit Def, or any other client listed in the Engagement Agreement.

197.    Instead, Defendants explained to the Receiver that their clients "have missed their first two 2024 payments."  They then went further and made a remarkable request: "Due to the nature of our work, ***we ask for the prioritization of the payment of this and the remainder of the 2024 fees***, either through the captive insurance policy … or the receivership estate" (emphasis added).  In other words, Defendants demanded that Ice Legal be paid *before all other potential creditors, including the consumers*.  And Defendants did this, even though they knew they had performed no legal work at all during 2022, 2023, and 2024 – and there was no possible work that could be done in the future given that the debt relief enterprise to which Ice Legal had been hired to provide regulatory and legal compliance advice had been shuttered as a result of the Regulatory Enforcement Action.

198.    After receiving the demand, the Receiver undertook to review Ice Legal's claims and demand to be paid ahead of other creditors.

199.    On August 14, 2024, the Receiver requested that Ice Legal provide the entire client file to the Receiver to evaluate the claim.  The Receiver specifically requested that Ice Legal provide a copy of its client file to the Receiver, since the client file belonged to the clients, which were now Receivership Defendants.

200.    Given that Strategic, Lit Def, and other clients of Ice Legal were now facing massive regulatory exposure, it was important for the Receiver to investigate the exact nature of

Ice Legal's legal advice to the entities, and also to determine what specific legal advice Ice Legal had provided to Strategic and other Receivership Defendants. In addition to assessing whether there was any valid basis to pay Ice Legal for any work previously done, including if any work was done *prior* to the implementation of the TRO, the Receiver also needed to consider whether there was any basis to recover amounts previously paid to Ice Legal or bring claims against Ice Legal.

201. Ice Legal refused to provide a copy of the client file to the Receiver. It initially claimed that concerns about conflicts of interest prevented production of the file. The Receiver was thus forced to reconstruct the work done by Ice Legal based on a review of Strategic's files and the invoices sent to Strategic. Despite the fact that the client file belongs to a client and a lawyer has a fiduciary duty and ethical obligation to provide a copy of the client file upon request to all of its clients, and despite the Receiver's repeated requests to provide a copy of the client file, Defendants failed to and/or refused to produce the client file to the Receiver up to the filing of this Amended Complaint.

202. Ultimately, after reconstructing the client file, reviewing the Engagement Agreement, reviewing the invoices and determining that Ice Legal had provided next to no actual legal services and had only worked a total of approximately 60 hours (approximately 50 hours of which was performed in the first two months), and reviewing the limited email correspondence between Defendants and representatives of Strategic, the Receiver concluded that Ice Legal was not a valid creditor and determined that they should not be paid any further amounts. Additionally, the Receiver concluded that there were numerous viable claims to recover money paid to Ice Legal, as detailed herein.

**F.    Ice Legal Breached Numerous Fiduciary Duties to the Strategic Defendants and Committed Malpractice**

203.    The Agreement, at Attachment B ("Scope of Engagement"), indicates that Defendants' assigned legal work would involve comprehensive review and advice regarding the Clients' compliance with consumer protection laws, debt reduction laws, and rules regulating attorneys, with the specified services including the following:

a.    <u>Advice Regarding Compliance with Consumer Protection and Debt Reduction Laws</u>.  Provision of legal advice and counsel with respect to compliance with state and federal laws and regulations ("laws") relating to the marketing, sale and delivery of services to consumer clients relating to debtor rights and the negotiation and resolution of consumer debt.  This includes the marketing, sale and delivery of a program or service to renegotiate, settle, or in any way alter the terms of payment or other terms of the debt between a person and one or more unsecured creditors or debt collectors, including, but not limited to, a reduction in the balance, interest rate, or fees owed by a person to an unsecured creditor or debt collector.  These include without limitation state consumer protection laws, state debt settlement or debt resolution laws as well as regulations promulgated by the Consumer Finance Protection Bureau, Federal Trade Commission, Federal Reserve and similar laws.  This may include the review of forms of agreements with and disclosures to consumers, review of Client operations, procedures and policies and the development and delivery of training materials for Client staff.

b.    <u>Advice Regarding Compliance with Bar Ethics Rules and Rules of Professional Conduct</u>.  Provision of legal advice and counsel with respect to compliance with applicable rules of professional conduct and similar regulations governing the

practice of law and the required supervision by lawyers of non-lawyer professionals incidental to the practice of law.  This may include the review of forms of agreements with and disclosures to consumer clients, review of Client operations, procedures and policies and the development and delivery of training materials for Client staff.

    c.    <u>Regulatory Investigations</u>.  Providing advice, counsel and support in Client's response to investigative demands, inquiries or enforcement actions brought by or on behalf of state or federal regulators or bar regulators arising out or related to the scope of services described in items 1 and 2 above.

204.    Despite being paid for three years and continuing to send invoices seeking full payment, Defendants substantially failed to provide the "legal advice and counsel" set forth in Attachment B of the Engagement Agreement.  In total, Defendants produced minimal work product, primarily consisting of  a single short, bullet-point "initial outline" that provided a "preliminary assessment" of potential legal issues affecting Strategic and other clients and negligently failed to reasonably and sufficiently advise any of their clients of the full scope and extent of the financial liability and regulatory peril arising from their business practices.

205.    This "initial outline" of potential "issues" included an informal list of potential issues in bullet-point format, with limited actual advice – it merely identified potential issues, without providing meaningful advice and counsel regarding compliance.  After sending this initial outline to the Clients, there is scant evidence that Defendants ever provided any advice and counsel regarding the potential legal issues they had mentioned in the outline.

206.    After submitting their April 21, 2021 bullet-point "outline," Defendants performed little or no further legal work for Strategic, Lit Def, or any other client on any subject,

including to help comply any of their clients with consumer-oriented state and federal law laws and regulations.

207.    Until the filing of the Regulatory Enforcement Action and the imposition of the receivership in January 2024, the Strategic Parties and other Receivership Defendants were adversely dominated and under the control of wrongdoers engaged in the Strategic debt relief business enterprise, including Individual Defendants identified in the Regulatory Enforcement Action and officers of the Strategic Parties, resulting in the tolling of applicable statutes of limitations under the adverse domination doctrine, since controlling wrongdoers, and those assisting or jointly participating with those persons in control, would not bring an action that exposes the conduct.

208.    On January 21, 2025, the Receiver and Defendants entered into a Tolling Agreement whereby they agreed to toll the statutes of limitations "or like principle of law or equity" for all claims relating to this matter from November 1, 2024 (the "Effective Date" of the Tolling Agreement) until June 30, 2025, or such earlier time as either party gives notice of termination in accordance with the terms of the Tolling Agreement.

209.    On March 11, 2025, the Receiver, by and through counsel, gave written seven-day notice of termination of the Tolling Agreement to counsel for Defendants in accordance with the terms of the Tolling Agreement, and the Tolling Agreement thus terminated on March 18, 2025.

<u>**COUNTS OF THE COMPLAINT**</u>

<u>**COUNT 1**</u>
**BREACH OF FIDUCIARY DUTY**
**(Against All Defendants)**

210.    Plaintiff repeats and realleges the allegations of each and every one of the prior paragraphs, inclusive, as if fully set forth herein.

211.    The Engagement Agreement dated March 10, 2021 created an attorney-client relationship, and, therefore, a fiduciary relationship, between Ice Legal and its attorneys Thomas Ice and Ariane Ice, on the one hand, and Strategic, Lit Def, Hedgewick, and other clients, on the other hand.

212.    Defendants breached their fiduciary obligations to, among others, Strategic, Lit Def, and Hedgewick, all three of which are now Receivership Defendants, in numerous ways, including by charging unreasonable and unearned fees of $2.625 million in exchange for what turned out to be approximately 60 hours of legal work that was actually performed.  Defendants had not earned these fees, and they should forfeit and return the fees charged and received, apart from the quantum meruit value of any work performed.

213.    This included charging their clients $1.625 million in fees in 2022 and 2023 without performing any legal work for any client under the Engagement Agreement.  Defendants had not earned these fees, and they should forfeit and return the fees charged and received, apart from the quantum meruit value of their work.

214.    Defendants further breached their fiduciary duties by proposing and entering into a fee arrangement that included nonrefundable advance fees not permitted under the law, failing to identify and remedy obvious conflicts of interest at the time of the Engagement Agreement and throughout the relationship, failing to advise their clients under the Engagement Agreement of such conflicts of interest between them or secure conflict waivers where permissible, directly impinging on their clients' absolute right to discharge their attorney, and requiring their clients to pay all fees through the end of the contract's term in the event of certain termination events under the Engagement Agreement.

215.    Defendants further breached their fiduciary obligations to their clients by substantially failing to provide the "legal advice and counsel" required in Attachment B of the Engagement Agreement.  Among other things, Defendants failed to reasonably and sufficiently advise their clients of the full scope and extent of the financial liability and regulatory risks arising from their business practices.  Instead, after submitting their meager April 21, 2021 bullet-point memorandum listing potential "issues," Defendants continued to invoice their clients for amounts, which Defendants were aware derived from businesses Ice Legal had recently alleged comprised a RICO enterprise and were collecting advance fees from consumers.  Defendants did this while performing little or no further legal services for Strategic, Lit Def, and/or any other client.

216.    Moreover, Defendants breached their fiduciary duties owed to their corporate clients because they became aware that officers and employees of Strategic, Lit Def, and/or other clients were not seeking any of Ice Legal's advice and were instead continuing to engage in activity that was a violation of a legal obligation to the organization or organizations and/or a violation of law that reasonably might be imputed to the organization or organizations.  Defendants also knew this conduct by officers and employees of Strategic, Lit Def, and/or other clients was likely to result, and did in fact result, in substantial injury to the organization or organizations.  Defendants owed fiduciary obligations to proceed as was reasonably necessary in the best interest of their clients that were organizations (including Strategic, Lit Def, Hedgewick, and non-party MEC) and should have undertaken measures reasonably necessary to protect these organizational clients from injury but failed to do so

217.    Defendants' breach of their fiduciary duties was a substantial factor in causing identifiable losses, including the payment of unreasonable fees to Defendants, to Strategic in an amount to be determined at trial.

218.    Further, as a result of Defendants' breach of their fiduciary duties to the Strategic Parties, Plaintiff is entitled to disgorgement of all amounts paid to Ice Legal under the Engagement Agreement.

**COUNT 2**
**PROFESSIONAL NEGLIGENCE**
**(Against All Defendants)**

219.    The Receiver repeats and realleges the allegations of each and every one of the prior paragraphs, inclusive, as if fully set forth herein.

220.    Pursuant to the Engagement Agreement dated March 10, 2021, Defendants, on the one hand, and Strategic, Lit Def, Hedgewick, and other clients, on the other hand, entered into an attorney-client relationship.

221.    Pursuant to the Engagement Agreement, Ice Legal and its attorneys, including Thomas Ice and Ariane Ice, agreed to provide the legal services described in Attachment B to the agreement ("Scope of Engagement"), which legal services included, *inter alia*, "[p]rovision of legal advice and counsel with respect to compliance with state and federal laws and regulations ('laws') relating to the marketing, sale and delivery of services to consumer clients… [t]hese include without limitation state consumer protection laws, state debt settlement or debt resolution laws as well as regulations promulgated by the Consumer Finance Protection Bureau, Federal Trade Commission, Federal Reserve and similar laws."

222.    Defendants committed professional negligence by negligently and substantially failing to provide the "legal advice and counsel" required under the Engagement Agreement. Based on the Engagement Agreement, Defendants were hired in a multiyear retainer agreement

to help the Strategic Parties and MEC comply with consumer-oriented state and federal laws and regulations. Despite being hired for this purpose, Defendants negligently failed to provide Strategic, Lit Def, Hedgewick, and other clients, including Non-party MEC with legal advice sufficient for their clients to comply with consumer-oriented state and federal laws and regulations.

223.    More particularly, Defendants' "legal advice and counsel" to the Strategic Parties consisted primarily of a short memo dated April 21, 2021, which was a bullet-point "initial outline" of potential legal issues affecting the Strategic Parties. Defendants failed to reasonably and sufficiently advise Strategic, Lit Def, Hedgewick, and other clients, including non-Party MEC of the full scope and extent of the financial liability and regulatory peril arising from their clients' business practices or to provide sufficient advice to remedy identified issues. After April 2021, Defendants performed little or no further legal services for any of their clients.

224.    Furthermore, during the course of their professional relationship with Strategic, Lit Def, Hedgewick, and Non-Party MEC, as joint clients, Defendants were aware that officers and employees of Strategic, Lit Def, and other clients were not complying with consumer-oriented state and federal laws and regulations. Within months of the start of the Engagement Agreement, it became apparent to Defendants that officers and employees of Strategic, Lit Def, and other clients were engaged in activity that was a violation of a legal obligation or obligations to the client organization or organizations or a violation or violations of law that reasonably might be imputed to the organization or organizations, and which was likely to result, and did in fact result, in substantial injury to the organization or organizations.

225.    It was apparent to Defendants that certain officers and employees of Strategic, Lit Def, and other clients were not interested in having Defendants provide any legal advice to them

and also were not implement any changes as a result of Defendants' bullet-point "initial outline" of potential legal issues, while still paying Defendants millions of dollars in unearned legal fees for which no work was provided.

226.    Under these circumstances, Defendants were obligated to proceed as was reasonably necessary in the best interest of all of their organizational clients, including the Strategic, Lit Def, Hedgewick, and Non-Party MEC, and should have undertaken measures reasonably necessary to protect Strategic, Lit Def, Hedgewick, and Non-Party MEC from injury. Defendants negligently failed to take any of the appropriate steps to protect Strategic, Lit Def, Hedgewick, and Non-Party MEC despite their knowledge of the circumstances.

227.    Due to Defendants' negligent provision of the "legal advice and counsel" required under the Engagement Agreement, including their negligent failure to undertake measures reasonably necessary to protect the interests of their organizational clients in light of the officers' and employees' ongoing detrimental conduct, Defendants proximately caused the Strategic, Lit Def, and Hedgewick (each of which is a Receivership Entity) to suffer harm, including increased regulatory exposure and liability and the costs of defending and participating in the actions brought by the federal and state regulators (including the resulting receivership).

228.    For the sake of avoidance of doubt, the Receiver is only bringing claims and seeking to recover for the harm caused to Receivership Defendants.

229.    As an actual and proximate effect of Defendants' negligent provision of legal services, Strategic, Lit Def, and Hedgewick,were harmed in numerous ways in an amount to be determined at trial.

## COUNT 3
## RESCISSION OF INVALID ENGAGEMENT AGREEMENT AND RESTITUTION
### (Against All Defendants)

230.    Plaintiff repeats and realleges the allegations of each and every one of the prior paragraphs, inclusive, as if fully set forth herein.

231.    The Engagement Agreement dated March 10, 2021 was designed and intended to restrict Defendants' ability to represent consumers having claims against Strategic, Lit Def, Hedgewick, and related entities and individuals.

232.    The Engagement Agreement arose in the context of settlement discussions between Defendants and Strategic, Lit Def, Hedgewick, and related entities regarding consumer clients represented by Defendants, and was effectively part of, and entered in connection with, such settlements.

233.    The Engagement Agreement was therefore prohibited by applicable ethical rules, including ABA Model Rule 5.6 and New York Rule of Professional Conduct 5.6, is unenforceable, and is void as against public policy.

234.    The Engagement Agreement was also structured as a nonrefundable advance fee, which is *per se* unenforceable, void, and not permitted under the law.

235.    Further, all nonrefundable retainer fees, even where styled as a general, "true," or "classic" retainer, are *per se* unlawful and unenforceable under the New York Rules of Professional Conduct and applicable case law.

236.    Ice Legal's engagement agreement with the Strategic Parties presented a confusing and unenforceable fee structure, purporting to have fees "earned on receipt" but otherwise structuring the agreement as fixed pre-payment for a specific maximum number of hours.

237.    Moreover, the Engagement Agreement charged an unreasonable and grossly

excessive fee, which was untethered to any work actually done.

238.    The Engagement Agreement also improperly limited their clients', including Strategic's, Lit Def's, and Hedgewick's, unbridled prerogatives as Ice Legal's clients to terminate their attorney at will and contained an unlawful Termination Provision that is void against public policy.  The Engagement Agreement did this by requiring a client to pay all remaining unearned fees if the client wished to terminate the Engagement Agreement, even for cause.

239.    The Engagement Agreement also improperly required Defendants to provide the Clients notice and an opportunity to correct prior to undertaking mandatory withdrawal under ABA Model Rule 1.16(a) or New York Rule of Professional Conduct 1.16(a).

240.    The Engagement Agreement is unlawful and should be voided, given the abuse and misuse of an attorney-client representation as a means to make hundreds, if not thousands, of unnamed people and entities purported "clients", most if not all of whom did not know they were clients, did not meaningfully consent to the attorney-client representation, did not know about actual or potential conflicts of interest, and did not waive conflicts of interest.  This created a fiction that Defendants were counsel to all of these entities and individuals as their supposed clients, and this was done for an improper purpose.  The Engagement Agreement is also void on public policy grounds because Ice Legal represented to all of the clients from inception that it was not aware of any conflicts of interests among the clients, despite its awareness of obvious conflicts of interest between and among the clients.

241.    The purpose of this amorphous web of clients was not to provide actual advice to any of these individuals, but rather to cast as wide a net as possible to buy peace from Ice Legal and conflict it out of being adverse to as broad a group as possible in the Strategic debt relief

65

operation.

242.    The agreement is also void because it was purposely structured as a way to evade the restrictions of ABA Model Rule 5.6 and New York Rule of Professional Conduct 5.6.

243.    This is especially the case, given the circumstances here, including: (1) an express request by representatives of Strategic during settlement discussions to restrict Ice Legal's future business; (2) the Parties' knowledge of the limitations on restricting future business as proposed by Strategic; (3) the parties' discussions of a "future relationship" during those settlement discussions regarding consumer clients' claims as a means to circumvent the rule's limitations; (4) the unusual features of the Engagement Agreement, including the absurd naming of hundreds, if not thousands, of clients; (5) the supposed nonrefundable nature of Defendants' fees despite the fact that the agreement expressly called for providing services; (6) the restrictions on the clients' ability to terminate, and requirement that they pay unearned fees after termination; (7) the financial incentives embedded in the Engagement Agreement intended to prevent Ice Legal from terminating or raising issues; (8) the fact that no actual services – at all – were provided for the vast majority of the attorney—client relationship; and (9) the excessive and unreasonable amount of the fees.  It is also not known whether the consent of any of Ice Legal's former consumer clients was obtained or necessary for Ice Legal to enter into this Engagement Agreement.

244.    Furthermore, Defendants did not, in fact, provide substantial legal services to earn the fees charged and received, based on the amount of work they actually did.

245.    Strategic, Lit Def, and Hedgewick are entitled to rescission of the Engagement Agreement and restitution of amounts paid pursuant to the agreement.

### COUNT 4
### VOIDABLE OR FRAUDULENT TRANSFER
### (Against All Defendants)

246.    Plaintiff repeats and realleges the allegations of each and every one of the prior paragraphs, inclusive, as if fully set forth herein.

247.    Effective April 4, 2020, New York (similar to the majority of other States) adopted a version of the Uniform Voidable Transactions Act ("UVTA"), codified at N.Y. Debt. & Cred. Law §§ 270, *et seq*. (the "NY-UVTA").

248.    The NY-UVTA defines a voidable transfer to include a transfer made by a debtor "[w]ithout receiving a reasonably equivalent value in exchange for the transfer," and where the debtor "was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction" or "[i]ntended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due."  N.Y. Debt. & Cred. Law § 273(a)(2).

249.    Ice Legal's clients, including Strategic, Lit Def, and Hedgewick, collectively paid legal fees without receiving reasonably equivalent value in exchange.  Specifically, Ice Legal's clients  paid Defendants $2.625 million in exchange for only 63.4 invoiced hours of legal services.  Indeed, in 2022 and 2023, Ice Legal's clients paid Defendants a total of $1.625 million in exchange for *no* legal work whatsoever.  All of these fees were the proceeds of a common debt settlement enterprise being run primarily by and through Strategic and its officers and employees, and Strategic itself was responsible for paying, and did pay, the vast majority, if not all, of these fees directly and indirectly.

250.    At the time of their transfers to Defendants, Ice Legal's clients, including Strategic, Lit Def, and Hedgewick were engaged in a business involving the collection of

advance fees from consumers, which resulted in a regulatory enforcement action, and potential regulatory liability for which the Strategic Parties' remaining assets were unreasonably small in relation to their liability to creditors, including consumers.

251.    In its various state court lawsuits against Strategic and its related entities, Defendants had alleged that the advance fees Strategic was collecting from consumers were unlawful.

252.    Through the course of the  representation, Defendants understood – as reflected in their own previous allegations against Strategic and related entities – that the fees they were collecting from their clients s had been unlawfully collected from consumers as advance fees.

253.    At the time Ice Legal received payments from their clients, including Strategic, Lit Def, and Hedgewick believed, or reasonably should have believed, that as a result of the collection of  advance fees from consumers in connection with Strategic's debt settlement common enterprise, Strategic, Lit Def, and Hedgewick were incurring, and would continue to incur, liabilities to creditors, including consumers, that exceeded their ability to pay when due.

254.    Accordingly, the Receiver seeks to recover as voidable or fraudulent transfers all funds received by Defendants from Strategic, Lit Def, and Hedgewick.  The Receiver therefore requests that the Court order Defendants, jointly and severally, to pay to the Receiver all voidable or fraudulent transfers of funds they received, as alleged herein and as further shown by proof at trial.

255.    The Receiver further asks that he be awarded pre- and post-judgment interest from Defendants from the date of the receipt of each voidable or fraudulent transfer.

## COUNT 5
## BREACH OF CONTRACT
### (Against Ice Legal)

256.    Plaintiff repeats and realleges the allegations of each and every one of the prior paragraphs, inclusive, as if fully set forth herein.

257.    The Engagement Agreement dated March 10, 2021 purported to create an attorney-client relationship between Ice Legal, on the one hand, and Strategic, Lit Def, Hedgewick, and other clients, on the other hand.

258.    Pursuant to the Engagement Agreement dated March 10, 2021, Ice Legal was contractually obligated to provide the legal services described in Attachment B to the agreement ("Scope of Engagement"), which legal services included, *inter alia*, "[p]rovision of legal advice and counsel with respect to compliance with state and federal laws and regulations ('laws') relating to the marketing, sale and delivery of services to consumer clients… [t]hese include without limitation state consumer protection laws, state debt settlement or debt resolution laws as well as regulations promulgated by the Consumer Finance Protection Bureau, Federal Trade Commission, Federal Reserve and similar laws."

259.    Defendant Ice Legal breached its contractual duties to Strategic, Lit Def, Hedgewick, and other clients by substantially failing to provide the "legal advice and counsel" required in Attachment B of the Engagement Agreement.  More particularly, Ice Legal's "legal advice and counsel" to Strategic, Lit Def, Hedgewick, and other clients.  Ice Legal failed to reasonably and sufficiently advise Strategic, Lit Def, Hedgewick, and/or any other client of the full scope and extent of the financial liability and regulatory peril arising from their business practices.  Instead, after submitting their meager April 21, 2021 memorandum, Defendants continued to invoice Strategic, Lit Def, Hedgewick, and Non-Party MEC for and accept as payments amounts, which Defendants were aware derived from businesses Ice Legal had

69

recently alleged comprised a RICO enterprise and were collecting advance fees from consumers. Defendants did this while providing little or no further legal services for Strategic, Lit Def, Hedgewick, and/or any other client.

260.    Defendants materially breached their express and implied contractual obligations owed to Strategic, Lit Def, Hedgewick, and other clients.  Furthermore, in entering a contract to provide legal services to Strategic, Lit Def, Hedgewick, and other clients, Defendants made an implied promise to exercise due care in performing the services required by the contract and breached these obligations by failing to perform the legal services set forth in the agreement while nevertheless charging unreasonable and excessive fees despite their nonperformance.

261.    As an actual and proximate effect of Ice Legal's breaches of its obligations under the Engagement Agreement, Strategic, Lit Def, and Hedgewick were harmed in an amount to be determined at trial, including payment of excess and unearned legal fees.

**COUNT 6**
**UNJUST ENRICHMENT**
**(Against All Defendants)**

262.    Plaintiff repeats and realleges the allegations of each and every one of the prior paragraphs, inclusive, as if fully set forth herein.

263.    Defendants received payments of $2.625 million from their clients, including Strategic, Lit Def, and Hedgewick.

264.    Defendants characterized these payments as "true retainer" payments for legal services.  In fact, Defendants were required to perform services for these fees but performed services that were either deficient or non-existent.  Defendants received $2.625 million between March 2021 and December 2023 in exchange for only 63.4 invoiced hours of legal services. Defendants received $1.625 million in 2022 and 2023 despite performing no services whatsoever.

265.    Defendants obtained these payments from their clients after informing their clients and/or their representatives that Ice Legal planned  to bring future litigation ("100 suits a year") on behalf of consumers against Strategic and related entities if Strategic and related entities refused to agree to Defendants' terms.

266.    Defendants obtained these payments despite their awareness that the payments were made using advance fees collected from consumers, which Defendants had previously alleged were not legal.

267.    Defendants also obtained these payments despite having recently alleged in multiple lawsuits that Strategic was, *inter alia*, a "fraudulent debt settlement enterprise, whose members and associates engaged in fraudulent and deceptive practices designed to enroll consumers in useless 'debt settlement' plans and extract unearned fees from them," "conspir[ing] to defraud Florida consumers," "defraud[ing] consumers by posing as lawyers and law firms," "evading laws relating to non-lawyer debt settlement companies," carrying out a "a bait-and-switch scheme," "fraudulently induc[ing] Class Members to enter into illegal contracts," and engaging in a "pattern of racketeering activity."

268.    As a result of said payments, Defendants were unjustly enriched.

269.    The Receiver seeks an equitable remedy ordering that Defendants are holding, and shall continue to hold, the amount of the payments the Receivership Entities made to the Defendants in constructive trust for the Receiver.

270.    The Receiver further asks that he be awarded pre- and post- judgment interest from Defendants from the date of Defendants' receipt of each payment.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Receiver, as Court-appointed Receiver for Strategic, Lit Def, and Hedgewick, respectfully prays for judgment in his favor and against Defendants Ice Legal, LLC, Thomas Ice, and Ariane Ice, as follows:

1.      For the relief stated herein, including all money damages of the Strategic Parties resulting from Defendants' conduct, in an amount to be determined at trial;

2.      For money damages, disgorgement, and/or restitution in the amount of all payments made by Strategic, Lit Def, and/or Hedgewick to Defendants in connection with the Engagement Agreement, which the Receiver understands to be $2,625,000, plus all interest from the date of each payment;

3.      For an order rescinding the Engagement Agreement as *per se* invalid under applicable law;

4.      For an order imposing a constructive trust for the benefit of the Receiver over all moneys transferred by Strategic, Lit Def, and/or Hedgewick to Defendants pursuant to the Engagement Agreement;

5.      For pre- and post-judgment interest;

6.      For attorneys' fees, expenses, and costs; and

7.    For such other and further relief as the Court may deem proper.


Dated: May 22, 2025


                                    **HODGSON RUSS LLP**

                                    By: ___ */s/ James C. Thoman* _____
                                    James C. Thoman, Esq.
                                    140 Pearl Street, Suite 100
                                    Buffalo, New York 14202
                                    Telephone:  (716) 856-4000
                                    Facsimile:  (716) 849-0349
                                    Email:  jthoman@hodgsonruss.com


                                    **MCNAMARA SMITH LLP**

                                    By: ___ */s/ Logan D. Smith* _____
                                    Logan D. Smith  (*Pro Hac Vice Pending*)
                                    Alexander D. Wall (*Pro Hac Vice Pending*)
                                    McNamara Smith LLP
                                    655 West Broadway, Suite 900
                                    San Diego, California 92101
                                    Telephone:  (619) 269-0400
                                    Facsimile:  (619) 269-0401
                                    Email:  lsmith@mcnamarallp.com;
                                    awall@mcnamarallp.com

                                    *Attorneys for Plaintiff, Court-appointed Receiver,*
                                    *Thomas W. McNamara*