# EXHIBIT A



6586 Hypoluxo Road ~ Suite 350
Lake Worth, FL 33467
www.icelegal.com

March 10, 2021

Thank you for choosing Ice Legal, PA ("Firm") to represent the clients identified on Attachment A (collectively, "Clients" or "Client" as context permits, and each, a "Client"). The purpose of this letter is to confirm the terms of the relationship.

1. SCOPE OF ENGAGEMENT; PERFORMANCE OF SERVICES

    1.1. Client has requested, and the Firm agrees to be available and will provide, the following legal services in the scope described in Attachment B (the "Engagement" and such services the "Services"). The scope of the Engagement may be expanded only by mutual written consent.

    1.2. The terms of this letter will apply to any expanded scope (including work on unrelated matters), unless superseded or supplemented by a written agreement signed by Client and the Firm.

2. TERM OF ENGAGEMENT; PAYMENT OF FEES AND EXPENSES

    2.1. The Engagement will be for a term from the date of this letter to December 31, 2024 (the "Term").

    2.2. Fees for the Engagement are described on Attachment B.

    2.3. The Firm will provide Client with a monthly statement describing in reasonable detail Services performed, time expended by Firm professionals and any Out of Pocket Expenses (defined below). The Firm will not incur additional hours of Services beyond the maximum hours during the applicable period for the Engagement ("Incremental Hours") or any Out of Pocket Expenses without the prior written approval of Client. All such approvals will be through the Client Liaisons defined in Attachment A.

    2.4. Should the Firm request and Client approve Incremental Hours, the Incremental Hours will be calculated as the amount of time spent by the Firm's professionals multiplied by their individual hourly rates. To the extent the Client approves the Firm to provide Services above and beyond the maximum number of hours identified in Attachment B ("Incremental Hourly Services"), the Firm's maximum hourly rates for Incremental Hourly Services are provided on Attachment B, which rates represent the current levels, qualifications and experience of professionals to be utilized in performance of the Services ("Maximum Rate"). Should other professionals be utilized by the Firm to perform

Services in the future, the hourly rates will be less than the Maximum Rate, and will be adjusted to reflect the relative role and experience of the professional performing the Services in a similar proportion to the Maximum Rate as found in the geographic market where the professional is performing the Services.  The Firm may increase Incremental Hourly Rates not more than once annually; provided that rate increases will be limited to the lesser of: (a) the most recent Consumer Price Index for All Urban Consumers in the PSU including New Hampshire 1982-84 = 100, published by the U.S. Bureau of Labor Statistics (BLM) for the most recent annual period (CPI) or (b) two percent (2.0%).  Should the CPI be a negative number, the Firm will reduce Incremental Hourly Rates by the lesser negative amount of (a) CPI; or (b) two percent (2.0%).

2.5. In addition to professional fees, the Firm will be reimbursed for out-of-pocket expenses incurred in the Engagement, such as filing fees for courts and governmental offices, courier services, reasonable travel costs (transportation, lodging, meals, etc.), electronic discovery vendors, court reporters, investigators, consultants, experts, and external printing or photocopying services ("Out of Pocket Expenses").  Any and all Out of Pocket Expenses are to be approved in writing by Client Liaison prior to the expenses being incurred.  To the extent approved, Out of Pocket Expenses will be incurred in accordance with the guidelines, policies or limitations provided by Client Liaison.  Approved expenses will be paid by Client.  Expenses incidental to the operation of a services business, such as office space, maintenance and use of electronic research platforms and services, maintenance and use of telecommunications and network capabilities and infrastructure, photocopying services for internal or client use, are solely for the Firm and will not be paid or reimbursed by the Client.  All travel must be approved by Client Liaison in advance and all approved travel will be reimbursed in accordance with Client's typical travel policies (class of travel, hotel type, per diem allowances for meals, etc.) applicable to Client's non-executive employees, which Client Liaison will make available from time to time upon request.

2.6. Fees will be invoiced to Client Liaison in the amounts and frequency described in Attachment B.  Fees for Incremental Hourly Fees and expenses will be invoiced monthly, with an itemized description of the services rendered and costs incurred.  Payment of Incremental Hourly Fee invoices not subject to a *bona fide* dispute is due thirty (30) days after receipt.  Fixed retainer payments described on Attachment B will be due on or before the dates specified in Attachment B via bank wire to an account provided to Client Liaison by the Firm. All fees will be paid subject to receipt of an invoice and the provision by the Firm of Form W-9 or similar tax identification form.

3. COMMUNICATION

   3.1. Unless instructed otherwise by Client Liaison, the Firm will use electronic communications (such as e-mail, cellular telephones, Voice Over Internet, etc.) to communicate with Client.  Client consents to the Firm's use of electronic communications in connection with the Engagement.

    3.2. The Firm cannot make any guarantee concerning the efficacy of the Engagement. Attorneys may express opinions or beliefs about various courses of action and anticipated results; however, any such statement is not a promise or guarantee of a particular outcome.

4. CONFLICTS AMONG CLIENTS

    4.1. The Firm and each client acknowledges that numerous of the clients are separately owned, separately controlled and do not constitute and are not part of a single entity. Therefore, each client acknowledges that the Firm will be representing multiple persons and entities in connection with the Engagement. At this time, neither the clients nor the Firm are aware of any conflicts of interest among the clients. While the Firm may provide a single invoice for convenience of administration, and the clients may benefit from the sharing of costs and resources, each client recognizes that there are also disadvantages to such representation, including the possibility of miscommunication or disagreement amongst clients directing the Firm with respect to its representation in the Engagement and hereby waives any conflict or potential conflicts. The Firm advises that each client should consult independent counsel regarding this waiver. Each client's signature on this agreement is a representation that each client has consulted, or had a reasonable opportunity to consult, independent counsel regarding this waiver.

5. TERMINATION OF ENGAGEMENT

    5.1. Unless terminated sooner in accordance with this Section, the Engagement automatically will terminate at the end of the Term. In the event the Firm provides approved Incremental Hourly Services on the Engagement beyond the expiration of the Term, the Engagement will terminate as of the date of the last time recorded to the Engagement.

    5.2. Written Notice. Both the Firm and the Client must provide written notice of any early termination and the reasons for the termination.

    5.3. The Firm may terminate the Engagement only to the extent permitted under the applicable rules of professional conduct. If either the Firm or Client seeks to terminate the Engagement on the grounds that such termination is permitted or required under ABA Model Rule 1.16(a) or (b), or state rules based upon these Model Rules, the part(ies) seeking termination must first convey its concerns in writing to the other part(ies) and must employ its best efforts to remedy or resolve any issue(s) under the rules of professional conduct that might preclude the continuation of the Engagement. If the Firm terminates the Engagement on such grounds, the rebuttable presumption will be that Client will be obligated to pay for the Firm's services only through the date of termination (including any approved unreimbursed Out of Pocket Expenses incurred by the Firm through the date of termination). If the Client terminates the Engagement on such grounds, the rebuttable presumption will be that the Client will be obligated to pay for the Firm's services through the end of the Term (including any approved unreimbursed Out of Pocket Expenses). Any disputes regarding any party's obligation to make or demand payments upon such termination will be resolved in accordance with Section 5.5.

5.4. If Client terminates the Engagement for a reason other than: (1) as set forth in Section 5.3 above; or (2) the Firm's failure to perform Services in accordance with this letter, then such termination will not relieve Client from the obligation to pay for all retainer fees contemplated through the end of the Term as well as fees for any approved Incremental Hourly Services and reimbursement for any approved Out of Pocket Expenses incurred by the Firm up to the date of termination.

5.5. The Firm's inability to perform Services due to an unwaived conflict between clients, will not constitute a "failure to perform Services." Any disputes regarding any party's obligation to make or demand payments upon termination due to unwaived conflict will be resolved in accordance with Section 5.6

5.6. The Parties recognize and acknowledge that fee disputes relating to Sections 5.3 and 5.5 above may occur and that such disputes, should they occur, could result in the spending of considerable resources as well as having a potential negative impact on the reputation of either or both parties. Therefore, the parties have agreed to resolve disputes relating to these sections as provided below.

    5.6.1. In the event of a termination, if any Party disputes the rebuttable presumptions set forth in Sections 5.3 or 5.4 with respect to the payment or non-payment of fees and costs, then such Party must submit a written notice of demand to the other Parties that fairly summarizes the factual and legal grounds of any dispute within 21 days of the date of termination. If no such notice of demand is delivered within 21 days, the presumptions set forth above will be deemed conclusive. If a notice of demand is timely served, then any Party who wishes to contest the notice of demand must serve a written response to such notice within 21 days of receipt of the notice of demand. Such response will fairly summarize the legal and factual basis for contesting the notice of demand. If no such response is timely served, the notice of demand will be deemed undisputed and any objections thereto will be conclusively deemed to be waived.

    5.6.2. If a timely notice of demand and response are served, then the subject matter of any disputes raised therein (whether asserted by or against Parties to this Agreement, or by or against the agents, affiliates, representatives, employees, vendors, owners, contractors, insurers, or attorneys of the Parties) must be resolved by binding confidential arbitration as set forth in this paragraph. Any and all threshold issues of arbitrability, including disputes regarding the arbitrability of any claims or defenses (including disputes regarding whether claims brought by or against a non-party to this Agreement are arbitrable) must also be decided by arbitration. All claims and defenses asserted in the written notice of demand and written response will be adjudicated by a panel of three arbitrators selected from members of the Association of Professional Responsibility Lawyers that have at least 20 years of legal experience. The Firm (or its agents, etc.) will select one arbitrator; the Client(s) (or their agents, etc.) will select another arbitrator, and those two arbitrators will select the third arbitrator. Except as expressly set forth herein, the panel of arbitrators will make

decisions (including entry of an award) based on a majority vote of the panel. The panel will conduct a confidential arbitration proceeding and will enter a written award. The parties to the arbitration will split the costs of arbitration with 50% of the costs being borne by the Firm (or its agents, etc.) and 50% being borne by the Clients (or their agents, etc.). The parties will bear their own fees and costs. The arbitration will be based on written submissions by the parties, and, if deemed necessary by a majority of the panel, oral argument of counsel. The panel will set a briefing schedule for simultaneous opening briefs and simultaneous responses. The parties may submit affidavits and declarations with their submissions, but no evidentiary hearing will be permitted unless the panel unanimously deems it necessary. No discovery will be permitted under any circumstances, and the panel will use its best efforts to conclude any arbitration proceeding and issue an award within 180 days of the panel being named. During the pendency of any arbitration proceeding, the Client(s) will be under no obligation to make any payments to the Firm; provided, however, that if the panel determines that the Client(s) have wrongly withheld payment, the panel may award pre-award interest at the rate of 3% per annum. The parties' rights of confirmation and appeal will be dictated by the Federal Arbitration Act.

5.7. Following termination of the engagement, any otherwise nonpublic information you have supplied to us which is retained by us will be kept confidential.

If this letter correctly reflects your understanding of the terms of the Engagement, please execute the letter below. Digital copy signatures exchanged by e-mail have the same binding effect as original ink signatures.

We appreciate your confidence in the Firm, and we look forward to working with you.


ICE LEGAL, PA


By:_____
           Member/Partner

                                              [*Signature Page Follows*]

| | |
|---|---|
| STRATEGIC FAMILY, INC.<br>(on behalf of the Strategic group of Clients)<br><br>By: _____<br>Name: MARC J LEMBERG<br>Title: GENERAL COUNSEL | |
| HEDGEWICK, LLC<br>(on behalf of itself and the law firms which receive its services)<br><br>By: _____<br>Name: _____<br>Title: _____ | |
| LITIGATION DEFENSE STRATEGIES, LLC<br>(on behalf of itself and the law firms which receive its services)<br><br>By: _____<br>Name: _____<br>Title: _____ | |
| MEC DISTRIBUTION, LLC<br><br>By: _____<br>Name: FRANK DRISCOLL<br>Title: Chief Operating Officer | |

| | |
|---|---|
| **STRATEGIC FAMILY, INC.**<br>(on behalf of the Strategic group of Clients)<br><br>By: _____<br>Name: _____<br>Title: _____ | |
| **HEDGEWICK, LLC**<br>(on behalf of itself and the law firms which receive its services)<br><br>By: *[signature]*<br>Name: *Jason Blust*<br>Title: *Manager* | |
| **LITIGATION DEFENSE STRATEGIES, LLC**<br>(on behalf of itself and the law firms which receive its services)<br><br>By: *[signature]*<br>Name: *Jason Blust*<br>Title: *Manager* | |
| **MEC DISTRIBUTION, LLC**<br><br>By: _____<br>Name: _____<br>Title: _____ | |

**Ice Legal, P.A.**
6586 HYPOLUXO ROAD, SUITE 350, LAKE WORTH, FL 33467 • TELEPHONE (561) 729-0530

# ATTACHMENT A

Clients

Strategic Family, Inc. and its direct and indirectly owned subsidiaries and related entities from time to time, and their directors, members, managers, officers, employees and consultants (collectively "Strategic"), including without limitation:

a) Strategic Financial Solutions, LLC
b) Strategic Client Support, LLC
c) Strategic CS, LLC
d) Strategic CS, Inc.
e) Strategic Consulting, LLC
f) Strategic LD, LLC
g) T Fin, LLC
h) Timberline Financial, LLC
i) Atlas Debt Relief, LLC
j) Anchor Client Services, LLC
k) Boulder Client Services, LLC
l) Canyon Client Services, LLC
m) Heartland Client Services, LLC
n) Rockwell Client Services, LLC
o) Summit Client Services, LLC
p) Versara Lending, LLC
q) Peerform, Inc.

Hedgewick, LLC (or its designee) and all current and future members, managers and employee (collectively, "Hedgewick").

Litigation Defense Strategies, LLC and all current and future members, managers and employees (collectively, "Lit Def Strategies").

All law firms, and their current and future members, managers, partners, employees and attorneys, who receive services from Hedgewick or Lit Def Strategies (each a "Consumer Law Firm"). The Firm represents: (a) it has received and reviewed a list of Hedgewick's and Lit Def Strategies' current clients; and (b) it is not aware of any conflicts with those entities that would preclude the Firm from providing legal advice to (or for the benefit of) those entities or receiving confidential or privileged information from (or regarding) those entities.

The parties understand and acknowledge that: (1) both Hedgewick and Lit Def Strategies provide consulting services to various law firms (and those firms' members, partners, and managers) that represent consumers; (2) the legal services and advice provided by the Firm under this Agreement are intended to benefit not only Hedgewick and Lit Def Strategies, but also Hedgewick's and Lit Def Strategies' present and future clients; and (3) as part of this engagement, the Firm is likely to receive confidential and privileged information relating to the present and future clients of

Hedgewick and Lit Def Strategies. The Firm acknowledges that it has received and reviewed a list of Hedgewick's and Lit Def Strategies' current clients, and that those law firms shall have the status of clients of the Firm. The Firm represents and warrants that it is not aware of any conflicts with those entities that would preclude the Firm from providing legal advice to (or for the benefit of) those entities or receiving confidential or privileged information from (or regarding) those entities. In the event Hedgewick or Lit Def Strategies take on any new clients during the term of this Agreement, they shall provide the Firm with information regarding that new client to allow the Firm to assess the existence of any conflicts prior to the rendition of any legal services for such law firm.

MEC Distribution, LLC and its affiliates, and their directors, managers, officers and employees to the extent the same are acting within the scope of their employment or director roles (collectively, "MEC").

It is understood that for parties (be they entities or individuals) that are not current clients, but in future satisfy the conditions described in this Attachment to become clients (including the creation of a new direct or indirect wholly owned subsidiary or a new Consumer Law Firm), such parties will be deemed additional clients when notified to the Firm and the Firm has had an opportunity to run a prompt and reasonable check to ensure no conflicts of interest exist. In the event the Firm believes there is a conflict of interest between an existing Client and the new client that would require a waiver, the Firm will provide the Client an opportunity to waive any conflict which will be communicated to Firm through the applicable Client Liaison(s). The Clients, as of the date of this letter, acknowledge it is their current intention that any such conflict will be waived for any new client that satisfies the conditions described in this Attachment during the Term.

Client Liaisons

For Strategic:        Strategic Family, Inc's General Counsel, presently Marc Lemberg

For other Clients:    Jason Blust

**ATTACHMENT B**
Scope of Engagement and Fees

SCOPE OF ENGAGEMENT.

1) Advice Regarding Compliance with Consumer Protection and Debt Reduction Laws. Provision of legal advice and counsel with respect to compliance with state and federal laws and regulations ("laws") relating to the marketing, sale and delivery of services to consumer clients relating to debtor rights and the negotiation and resolution of consumer debt. This includes the marketing, sale and delivery of a program or service to renegotiate, settle, or in any way alter the terms of payment or other terms of the debt between a person and one or more unsecured creditors or debt collectors, including, but not limited to, a reduction in the balance, interest rate, or fees owed by a person to an unsecured creditor or debt collector. These include without limitation state consumer protection laws, state debt settlement or debt resolution laws as well as regulations promulgated by the Consumer Finance Protection Bureau, Federal Trade Commission, Federal Reserve and similar laws. This may include the review of forms of agreements with and disclosures to consumers, review of Client operations, procedures and policies and the development and delivery of training materials for Client staff.

2) Advice Regarding Compliance with Bar Ethics Rules and Rules of Professional Conduct. Provision of legal advice and counsel with respect to compliance with applicable rules of professional conduct and similar regulations governing the practice of law and the required supervision by lawyers of non-lawyer professionals incidental to the practice of law. This may include the review of forms of agreements with and disclosures to consumer clients, review of Client operations, procedures and policies and the development and delivery of training materials for Client staff.

3) Regulatory Investigations. Providing advice, counsel and support in Client's response to investigative demands, inquiries or enforcement actions brought by or on behalf of state or federal regulators or bar regulators arising out or related to the scope of services described in items 1 and 2 above.

4) Client recognizes that the Firm's principals are not admitted to practice in all fifty states, but rather, are presently admitted in thirty-three states and the District of Columbia. The scope of representation, particularly with respect to multi-jurisdictional practice, will be in accordance with applicable rules of professional conduct of these jurisdictions.

In all matters, the Firm may act as primary counsel or supporting counsel advising the Clients' primary litigation or regulatory outside counsel or in-house counsel, as directed by the Client.

The Firm's primary point of contact, instruction and approvals will be the Client Liaisons or such individuals as the Client Liaisons may advise in writing from time to time.

FEES

The Fees described herein are a "true" or "classic" retainer that secures the Firm's availability for each year during the Term for the maximum number of hours described below and are earned upon receipt. There is no requirement that the Firm spend the number of hours below during any year or in total; rather the numbers below represents caps.

| Year | Retainer Fee | When Retainer Fee is Paid | Maximum Hours | Incremental Hourly Services Rate |
|---|---|---|---|---|
| 2021 | $1,000,000 | $500,000 upon signing<br>$250,000 by July 15<br>$250,000 by November 15 | 700 | $500/hour for Thomas Ice and Ariane Ice |
| 2022 | $1,000,000 | $250,000 by February 15<br>$250,000 by April 15<br>$250,000 by July 15<br>$250,000 by November 15 | 500 | May be adjusted per agreement |
| 2023 | $625,000 | $156,250 by February 15<br>$156,250 by April 15<br>$156,250 by July 15<br>$156,250 by November 15 | 200 | May be adjusted per agreement |
| 2024 | $625,000 | $156,250 by February 15<br>$156,250 by April 15<br>$156,250 by July 15<br>$156,250 by November 15 | 50 | May be adjusted per agreement |