UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| THOMAS W. MCNAMARA, as the Court-Appointed Receiver for StratFS, LLC (f/k/a Strategic Financial Solutions, LLC); et al., <br><br> Plaintiff, <br><br> vs. <br><br> ICE LEGAL, P.A., a Florida Profit Corporation, THOMAS ICE, an individual, and ARIANE ICE, an individual, <br><br> Defendants. | Case No. 1:25-cv-00275-EAW <br><br> Related Cases: <br> *Consumer Financial Protection Bureau, et al. v. StratFS, LLC, et al.* <br> Western District of New York <br> Case No. 1:24-cv-00040-EAW-MJR <br><br> *McNamara v. Monevo Inc.* <br> Western District of New York <br> Case No. 1:24-cv-00977-EAW |

**RECEIVER'S OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ...................................................................................................................... 1

I.      ARGUMENT ................................................................................................................. 2

      A.      The Court Has Ancillary Jurisdiction Over the Receiver's Third-Party Actions ................................................................................................................ 2

      B.      The Receiver Has Standing to Pursue Damages Including For Amounts Paid to Defendants under the Engagement Agreement and Litigation and Receivership Costs ................................................................................................ 3

      C.      The Receiver Has Standing to Sue on Behalf of Hedgewick Consulting, LLC and Lit Def Strategies, LLC ............................................................................ 4

      D.      The Receiver Has Standing to Sue on Behalf of Hedgewick Consulting, LLC because the Receiver Designated It as a Receivership Defendant Under the Preliminary Injunction ...................................................................... 5

      E.      *Wagoner* is Inapplicable to the Receiver's Claims ........................................... 7

      F.      The Receiver Has Standing Regarding Voidable or Fraudulent Transfers........... 14

      G.      The Receiver Is Only Bringing Claims on Behalf of Receivership Defendants ............................................................................................................ 16

II.      CONCLUSION ............................................................................................................. 16

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Armstrong v. Collins*,
2010 WL 1141158 (S.D.N.Y. Mar. 24, 2010) ....................................................... 15

*Baliga v. Link Motion, Inc.*,
2022 WL 6091994 (S.D.N.Y. Oct. 7, 2022) ..................................................... 2, 3

*Carney v. Montes*,
2014 WL 671263 (D. Conn. Feb. 21, 2014) ........................................................ 15

*Donell v. Kowell*,
533 F.3d 762 (9th Cir. 2008) ............................................................................ 16

*FTC v. Campbell Cap. LLC*,
2018 WL 5781458 (W.D.N.Y. Oct. 24, 2018) ...................................................... 6

*In re Lafayette Radio Elecs. Cor*p.,
761 F.2d 84 (2d Cir. 1985) ................................................................................. 3

*In re Lawrence*,
24 N.Y.3d 320 (2014) ....................................................................................... 14

*Levisohn, Lerner, Berger & Langsam v. Med. Taping Sys., Inc.*,
20 F. Supp. 2d 645 (S.D.N.Y. 1998) ................................................................. 13

*Matter of Cooperman*,
83 N.Y.S.2d 465 (1994) ..................................................................................... 14

*Riehle v. Margolies*,
279 U.S. 218 (1929) ............................................................................................ 2

*Saba Cap. Cef Opportunities 1, Ltd. v. Nuveen Floating Rate Income Fund*,
88 F.4th 103 (2d Cir. 2023) ................................................................................. 4

*Shaw v. Manufacturers Hanover Trust Co.*,
68 NY.2d 172 (1986) ........................................................................................ 14

*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014) ............................................................................................ 4

*Texas & P. Ry. Co. v. Pottorff*,
291 U.S. 245,
54 S. Ct. 416 (1934) .......................................................................................... 15

*U.S. Small Bus. Admin. v. Ameritrans Holdings, LLC*,
2021 WL 7908051 (E.D.N.Y. June 15, 2021),
report and recommendation adopted, 2024 WL 704621 (E.D.N.Y. Feb. 21, 2024) ............ 15

**Rules**

ABA Model Rule 5.6 ............................................................................................................. 1, 13

New York Rule of Professional Conduct 5.6 ....................................................................... 1, 9, 13

## INTRODUCTION

Defendants  Ice Legal, P.A., Thomas Ice, and Ariane Ice (collectively "Ice Legal" or "Defendants") claim the Court lacks subject matter jurisdiction over this case based on a laundry list of nine separate argument (*see* Dkt. No. 31-1, at 2-25, Sections II-X).  None of the arguments has merit.

The Receiver has standing to pursue claims to recover from Ice Legal.  As alleged, as a condition of settling a series of consumer cases brought by Ice Legal, the firm agreed to switch sides and represent Strategic and related entities and entered into an Ice Legal Engagement Agreement that prevented the firm from representing consumers asserting claims against Strategic (or any person or entity remotely related to Strategic's debt relief enterprise) going forward.  Ice Legal , as licensed attorneys, were unambiguously prohibited from entering into an agreement which barred them from filing claims on behalf of new parties against a settling opponent: such an agreement is unlawful under New York Law (New York Rule of Professional Conduct 5.6). As alleged in the First Amended Complaint ("FAC") and uncontradicted, Ice Legal was aware of this prohibition and nevertheless violated it, by purposely structuring its Engagement Agreement to evade the restrictions of ABA Model Rule 5.6 and New York Rule of Professional Conduct 5.6.  *See* FAC ¶¶ 242-243.  The Engagement Agreement contained numerous unlawful provisions and was rife with obvious conflicts of interest but, crucial to the firm, it also included outrageously rich payment terms by which Ice Legal received millions of dollars in guaranteed payments, which the firm improperly described as nonrefundable, earned-on-receipt "retainer fees" for legal consulting services.  Under the law, Defendants were required to earn their fees, which had to be reasonable.  In other words, if they performed work, they could be paid the value of those services on a quantum meruit basis.  Ice Legal ultimately performed approximately 60 hours of work over a three-year period.  Nevertheless, the firm

received $2.625 million (which equated on an hourly basis to more than $40,000 per hour).  FAC

¶¶ 8, 13.[1]

I.    **ARGUMENT**

    A.    **The Court Has Ancillary Jurisdiction Over the Receiver's Third-Party Actions**

       Ice Legal primarily argues the Receiver lacks ancillary jurisdiction to pursue this matter.

*See* Dkt. No. 31-1 at 4-12.  The Supreme Court has said otherwise, and Defendants' argument

contorts well-established law that courts have ancillary jurisdiction over claims brought by

federal equity receivers.  "The appointment of a receiver of a debtor's property by a federal court

confers upon it, regardless of citizenship and of the amount in controversy, federal jurisdiction to

decide all questions incident to the preservation, collection, and distribution of the assets. It may

do this either in the original suit… or by ancillary proceedings[.]"  *Riehle v. Margolies*, 279 U.S.

218, 223 (1929).  This Court's ancillary jurisdiction arises from its authority to effectuate the

Preliminary Injunction in the Main Case.  *See, e.g., Baliga v. Link Motion, Inc.*, 2022 WL

6091994, at *2 (S.D.N.Y. Oct. 7, 2022) ("the Court's ancillary jurisdiction derives mainly from

---

[1] As alleged, the vast majority of the Strategic and related entities' "clients" were "clients" on paper and were not actually represented by the Defendants in any meaningful respect.  FAC ¶¶ 8, 240 & 243.  Most of the purported "clients" under the Engagement Agreement are in fact the unnamed "members, managers, and employees" of innumerable Strategic-related entities.  *See* Dkt. No. 24-1 at 9 (Engagement Agreement, "Attachment A").  In reality, of course, and as alleged, Defendants had no idea who their "clients" were under the Engagement Agreement, never spoke to most of them, and importantly, never received conflicts waivers from any of them.  The Engagement Agreement was unlawful – as many the people and entities had obvious conflicts of interest with one another.  FAC ¶¶ 93-94.  Defendants expressly discussed some of these conflicts (in Ice Legal's own words, "inherent conflicts") in a April 19, 2021 "initial outline" of legal issues, which they sent to Jason Blust and Strategic's general counsel.  FAC ¶ 95.  Despite this recognition of the issues, Ice Legal misrepresented that they were not "aware of any conflicts of interests among the clients" in the Engagement Letter entered a short time before and never obtained the necessary conflict waivers.  FAC ¶¶ 91-92.

its authority to manage its proceedings and effectuate its previous orders, including the Receiver

Order, the R&R, and the D&O").

Here, the Preliminary Injunction directs and authorizes the Receiver to pursue third-party

claims on behalf of the Receivership Entities. *See* PI § IX.L. Courts have ancillary jurisdiction

to effectuate their own orders (*see Baliga,* 2022 WL 6091994, at *2), and there is little need to

engage on Defendants' protracted arguments regarding supplemental jurisdiction and ancillary

jurisdiction. *Id.; cf. In re Lafayette Radio Elecs. Cor*p., 761 F.2d 84, 92-93 (2d Cir. 1985) (Court

with authority to enter an order "necessarily has ancillary … jurisdiction to enter orders and

judgments designated to effectuate that decree.").

Ice Legal incredibly argues that this action does not share a "***common nucleus of***

***operative fact***" with the Main Case. Dkt No. 31-1 at 14-15 (emphasis added). But Defendants

talk out of both sides of their mouth on this point: they filed a Motion to Intervene in the Main

Case, premised, in part, on the fact that this action "shares with the main action ***a common***

***question of law or fact***[.]" Dkt. No. 680-1 (Emphasis added). Defendants' arguments here

cannot be credited.[2]

## B. The Receiver Has Standing to Pursue Damages Including For Amounts Paid to Defendants under the Engagement Agreement and Litigation and Receivership Costs

The Receiver has standing to pursue damages for harm caused to the Receivership

Entities who were Ice Legal clients. In addition to the amounts paid to Ice Legal under the

Engagement Agreement, the Receiver is seeking as damages "the costs of defending and

---

[2] While Defendants offer several additional arguments attempting to attack extending ancillary jurisdiction to claims by federal receivers (*see* Dkt. No. 31-1 at 16-20), these are largely dressed-up attempts to claim somehow that the Receiver cannot meet the "common nucleus of operative fact" test, a contention which does not pass the straight-face test in light of the allegations and Ice Legal's admission elsewhere that it does.

participating in the actions brought by the federal and state regulators (including the resulting receivership)."  FAC ¶ 227.

Defendants argue that the Receiver lacks standing because his damages are uncertain.  To the contrary, the excessive fees paid to Ice Legal are certain – $2.625 million.  Other damages are certain as well.  Ice Legal attempts to paint the other damages as purely "contingent" future damages; they are not.  Indeed, significant and certain damages have been suffered by the Receivership Entities in having to defend the Main Case and receivership costs incurred to date.  Ice Legal's arguments go to the quantum of the Receiver's damages, not standing to proceed.

Ice Legal is wrong on the law on this point, too.  The Second Circuit permits an assertion of future damages if there is a "substantial risk that the harm will occur."  *Saba Cap. Cef Opportunities 1, Ltd. v. Nuveen Floating Rate Income Fund*, 88 F.4th 103, 111 (2d Cir. 2023).  "[T]he standing requirement does not uniformly require plaintiffs to demonstrate that it is literally certain that the harms they identify will come about... Rather, an allegation of future injury is sufficient where the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur."  *Id.* (citing S*usan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)).  Given that the Court, in the Main Case, has already found that "plaintiffs are likely to succeed on the merits of their claim that defendants are charging and receiving advance fees in violation of the TSR, and that the face-to-face exception does not apply" (Dkt. No. 183 at 8), there is no doubt that a "substantial risk" of additional damages exists here.

## C.    The Receiver Has Standing to Sue on Behalf of Hedgewick Consulting, LLC and Lit Def Strategies, LLC

Defendants next argue that the Receiver lacks standing to sue on behalf of Receivership Entities Hedgewick Consulting, LLC and Lit Def Strategies, LLC, *making the factual claim* that

these entities are different from the "Hedgewick, LLC" and "Litigation Defense Strategies, LLC." Dkt. No. 31-1, at 22-23. This argument is frivolous.

The Receiver alleges the obvious: that the "Hedgewick, LLC" and "Litigation Defense Strategies, LLC" named on the Engagement Agreement are Receivership clients, specifically Hedgewick Consulting, LLC and Lit Def Strategies, LLC. *See, e.g.*, FAC ¶¶ 6, 15, 30. Defendants provide no evidence at all to support their specious claim that "Hedgewick, LLC" and "Litigation Defense Strategies, LLC" are entities separate and distinct from Hedgewick Consulting, LLC and Lit Def Strategies, LLC.

Ice Legal cannot with a straight face deny that its clients (whose signing representative in the Engagement Agreement was Jason Blust) are not the Receivership Entities Lit Def Strategies, LLC and Hedgewick Consulting. Ice Legal's gamesmanship on this score is highlighted by Mr. Ice's outreach to the Receiver in May of 2024, demanding the Receiver pay (ahead of all other creditors, including any potential consumer victims) the firm's unpaid invoices of clients "Strategic Family, Inc., Hedgewick, LLC, Litigation Defense, Strategies, LLC, and MEC Distribution, LLC." *See* FAC ¶¶194-196.

Moreover, Ice Legal's argument is based on an impermissible attempt to argue facts at the pleadings stage. Ultimately, if Ice Legal wishes to pursue this tact, they will have their opportunity to prove that claim that "Hedgewick, LLC" and "Litigation Defense Strategies, LLC" are distinct from "Hedgewick, Consulting LLC" and "Lit Defense Strategies, LLC." But this is not a jurisdictional issue.

### D. The Receiver Has Standing to Sue on Behalf of Hedgewick Consulting, LLC because the Receiver Designated It as a Receivership Defendant Under the Preliminary Injunction

Ice Legal's next argument – that the Receiver specifically lacks standing as to Hedgewick (Dkt. No. 31-1 at 24-25) fares no better. Defendants piggyback on the unsuccessful argument

made in the Main Case by Fidelis Legal Support Services, LLC ("Fidelis"), and The Bush Lake

Trust ("Bush Lake Trust").  Fidelis and Bush Lake Trust argued that parties in the Main Case

cannot be "Receivership Defendants" under the PI if they were added to the receivership

pursuant to Section 9(N) of the Preliminary Injunction.  Dkt. No. 31-1 at 16-17.

       According to Ice Legal, the provision allowing the Receiver to name new companies as

Receivership Defendants is unlawful, because it "subjects a party to a preliminary injunction

without the normal due process protections required for such orders."  Dkt. No. 31-1 at 24-25.

The Court in the Main Case has rejected this argument on numerous occasions.  *See, e.g.*, Main

Case Dkt. No. 692 at 12-17.  The provision allowing the Receiver to add new Receivership

Defendants is a standard one routinely approved by Courts in this district and beyond.  *See, e.g.,*

*FTC v. Campbell Cap. LLC,* 2018 WL 5781458, at *4-5 (W.D.N.Y. Oct. 24, 2018); *FTC v. 4*

*Star Resol. LLC*, No. 15-cv-112S (W.D.N.Y. Feb. 10, 2015), Dkt. No. 29; *FTC v. Vantage Point*

*Servs., LLC*, No. 15-cv-0006S (W.D.N.Y. Jan. 5, 2015), Dkt. No. 11; *FTC v. Graham*, No. 3:22-

cv-00655-MMH-JBT (M.D. Fla, July 15, 2022).  It simply allows the Receiver to carry out

court-ordered duties, which include safeguarding and recovering assets belonging to the

Receivership Estate.[3]

---

[3] Were the Court to embrace the arguments that Ice Legal makes, the Receiver would not have
been able to recover millions of dollars that Fidelis and related parties had attempted to hide
from the parties, Court, and Receiver and intentionally kept out of the Receivership Estate.  *See*,
*e.g.*, Dkt. No. 730 at 15-16 (Court in the *Main Case* holding that "Blust and Christo created
Fidelis as a secret successor to Lit Def.  (Dkt. No. 646; Dkt. No. 692, pgs. 3-4.)  After the TRO
was entered, and through entry of the PI, Blust and Christo schemed to hide Fidelis, an asset of
the receivership estate, from both the Receiver and the Court. *(Id.)* Between July 2021 and 2025,
Fidelis transferred over $37 million to Bush Lake, BDC Group, Two Square, and Veteris, each
of which are controlled, in whole or in part, by Christo.  (Dkt. No. 692, pgs. 7-11.)  In particular,
at least $14 million dollars of apparent debt-relief proceeds were transferred by Fidelis to Bush
Lake and other movants almost immediately after this lawsuit began and the TRO was entered.
*(Id.)*  As this Court previously recognized, the record here strongly suggests that these funds

With respect to Hedgewick, Defendants also parrot another unsuccessful argument made by Fidelis and the Bush Lake Trust, to the effect that parties in the Main Case cannot be Receivership Defendants if they were added to the receivership pursuant to Section 9(N) of the Preliminary Injunction.  Dkt. No. 31-1.  The Court considered and rejected this argument:

> Bush Lake also argues, incorrectly, that a party to the lawsuit cannot be named as a receivership defendant under the Pl. Bush Lake seems to conflate the definition of "Receivership Defendant" pursuant to Section 9(N) of the Pl, which has no exclusion for an entity subsequently named as a party in the lawsuit, and Section IX(S) of the Pl, which instructs the Receiver to provide notice to non-parties named as receivership defendants and permits non-parties to challenge such designation in court.  The Court does not read these two provisions, either together or separately, as indicating that a party to the lawsuit may not also be designated a receivership defendant.

Main Case, Dkt. No. 14, n.14.  Despite this ruling (which came out on May 22, 2025), Defendants (in its June 4, 2025 filing) called the Receiver's position that Hedgewick is a Receivership Defendant "patently frivolous."  Dkt. No. 31-1, at 25.  Ice Legal is wrong.

### E. *Wagoner* is Inapplicable to the Receiver's Claims

Ice Legal next argues that altogether *Shearson Lehman Hutton, Inc. v. Wagoner,* 944 F.2d 114 (2d Cir. 1991), eliminates standing, "[b]ecause the Receiver's Claimants were complicit in all the purported wrongdoing they allege against Ice Legal…."  Dkt. No. 31-1 at 11.  But Ice Legal's reliance on *Wagoner* is misplaced.  The conduct at issue is indeed Ice Legal's: Ice Legal drafted a conflict-riddled illegal engagement agreement (on Ice Legal letterhead and signed by partner Thomas Ice); that engagement agreement falsely claimed there were no conflicts of interests among the clients; Ice Legal breached their fiduciary duties to their clients; Ice Legal opportunistically sought, charged, and received unearned and excessive fees; Ice Legal prohibited the clients from terminating the agreement, and the like.

---

were transferred in order to divert assets of defendants' debt-relief operation which otherwise would have been subject to receivership and the asset-freeze.").

In claiming that the Receivership Defendants "instigated and participated in" the purported wrongdoing, Defendants misstate the actual allegations in the FAC, and omit numerous allegations relevant to these issues. *See* Dkt. No. 31-1 at 26-27. The allegations make crystal clear that the requested recovery is based on the *attorneys' own conduct, their own negligence, and their breaches of their obligations to their clients.* As alleged in the FAC, the heart of this case rests on the Ice Legal Engagement Agreement, under which Ice Legal received excessive and unreasonable fees in violation of New York Law. These fees were purported to be earned on receipt and non-refundable. The Engagement Agreement contained numerous illegal provisions, including an unlawful termination provision, which restricted the clients' sacrosanct ability to terminate, a "conflicts provision" which failed to apprise clients of other known clients, misrepresentations by Ice Legal that it was aware of no conflicts when Ice Legal knew otherwise (having specifically identified "inherent conflicts"), and falsely claimed that all clients had agreed to waive conflicts, when Defendants were aware that just four clients had signed the Agreement. *See*, *e.g.*, FAC ¶¶ 107, 109-115, 141 & 145-149.

The allegations focus on Ice Legal's actions towards their many clients and the overly complex joint client relationship rife with conflicts of interest. Further, Ice Legal's conduct also extended to providing negligent, deficient, and ultimately almost non-existent legal advice to their clients while happily charging and accepting excessive and unreasonable $2.6 million in fees. All told, as alleged in the FAC and uncontroverted, Ice Legal performed a total of approximately 60 hours of work, earning what equated to more than $40,000 per hour. FAC ¶ 113. As alleged, Defendants actually performed *zero* work for more than two years of the agreement, but kept invoicing and were paid $1.625 million over that period alone. FAC ¶ 118.

Tellingly, Defendants' motions gloss over the allegations that the Ice Legal Engagement Agreement is void because it was purposely structured to evade the restrictions of New York Rule of Professional Conduct 5.6, which prohibits attorneys from restricting their future legal practice in connection with settlements. *See* FAC ¶¶ 10, 233 & ¶¶ 242-243. But, as the allegations make clear, Ice Legal improperly decided – while representing consumers against Strategic and related parties – to link the consumer settlement discussions to a future "consulting agreement" with Strategic and related parties.[4] Indeed, as alleged, Ice Legal quickly settled the claims of the last group of consumers at less than a third the amount they settled the claims of earlier consumers. FAC ¶¶ 54-59. And they settled the last consumer claims just before launching discussions with Strategic and related entities, where the law firm proposed taking an equity stake in a Strategic – a company Ice Legal had just alleged was a RICO enterprise. FAC ¶¶ 67-68. And, as alleged, before all the last consumer settlements had been finalized, Defendants reached out to counsel for Strategic, urging him to begin negotiating their consulting agreement; counsel for Strategic had to inform Defendant Ariane Ice that those discussions could not formally begin until the consumer settlements were finalized. FAC ¶¶ 60-61.

As discussed above, Defendants proceeded to seek and enter the illegal Ice Legal Engagement Agreement containing unlawful provisions and an impermissible earned-on-receipt advance fee provision. Nevertheless, Ice Legal argues for dismissal on the grounds that the Receiver's "Claimants instigated and participated" in drafting the unlawful Engagement Agreement with them. Dkt. No. 31-1, at 26-28. But, again, Defendants disregard what has

---

[4] For example, the FAC alleges that while negotiating settlement of Ice Legal's consumer claims, "counsel representing Strategic and related entities raised the possibility of having Defendants execute an affidavit that would restrict their ability to represent consumers against Strategic going forward." FAC ¶ 49. Thomas Ice acknowledged that doing so would be unethical, but as a work-around instead expressed an interest in becoming Strategic's counsel.

actually been alleged and instead argue facts of their choosing instead.  Responsibility for the unlawful Ice Legal Engagement Agreement, as discussed above, rests squarely with the attorneys – Ice Legal.  It is the responsibility of the lawyers to identify and resolve conflicts of interest for their clients; Ice Legal did the opposite here. FAC ¶¶ 90-94.

As alleged, Ice Legal was aware Strategic and related parties would not settle consumer cases without some guarantee that Ice Legal would stop filing the claims.  Defendants enthusiastically advocated a solution by which they would act as "consultants" and demanded the Ice Legal Engagement Agreement include an unlawful "true retainer" or "classic retainer" earned-on-receipt provision, which ensured their full payment if the clients wanted to terminate the  agreement.  In other words, Ice Legal fashioned an Engagement Agreement in which it received full payment regardless.

In fact, as the FAC makes clear when Strategic's General Counsel Marc Lemberg sent a draft with a provision that would have required Ice Legal to earn its fees as it worked; Ice Legal revised the provision to specifically add the perfunctory provision it wanted that purported to make the fees for service earned on receipt.  FAC ¶¶ 103-106. Specifically, the language General Counsel Lemberg drafted proposed paying Defendants via a "fixed annual fee retainer which will be applied against a maximum annual number of hours of Services provided by Thomas Erskine Ice or Ariane Ice[.]"  FAC ¶ 105.  Instead, Ice Legal "revised this language to make these fees nonrefundable by stating that all of the fees would be considered a 'true' or 'classic' retainer[.]"  FAC ¶ 106.  This allegation alone makes clear, contrary to their claims otherwise, that Ice Legal aggressively drove the negotiations and were the ones who advocated for and

insisted on having fees for performing services that were (unlawfully) nonrefundable and threatened more consumer litigation if Ice Legal did not get the financial terms they demanded.[5]

But, when Ice Legal describes these allegations in their Motion, they claim only that "the Claimants—through Strategic's General Counsel—proposed the fee structure."  (Dkt. No. 31-1 at 26.)  What they do not mention is that Defendants, as alleged, drove the process, insisting on the unlawful, earned on-receipt fee structure in the final agreement.  This is once again a fact dispute inappropriate for resolution at this stage.

*Wagoner* is inapplicable here in light of the facts involving the illegal Engagement Agreement at the heart of this case.  When entering into that Engagement Agreement, which was on Ice Legal's letterhead and signed by Thomas Ice (Dkt. No. 24-1 at 6), it was Ice Legal who had heightened obligations to its clients under the New York Rules of Professional Conduct.  Attorneys are indeed required to comply with ethical obligations towards clients, even sophisticated ones.  As set forth in *Matter of Cooperman*, 83 N.Y.2d 465, 472, 633 N.E.2d 1069, 1071 (1994), "[t]he attorney's obligations, therefore, transcend those prevailing in the

---

[5] While negotiating their consumer clients' claims, Defendants repeatedly pressed Strategic and related parties about the proposed relationship.  For example:

> While Defendants were "in the midst of finalizing the November 2020 settlements for clients, Ariane Ice conveyed to a representative of Strategic and related parties that she was expecting someone from Strategic to reach out to Defendants about the proposed consulting agreement and wondered if that would be happening soon" (FAC ¶ 60).

On December 4, 2020, Ariane Ice wrote to Strategic: "Given the nature of the proposed role you outlined yesterday, we feel we must now take steps to remain 'non-adverse' to [the Strategic Parties] until these negotiations [concerning the proposed engagement] conclude… We ask that we move toward conclusion of these discussions (one way or the other) very quickly."  FAC ¶ 63.  On December 18, 2020, Ariane Ice wrote to counsel for Strategic and related parties: "we really need to finalize these discussions. Can we jump on a call?"  FAC ¶ 65.  During a subsequent call, Ice Legal threatened to bring "100 suits per year" against Strategic and related parties if they did not agree to Ice Legal's financial terms.  *Id.*

commercial market place … The duty to deal fairly, honestly and with undivided loyalty superimposes onto the attorney-client relationship a set of special and unique duties, including maintaining confidentiality, avoiding conflicts of interest, operating competently, safeguarding client property and honoring the clients' interests over the lawyer's[.]" *Id.* The *Cooperman* Court specifically held that "attorney-client fee agreements are a matter of special concern to the courts and are enforceable and affected by lofty principles different from those applicable to commonplace commercial contracts." *Id.*

Ice Legal were fiduciaries owing fiduciary obligations to all of their clients. And it was Ice Legal who is alleged to have *breached their fiduciary duties* in numerous ways. *See, e.g.*, FAC ¶¶ 210-216 (discussing all of the fiduciary duties owed by Ice Legal to its clients); *id.* ¶ 214 ("Defendants further breached their fiduciary duties by proposing and entering into a fee arrangement that included nonrefundable advance fees not permitted under the law, failing to identify and remedy obvious conflicts of interest at the time of the Engagement Agreement and throughout the relationship, failing to advise their clients under the Engagement Agreement of such conflicts of interest between them or secure conflict waivers where permissible, directly impinging on their clients' absolute right to discharge their attorney, and requiring their clients to pay all fees through the end of the contract's term in the event of certain termination events under the Engagement Agreement; *id.* FAC ¶ 119; *id.* ¶ 137.

Tellingly, Ice Legal glosses over the allegations of its heightened duties to its clients. But under such circumstances, Courts routinely permit receivers' standing to sue for these harms to the receivership entities – and *Wagoner* says nothing to the contrary.

Indeed, New York recognizes numerous claims under the circumstances, including for breach of fiduciary duties and rescission count. *See, e.g., Levisohn, Lerner*, *Berger & Langsam*

*v. Med. Taping Sys., Inc.*, 20 F. Supp. 2d 645, 650 (S.D.N.Y. 1998) ("*Under New York law, a client has an affirmative cause of action for rescission of an invalid retainer agreement and restitution or recoupment of legal fees paid in excess of the reasonable amount due to the attorney for services actually rendered.*").

Ice Legal can take no comfort in the fact that there are allegations that Strategic and related entities drafted language included in the Engagement Agreement, given Ice Legal's ultimate responsibility for all of the contents of its Engagement Agreement, which it had a fiduciary responsibility under the ethical rules to ensure was compliant with the Rules of Professional Conduct. *Wagoner,* which dealt with claims about defrauding a company with the cooperation of management, 944 F.2d 114 at 120 (which is not alleged here), was not intended to deprive equity receivers of standing for these types of claims and to absolve attorneys of their ethical obligations and fiduciary duties in circumstances like the ones we have here.

Finally, as to the rescission count (Count 3), the Ice Legal Engagement Agreement is unenforceable and void as against public policy entirely because of *Ice Legal's* violations of rules governing their conduct as attorneys. *See, e.g.*, FAC ¶¶ 232-33 (the agreement arose in the context of, and was part of, settlement discussions between Defendants and Strategic, Lit Def, Hedgewick, and related entities regarding Defendants' consumer clients, and was therefore prohibited by ABA Model Rule 5.6 and New York Rule of Professional Conduct 5.6); FAC ¶¶ 234-35 (the Engagement Agreement involved a nonrefundable advance fee, which is *per se* unenforceable, void, and unlawful under New York law); FAC ¶ 238 (the Engagement Agreement improperly limited the clients' ability to terminate Defendants at will); FAC ¶ 240 (the Engagement Agreement improperly made hundreds or even thousands of "clients" having myriad unresolvable and unwaived conflicts between them, and, further, falsely stated

Defendants were not aware of such conflicts); FAC ¶ 243 (Defendants unlawfully charged an unreasonable and excessive fee). These allegations, among others, assert breaches of obligations falling squarely on *Defendants* as attorneys, not on their clients.

After all, there is no rule prohibiting a *client* from agreeing to pay an unconscionable fee, for example, or from agreeing to joint representation despite undisclosed or unwaived conflicts of interest, or from impermissibly tying agreeing to restrict an attorney's practice in the context of a settlement. The obligations not to do so are specifically the obligations of the *attorneys* – Ice Legal –who are prohibited from such conduct. *See*, *e.g.*, *Matter of Cooperman*, 83 N.Y.S.2d 465, 472 (1994); *In re Lawrence*, 24 N.Y.3d 320, 336 (2014) ("Courts 'give particular scrutiny to fee arrangements between attorneys and clients,' placing the burden on attorneys to show the retainer agreement is 'fair, reasonable, and fully known and understood by their clients.'") (quoting *Shaw v. Manufacturers Hanover Trust Co.*, 68 NY.2d 172, 176 (1986)).

**F.    The Receiver Has Standing Regarding Voidable or Fraudulent Transfers**

Ice Legal argues the Receiver lacks standing to pursue voidable or fraudulent transfer claims because the words "including but not limited to, actions challenging fraudulent or voidable transfers" do not appear on in the Preliminary Injunction. Dkt. No. 31-1 at 29. This argument defies basic rules of grammar. The Preliminary Injunction expressly directs and authorizes the Receiver to "Institute, compromise, adjust, appear in, intervene in, or become party to such actions or proceedings in state, federal, or foreign courts that the Receiver deems necessary and advisable to preserve or recover the Assets of the Receivership Defendants, or that the Receiver deems necessary and advisable to carry out the Receiver's mandate under this Order[.]" PI § IX.L. Such "actions and proceedings" clearly encompass actions to recover fraudulently or otherwise voidably transferred funds. There is no restriction as to the types of claims they can bring.

Nevertheless, Defendants argue that, "Among the seven most recent McNamara-receivership cases that he has catalogued on his website, this case is the only one in which the words 'including but not limited to, actions challenging fraudulent or voidable transfers' do not appear in the order appointing the receiver."  Dkt. No. 31-1 at 29.  The fact that other Preliminary Injunctions, in other courts, in other cases where the Receiver was appointed as receiver specifically identify "fraudulent transfers" as one of the types of claims he is authorized to institute says nothing about the contours of *this* Preliminary Injunction, which does not have any exclusions.

Defendants' argument also shows a lack of familiarity with the purpose and role of an equity receiver.  *See also Texas & P. Ry. Co. v. Pottorff*, 291 U.S. 245, 261, 54 S. Ct. 416, 420 (1934) ("It is the duty of the receiver of an insolvent corporation to take steps to set aside transactions which fraudulently or illegally reduce the assets available for the general creditors, even though the corporation itself was not in a position to do so.")"

Defendants also argue that the Receiver lacks standing to bring these claims because the Receivership Defendants he represents "are not creditors."  Dkt. No. 31-1, at 29.  Not so.  The Receivership Entities that made the payments to Defendants – Strategic, Lit Def, and Hedgewick – are themselves the creditors for purposes of the Receiver's Voidable of Fraudulent Transfer cause of action (Count 4).  *U.S. Small Bus. Admin. v. Ameritrans Holdings, LLC*, 2021 WL 7908051, at *8 (E.D.N.Y. June 15, 2021), report and recommendation adopted, 2024 WL 704621 (E.D.N.Y. Feb. 21, 2024) (under Second Circuit law, "receiver appointed to recover assets for the receivership entity ... has standing to bring claims on the corporation's behalf' to recover the fraudulently transferred funds."); *Armstrong v. Collins*, 2010 WL 1141158, at *33 (S.D.N.Y. Mar. 24, 2010) (receivership entities are creditors for purposes of recovering

fraudulent transfers); *see also Donell v. Kowell*, 533 F.3d 762, 777 (9th Cir. 2008) ("The Receiver has standing to bring this suit because, although the losing investors will ultimately benefit from the asset recovery, the Receiver is in fact suing to redress injuries that [receivership entity] Wallenbrock suffered when its managers caused Wallenbrock to commit waste and fraud").  Here, under established New York law, the Receivership Entities that were caused to pay the funds – Strategic, Lit Def, and Hedgewick – are creditors for purposes of recovering those voidable or fraudulent transfers.

**G.    The Receiver Is Only Bringing Claims on Behalf of Receivership Defendants**

Finally, Defendants confusingly claim that the Receiver "is undeniably trying to bring claims that only partially belong to his Claimants."  Dkt. No. 31-1 at 31.  The Receiver is unclear where Defendants have gotten this idea, but to be clear, the Receiver is only bringing claims and seeking damages on behalf of Receivership Defendants.

**II.    CONCLUSION**

For the foregoing reasons, Defendants' motion to dismiss for lack of subject matter jurisdiction should be denied in its entirety.

Dated: July 3, 2025

> **HODGSON RUSS LLP**
>
> By:    */s/ James C. Thoman*
> James C. Thoman, Esq.
> 140 Pearl Street, Suite 100
> Buffalo, New York 14202
> Telephone:  (716) 856-4000
> Facsimile:  (716) 849-0349
> Email:  jthoman@hodgsonruss.com
>
> **MCNAMARA SMITH LLP**
>
> By:    */s/ Logan D. Smith*
> Logan D. Smith  (*Pro Hac Vice*)

Alexander D. Wall (*Pro Hac Vice*)
McNamara Smith LLP
655 West Broadway, Suite 900
San Diego, California 92101
Telephone:  (619) 269-0400
Facsimile:  (619) 269-0401
Email:  lsmith@mcnamarallp.com;
awall@mcnamarallp.com

*Attorneys for Plaintiff Court-appointed Receiver,*
*Thomas W. McNamara*